1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3      HONORABLE ANDRÉ BIROTTE JR., U.S. DISTRICT JUDGE

4

5   MICHAEL KORS, L.L.C., A              )
    DELAWARE LIMITED LIABILITY           )
6   COMPANY,                             )
                                         )
7                    PLAINTIFF,          )
                                         )
8           vs.                          ) No. CV 16-1271-AB
                                         )
9   CHUNMA USA, INC., A                  )
    CALIFORNIA CORPORATION; AND          )
10  JAE HYUN JUNG, AN INDIVIDUAL,        )
                                         )
11                   DEFENDANTS.         )
    _____ )

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              FRIDAY, APRIL 6, 2018

17                  11:26 A.M.

18              LOS ANGELES, CALIFORNIA

19

20

21

22  _____

23          **CHIA MEI JUI, CSR 3287, CCRR, FCRR**
            FEDERAL OFFICIAL COURT REPORTER
24          350 WEST FIRST STREET, ROOM 4311
            LOS ANGELES, CALIFORNIA 90012
25              cmjui.csr@gmail.com

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFF:

 3        KEATS GATIEN, LLP
          BY:  KONRAD GATIEN, ATTORNEY AT LAW
 4        120 SOUTH EL CAMINO DRIVE
          SUITE 207
 5        BEVERLY HILLS, CALIFORNIA 90212
          424-302-0692
 6
                    - AND -
 7
          PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
 8        BY:  ANDREW GORDON, ATTORNEY AT LAW
          AND  LESLIE GORDON FAGEN, ATTORNEY AT LAW
 9        AND  JACOB R. FIDDELMAN, ATTORNEY AT LAW
          1285 AVENUE OF THE AMERICAS
10        NEW YORK, NEW YORK 10019
          212-373-3575
11

12   FOR THE DEFENDANTS:

13        REES LAW FIRM P.C.
          BY:  ROBERT A. REES, ATTORNEY AT LAW
14        1925 CENTURY PARK EAST
          SUITE 2000
15        LOS ANGELES, CALIFORNIA 90067
          310-277-7071
16

17

18

19

20

21

22

23

24

25
```

```
 1              LOS ANGELES, CALIFORNIA; FRIDAY, APRIL 6, 2018

 2                            11:26 A.M.

 3                             - - -

 4              THE CLERK:  Calling CV 16-1271-AB, Michael Kors,

 5   LLC, versus Chunma USA, Inc., et al.

 6              MR. GATIEN:  Konrad Gatien for the plaintiff, Your

 7   Honor.  And with me today are Leslie Fagen, Andrew Gordon,

 8   and Jacob Fiddelman of the law firm Paul, Weiss, Rifkind,

 9   Wharton & Garrison, LLP, also for the plaintiff, Michael

10   Kors.

11              THE COURT:  Good morning.

12              MR. REES:  Robert Rees for the defendants.

13              THE COURT:  Good morning to you both.  My

14   apologies to you all.  I had a criminal matter that had some

15   pressing issues that popped up literally right before the

16   hearing; so I had to deal with that before this.

17              We are here for pretrial conference.  We have a

18   number of motions in limine to discuss and some procedural

19   matters.  I have had a chance to review the papers.

20   Admittedly, I did not review closely the papers filed by

21   Chunma yesterday.  We'll talk about that in a moment.

22              So we have trial set for April the 24th, I assume.

23   Let me just confirm.  So trial set for April 24th.  I assume

24   that date is still a good date for both sides.  Is that

25   correct?
```

```
1              MR. FAGEN:  Yes for the plaintiff, Your Honor.

2              THE COURT:  Mr. Rees.

3              MR. REES:  Yes.

4              THE COURT:  We have a potential issue, but I think

5    I am going to be able to work around it.  Normally, just so

6    you know, I would have trial starting Tuesday.  Since we

7    have calendar on Friday, we would not have trial.

8              I have another engagement where I have to be in

9    Boston by March the 3rd -- I'm sorry, May the 3rd.  So what

10   I may do is cancel or somehow move my calendar on April the

11   27th so we could get more trial days in that week, and so we

12   would go the 24th until, basically, the 2nd.  And my hope is

13   that we would be able to conclude the trial by that date.

14             And, I guess, that leads to the next point.  To

15   the extent you all don't know, I typically give the parties

16   a finite amount of hours to try the case.  I have a chess

17   clock here.  Whenever one party is at the lectern, the clock

18   is running against them and vice versa.

19             So the time is you use it as you want.  When you

20   are up at the lectern, the clock is clicking for direct,

21   cross, et cetera.

22             Each side will get 30 minutes for opening and

23   closing.  Plaintiff will have an extra ten minutes for

24   rebuttal.  My -- at least, based on the trial estimates, I

25   think that this case, if each side had 15 hours each to
```

```
 1    present their evidence -- that includes direct and

 2    cross-examination -- that should be enough.  That would be

 3    30 hours of trial time.

 4            Based on my limited time on the bench, we're

 5    averaging anywhere from 6 to 6 1/2 hours per day.  So we

 6    would be talking a good five to six days of trial, actual

 7    trial.

 8            Again, for those of you that haven't been here

 9    before, usually I will keep the parties here later in the

10    evening to deal with pretrial matters, any other issues we

11    need to deal with to try to minimize the amount of time

12    jurors are waiting.

13            So that is my proposal.  Does either side have any

14    strenuous objection to the proposed time limits?

15            From the plaintiff?

16            MR. FAGEN:  For plaintiff, Your Honor, we do not

17    have a problem with that.  Is the 15 hours inclusive of

18    openings and closings?

19            THE COURT:  No.  The 15 hours is 15 for plaintiff,

20    15 for defense.

21            MR. FAGEN:  Right, Your Honor.

22            THE COURT:  Mr. Rees.

23            MR. REES:  Yes.  One question --

24            THE COURT:  I can't hear you.  Would you stand up,

25    sir.  I can't --
```

```
 1            MR. REES:  One issue that they brought up

 2   yesterday, their liability expert is not available until

 3   April 30th.  This case is bifurcated.  And so, if I

 4   understood the Court correctly, you were trying to get the

 5   case completed by the 27th or 28th.

 6            THE COURT:  Can you step to the lectern because

 7   our court reporter is having trouble hearing you.

 8            MR. REES:  Sure.  My concern is that, if liability

 9   is not completed until the 30th when their liability witness

10   is available, if it goes to damages, that it might be

11   pushing it for -- to finish by May 2nd.

12            THE COURT:  We'll cross that bridge if and when we

13   get to it.  We'll work it out somehow some way.  These

14   things always seem to do that.

15            All right.  So let's talk about now at least the

16   motions in limine.  I did not issue a tentative order in

17   this case.  I am just going to give you, at least, my

18   tentatives orally, and then I will allow each side to be

19   heard as it relates to the motions in limine.

20            We'll start with the plaintiff's motions in

21   limine.  The first one is with respect to the exclusion of

22   the survey expert, Mark Keegan.

23            My tentative would be to deny this.  And generally

24   speaking -- just some general thoughts.  It seems to me on

25   both sides the challenges as to the experts, when you really
```

```
 1   get down to it, at least from the Court's perspective, a lot

 2   of this goes more towards weight and less towards

 3   admissibility.  And that's when you all utilize your

 4   exceptional cross-examination skills to chop away at these

 5   experts.  So my tentative as to the first motion is to deny

 6   it.

 7             Similarly, with respect to the damages expert,

 8   Motion in Limine Number 2, Jaime Holmes, I have some

 9   questions about these as well that I wanted to ask the

10   parties.  I just wanted to give the tentative.

11             As it relates to the Motion in Limine Number 3

12   with respect to the decision not conduct a survey by the

13   plaintiff and then the plastic product bag, my tentative

14   would be to deny at least as it relates to the request to

15   exclude information about the plaintiff not conducting the

16   survey.

17             I am inclined to grant the motion with respect to

18   the product bags, but I have a question about, sort of, what

19   the evidence would be with respect to the plastic product

20   bags, particularly whether or not there is evidence to

21   suggest that consumers actually saw this plastic product

22   bag.  So we'll discuss that shortly.

23             With respect to defendants' motions in limine, the

24   first one, the fashion expert -- is it Miss Goldpaper or

25   Goldaper?  My tentative would be to deny that motion.
```

```
 1              The damages expert, similarly Motion in Limine

 2    Number 2, to exclude the plaintiff's damages expert, my

 3    tentative would be to deny that motion as well.

 4              With respect to reference of the Motion in Limine

 5    Number 3, reference of the lawsuit filed by Coach, my

 6    tentative would be to grant that motion.  I would like to

 7    hear a little more on that.  It was some time ago, nine

 8    years ago.  I'd like to hear a little more about, sort of,

 9    how the plaintiff believes that intent would play out in

10    this case.  My tentative is to grant the motion.

11              Motion in Limine Number 4 to preclude any monetary

12    recovery, I would deny that motion.

13              And then as it relates to the protective order

14    specifically regarding Michael Kors and John Idol, again, I

15    had a chance to glance through the opposition filed

16    yesterday.  My inclination is to grant that motion.

17              I just don't see -- neither of those individuals

18    have been deposed, some larger theory that this lawsuit was

19    fueled by, I guess, Michael Kors being upset, not sure how

20    relevant that is to this matter.

21              So those are my tentatives as it relates to the

22    motions in limine.  Why don't we go through them.  Who from

23    the plaintiff wishes to be heard as it relates to any of

24    these motions?

25              Just for the record, just if you would state your
```

1  name so our court reporter gets all this down.

2          MR. GORDON:  Sure.  Good morning, Your Honor.

3  Again, Andrew Gordon from the Paul, Weiss firm.

4          Your Honor, our plan is I am going to handle the

5  survey expert and then the -- some of the other motions, I

6  just want to point out that my colleague, Mr. Fiddelman,

7  consistent with your rules concerning -- I will phrase it

8  the use of junior colleagues, will handle the damages

9  related.

10          THE COURT:  Right.

11          MR. GORDON:  There was one motion though I wanted

12  to ask in terms of the tentative, and that was the

13  investigators, Your Honor, which was also, I think, part of

14  the defendants have raised whether or not we were permitted

15  to call the investigators and another witness, Pippa Newman,

16  and they had submitted papers related to that.

17          THE COURT:  Let me look through my file because I

18  don't recall that.

19          MR. REES:  May I clarify, Your Honor.  They filed

20  a --

21          THE COURT:  You have to step to the lectern, sir.

22          MR. REES:  Fair enough.  Plaintiff filed a, maybe

23  ten days ago or so, a revised witness list.  It had a new

24  witness on -- this Philippa Newman.  They -- when -- during

25  discovery they never disclosed this name.  They identified

1    two people that we flew to New York and deposed, a woman

2    named Krista McDonough and a man named Matthew LaFargue.

3         In disclosures, in answers to interrogatories,

4    they never mentioned this person Newman.  They filed a

5    revised witness list and withdrew the two designated

6    witnesses and added Newman.

7         We said, "We object because we've never heard of

8    her.  We haven't deposed her."

9         They said, "We'll give you a chance to depose her

10   now."

11        I said, "We don't have time.  It's the eve of

12   trial."  So we filed an objection to their revised list.

13        They also named two investigators that have never

14   been disclosed in discovery, never been disclosed in the

15   disclosures.  And so it's not the subject of a formal in

16   limine motion, but it's an objection to their revised

17   witness list.

18        THE COURT:  Can we deal with that at the end and

19   deal with the motions in limine first because this caught me

20   off guard.  So let's deal with the motions in limine first.

21        MR. GORDON:  Apologies, Your Honor.  I just wanted

22   to put a pin in it.

23        Let me first start with the motion regarding

24   Mr. Keegan who is there survey expert.  And I appreciate

25   your tentative, and I think most times, Your Honor, I would

```
 1   tend to agree that, when you point out problems with your
 2   adversary's expert, including survey experts, it mostly goes
 3   to cross and weight rather than exclusion.
 4          But here, Your Honor, I respectfully disagree.  I
 5   think the problem that we have with Mr. Keegan is his survey
 6   is such a mess that we really don't get just to the weight.
 7          I think, given the role under Daubert of the Court
 8   being a gatekeeper and ensuring that Mr. Keegan employs the
 9   same level of intellectual rigor -- and I am quoting Daubert
10   at page 152 that characterizes the practice of an expert in
11   the relevant field -- that his testimony and his survey
12   should be excluded because he does not meet the basic
13   Daubert criteria.
14          He doesn't use a generally accepted methodology.
15   His survey departs from the standard Eveready confusion
16   survey in a number of respects.
17          And when he disagrees or does something different
18   than Eveready, it's not because it's been peer reviewed or
19   published or tested.  In short, it's not a generally
20   accepted methodology, and I fear that the jury -- we run the
21   risk of the jury just not understanding how inadequate it
22   is.
23          THE COURT:  But, Counsel, you lay out in pretty
24   good detail, sort of, the weaknesses and the issues as you
25   see it with respect to Mr. Keegan.  Again, why is that not
```

1    fair game for cross to say, "You didn't file generally

2    accepted methodology, you didn't do this, you didn't do

3    this, and you didn't do this" and look at the jury and say,

4    "This is their expert," again, assuming what you are saying

5    is true?

6            MR. GORDON:   I get your point, Your Honor, but I

7    think sometimes an expert falls so woefully short of that

8    line that we do have a responsibility to keep him out.

9            Here, to take the first point that we make in our

10   brief about not reflecting marketplace conditions, that

11   renders the survey useless for our purposes because he does

12   not re-create the world in which a shopper sees the product.

13           That is something that Courts have said

14   repeatedly, and we quote some cases like Steak Um and Goto

15   that surveys are only evidence of confusion if they

16   replicate the real world setting in which a consumer would

17   encounter the mark.

18           Here he has an Internet survey, he flashes a

19   picture of a bag on it, that bag disappears, and then he

20   asks some questions; and that's not how any shopper or any

21   potential user of the junior mark here sees the product.

22   It's just not.

23           And because of that, it doesn't show likelihood of

24   confusion at all.  And the Courts have said, look.  The

25   generally accepted methodology here is we create the

```
 1    marketplace conditions, and here he doesn't.

 2              So the jury is going to be asked to determine

 3    whether there is a likelihood of confusion, likelihood of

 4    source confusion either at the initial interest phase of a

 5    shopping consumer experience or the post sale experience,

 6    and he doesn't test any of that, and, therefore, that is

 7    just not to the weight of the evidence, Your Honor.  That is

 8    a legally deficient survey.

 9              THE COURT:  Doesn't the survey also address the

10    point of purchase or his survey, and isn't that relevant to

11    this case?

12              MR. GORDON:  Not in the way that any of the

13    consumers actually purchase a good.  You could design a

14    survey that shows how a purchaser would purchase a product

15    on the Internet, sure.  But he doesn't do that.  Nobody goes

16    onto a Website and just sees a bag for a moment.  That's not

17    how you shop.

18              That bag has a hang tag that suggests the name of

19    the product right on it prominently featured.  That's not

20    how consumers see goods.

21              To make it worse, they contend we're not really

22    even an Internet product, that we only get sold at swap

23    meets and kiosks and places like that.

24              The problem here is he's not testing anything

25    that's relevant for the jury's decision.  It's not just,
```

 1   hey.  You should have done your survey different.  It's the

 2   way he did his survey doesn't use the first criteria of

 3   being generally accepted, which is a survey that actually

 4   reflects the marketplace.

 5            And, Your Honor, as we also point out in that

 6   regard, he excludes women under 18.  He excludes men who

 7   might purchase.  He misrepresents the price point so what he

 8   uses is a wholesale price point, not a retail price point.

 9            These are all problems, Your Honor, that create a

10   survey that doesn't re-create the marketplace, and, as such,

11   as Courts have repeatedly held under Daubert, he just

12   doesn't get to get past go.

13            That is one area where, I think, Your Honor, it's

14   not just a matter of weight but it's a matter of

15   admissibility.

16            The other area and even more significant is, once

17   you get to the actual survey, what is he testing?  And here,

18   Your Honor, he is not testing, as I noted, initial interest,

19   he's not testing post sale.

20            He is really trying to test the source.  That's

21   what he is doing.  He is asking in the first question after

22   he says, "What do you think of the product," "Who do you

23   think puts out the product?"

24            And, Your Honor, the problem there is that's not

25   what confusion is under the law.  Confusion that's remedied

```
 1    by the Lanham Act is confusion not only as to the source --

 2    that is, who puts out the product, but also as to

 3    affiliation, connection, or sponsorship.

 4              That's why in just about every admissible Eveready

 5    study, there is always, always a follow-up question to who

 6    puts out the product or who makes the product, however you

 7    fashion it, that says "Well, do you think they are

 8    affiliated by anybody?  Do you think they're connected or

 9    licensed by anybody?"

10              Because what generally accepted survey methodology

11    tries to do is get to the question that you are trying to

12    answer under the Lanham Act.  So it's a standard practice.

13    It is generally accepted when performing likelihood of

14    confusion studies to ask these type of questions.

15              And we cite case law in our brief and treatises,

16    McCarthy and Swann as well as cases, and we also put in

17    Miss Butler, our expert, who makes clear that such questions

18    are essential to reliably determining whether there is a

19    likelihood of confusion.

20              So the problem here, Your Honor, is that this

21    survey cannot rule out source confusion because it can't

22    rule out the respondent's -- they may know it's not made by

23    Michael Kors, but they may think it's associated or

24    licensed.

25              And so, Your Honor, again, as we cite on page 10
```

1    of our briefing, surveys repeatedly and consistently are

2    thrown out because the generally accepted methodology under

3    Eveready and its progeny requires you to ask about source

4    confusion, not just who puts out the product.  So that's

5    problem Number 2.

6          Problem Number 3, Your Honor, even if we wanted to

7    get past those, again, it's just not going to the weight

8    here because I'm not sure the jury will understand.  These

9    are legally gatekeeping type issues.

10         THE COURT:  They are.  We may just go back and

11   forth.  I appreciate what you are saying, but you have got

12   an expert who is, basically, going to say what Keegan did is

13   garbage.  Isn't that really what you are driving at?

14         MR. GORDON:  It's garbage, but, when we have a

15   survey that's garbage, Your Honor, I think there is a

16   gatekeeping role under Daubert where we can't just say that

17   goes to weight or we're going to cross.  These are issues

18   that the jury is not going to appreciate.

19         For instance, Your Honor, to take two examples --

20   okay?  His control.  And his control is garbage.  The idea

21   of a control or a placebo is you keep everything the same as

22   the test, and then you have a control, and then you ask your

23   questions, and in this way you eliminate the noise.  That is

24   Survey 101, and here he has two totally different bags.

25         If I were coming to you and said, Your Honor, the

1    survey is garbage because of that, I think that is a

2    legitimate cross point.  You could have come up with a

3    better test, and, because you don't have a great test, you

4    are not really figuring out if there is confusion in the

5    marketplace.  I appreciate that.

6            But, Your Honor, when you are not re-creating the

7    marketplace, when you are not testing even for likelihood of

8    confusion and source confusion or initial interest or post

9    sale confusion, when you are not using generally accepted

10   survey questions, when you are not -- when you are creating

11   what's called the demand effect when you are creating a

12   survey where you are suggesting what the answer is, that is

13   more than it just being garbage.  That's a survey that we

14   shouldn't be wasting our time with.

15           And I think what the Supreme Court has said in

16   Daubert is, when we are so woefully below what is generally

17   accepted, we shouldn't just consider it a matter for cross.

18           So we might be just going in circles, Your Honor

19   and I appreciate your point, but these are such problems

20   with the survey because it's not legally doing what they are

21   going to claim it's going to do.  They're going to claim

22   there is no likelihood of confusion.

23           But he didn't test for likelihood of confusion.

24   And you might be able to tell the jury in some questioning,

25   "Hey, we would have done it differently, we would have done

1    it better, you shouldn't accept this."

2          But I think it's the Court's role to say, "Hey,

3    look.  It's such garbage.  It's not doing its job, it's not

4    establishing anything legally," and, under Daubert, that's

5    the responsibility of mine as opposed to just the jury.

6          THE COURT:  Fair enough.  I do a little ping-pong

7    here.  Unless you have anything further that relates to that

8    motion, I would like to hear from Mr. Rees.

9          MR. GORDON:  No, Your Honor.  I just want to point

10   out one thing in response to the briefing, and that's with

11   respect to his -- he's not using the generally accepted

12   Eveready survey questions and this use of the word is this a

13   genuine Kors product?

14         I just want to point out, Your Honor, that it's

15   not just us who is saying this is not generally accepted.

16   Mr. Keegan himself was asked at his deposition whether he

17   had seen a survey that ever included the word "genuine," and

18   he said he couldn't recall seeing one.

19         So, Your Honor, it's not just us and our expert.

20   It's not -- even Mr. Keegan is recognizing in important

21   respects that his survey doesn't do what it is supposed to

22   do.  With that I will turn it over.

23         THE COURT:  Mr. Rees.

24         MR. REES:  Thank you, Your Honor.  I think the

25   Court's tentative is spot on.  All of their arguments go to

```
 1    weight of it.  They have their expert that says this is the
 2    right way to do it.  Mr. Keegan has his own explanation of
 3    why what he did is the right way to do things.
 4              THE COURT:  Let me ask you.  Does Mr. Keegan's
 5    survey, does it re-create market conditions?
 6              MR. REES:  Yes.
 7              THE COURT:  Why do you believe that?
 8              MR. REES:  Because it identifies -- and he
 9    explains it better in his report -- but it identifies the
10    shoppers who are not going to be -- who are going to be
11    shopping at a discount place.
12              And a lot of what Goldaper says is consistent and
13    supports Keegan in saying that the Michael Kors products are
14    seen somewhere else and in fancier stores, and she gives
15    them different levels of retail.  But the lowest retails are
16    the mom-and-pop stores, the kiosks, the discount -- super
17    discount houses.  And he identifies super discount places in
18    his survey.
19              Let me go to a second point he makes out, which is
20    to say, we test for source.  That's exactly what people
21    confuse.  The whole idea of a trademark is it identifies the
22    source.  So when they see our bag, the question is do people
23    think that's a Noble Exchange bag?  Or do they think that's
24    a Michael Kors bag?
25              And Goldaper again in her deposition supports
```

 1    this.  They don't think about, well, was that a bag that

 2    came from a Michael Kors factory or somebody who had a

 3    license from Michael Kors or someone who is affiliated for

 4    Michael Kors?  They don't know.  They don't care.

 5            The only thing the consumer cares about is, is

 6    this a Michael Kors approved bag or a Noble Exchange

 7    approved bag?  That's the test as to source.  That's exactly

 8    what you are supposed to be testing here, and that's exactly

 9    what he did.

10            For them to come up and say, "Well, testing as to

11    source is unsufficient" makes no sense even according to

12    Goldaper.  Everything they raise is a issue that goes to

13    weight.

14            There are situations -- and we are going to come

15    to this when we talk with their economics expert, for

16    example, where an expert is so far afield that it doesn't

17    get past go, but that's not this case.

18            This is a bona fide -- and the Keegan report is

19    clear.  In his deposition, he defends it well.  It's a

20    bona fide Eveready study.  They can throw their rocks.

21            He says the jury won't appreciate the issue; so

22    the Court has to take it away from the jury.  I disagree.

23    This is exactly what the jury is supposed to be deciding.

24            THE COURT:  Thank you, Counsel.  Let's move on to

25    the next motion in limine that the plaintiff wants to be

1    heard.

2                Counsel, is it Mr. Gordon?

3                MR. GORDON:  Yes, Your Honor.

4                THE COURT:  I just want to make sure the names.

5    Okay.

6                Mr. Fiddelman, welcome to the party.

7                MR. FIDDELMAN:  Thank you, Your Honor.

8                THE COURT:  Did you travel from back East as well?

9                MR. FIDDELMAN:  Yes, Your Honor.

10               THE COURT:  All right.  You now have justified

11   your flight out here.  Okay.

12               MR. FIDDELMAN:  Thank you, Your Honor.

13               THE COURT:  Go ahead, Counsel.

14               MR. FIDDELMAN:  Thank you, Your Honor.

15               With respect to plaintiff's Motion in Limine

16   Number 2 regarding Mr. Holmes, the defendants' damages

17   expert, this motion relates to a slightly different point

18   about the Daubert standard, and that is that everyone

19   recognizes that expert testimony has to be based on actual

20   data, and it has to be based on correct legal premises and

21   correct instructions.

22               And where an expert's analysis is premised on an

23   incorrect instruction of law from counsel, its result

24   doesn't tell the jury anything relevant.

25               So this comes up as well in the defendants' motion

```
 1    with respect to our damages expert, Mr. Anderson, and, that

 2    is, what numbers and calculations get to be deducted from

 3    the damages amount, which starts with the defendants'

 4    revenues when you are calculating their profit, and then you

 5    deduct their costs.  And the question of what costs are

 6    deductible is a question of law.

 7           THE COURT:  Okay.

 8           MR. FIDDELMAN:  The statute -- first, as a big

 9    picture matter, the statute puts the burden of showing costs

10    on the defendant.  The plaintiff's burden is only to show

11    their revenues, and then the burden shifts.

12           What Mr. Holmes does -- and he explains this in

13    his deposition and on page 2 of his report -- is that he

14    takes as an approximation without any connection to the

15    facts -- he calculates the percentage of overall Chunma

16    sales that the NX bags make up, and he takes that

17    percentage, and he applies that pro rata to the total costs

18    shown in the tax return and says that must be the cost of

19    producing the NX bags.

20           He repeatedly caveats -- this he calls, by the

21    way, the full absorption method whereby any cost whatsoever

22    gets absorbed into the cost of manufacturing and selling the

23    goods.

24           He repeatedly caveats throughout his deposition

25    that he was instructed by counsel that the full absorption
```

```
 1    method is required by law, and it's not.  At least not
 2    without a factual showing that those expenses are actually
 3    tied to the production, distribution, and sale of the
 4    products in question.
 5           And the law on this is clear, and this comes up,
 6    actually, Your Honor, in some of the Anderson briefing.  But
 7    the Ninth Circuit has repeatedly held in the Wolfe case, in
 8    copyright cases, Kamar International and Frank Music, in the
 9    most recent case Jerry's Famous Deli, 2004, and Courts in
10    this district have -- not this district, but district
11    courts, the Northern District, the Winterland Concessions
12    case is a situation where this exact dispute between experts
13    arose.
14           The defendants' expert used full absorption
15    without any support for those costs which could include
16    office supplies, employees' salaries -- who knows what's in
17    that -- and automatically deducted it, and that evidence was
18    excluded because the law requires you to tie it to the
19    production of the actual infringing goods.
20           And here the NX bags are something less than half
21    of Chunma's total sales.  So any unsupported inference that
22    all of Chunma's expenses tied to those products is
23    unfounded.
24           And we would submit that the defense has not put
25    forth any justification for any of these numbers to be tied
```

```
 1   to the NX bags.

 2          What our expert does, Mr. Anderson -- and I don't

 3   mean to get ahead of the Court -- but what our expert does

 4   is he takes a look at the actual Chunma sales invoices and

 5   purchase invoices and actually calculates how much Chunma

 6   pays for the bags and uses that as their sales number.

 7          Now, again, he is doing this even though it's not

 8   our burden because we recognize we will have to rebut it.

 9          But that kind of data driven, actual fact driven

10   analysis is what the law requires.  And so there is really a

11   relevance question to the resulting numbers that Mr. Holmes

12   has come up with because his calculation method was based on

13   an instruction from counsel that turns out not to be what

14   the law requires.

15          THE COURT:  So I guess you present, sort of, a

16   thornier issue.  Is your concern it would play out at trial

17   that you cross-examine this expert and he will say, "I did

18   it based on what counsel told me," and we get into, sort of,

19   you trying to attack what counsel told you and/or present to

20   the jury that that was an incorrect statement of the law?

21   Is that the issue?

22          MR. FIDDELMAN:  That's right, Your Honor.  To

23   cross Mr. Holmes here, the questions we would have to ask

24   would be something akin to "isn't it right that the full

25   absorption method is not actually required by law?"  And
```

 1    that's not something that the jury is supposed to be sorting

 2    out.

 3              THE COURT:  And is it fair to say that Mr. Holmes,

 4    he relied on a whole bunch of source materials in

 5    formulating his opinion?  And I assume that Mr. Rees would

 6    say, look.  That's only one portion of things that he relied

 7    on.  To the extent the Court's concerned about it, then we

 8    could excise that -- excise, I guess, any mention of that?

 9              MR. FIDDELMAN:  Two responses, Your Honor.  First

10    is, in opposition to the motion, that defendants have put in

11    a list of documents considered by the expert.

12              I would submit that's not, actually, a relevant

13    response.  The documents that were looked at by the expert

14    are a very different thing from the calculation that was

15    done by the expert.

16              On page 2 of his report, he explains that he

17    simply took the cost numbers from the tax returns and

18    prorated them down based on the percentage of sales, and the

19    20 other documents listed on his documents-considered list,

20    apparently, do not come into his calculation.

21              THE COURT:  So then why can't you cross-examine

22    him on that fact, "That you didn't consider all of these

23    other items in the calculation"?

24              MR. FIDDELMAN:  Because the calculation that he

25    did do -- and this goes to the second part of your question,

1    Your Honor -- the calculation that he did do is prohibited

2    by law.

3            And if you knock out -- if you want to excise that

4    prohibited-by-law calculation, he no longer has any cost

5    calculation, and he's left only with a revenue calculation,

6    which, if that's the state of the evidence, there should be

7    a Rule 50 directed verdict for the full amount of revenues

8    because that's all plaintiff has to show.  The problem is

9    excising the problematic opinion leaves him with nothing.

10            THE COURT:  Fair enough.  Anything further on this

11    point?

12            MR. FIDDELMAN:  The second part of our motion,

13    Your Honor, although it's styled under the motion largely

14    having to do with Holmes, has to do with a particular

15    document, this one-page sales summary.

16            THE COURT:  From Chunma's accountant?

17            MR. FIDDELMAN:  That's right.  The problem with

18    this one-page sales summary is -- and it also ties back to

19    the Anderson comparables calculations.

20            During the discovery process, Chunma claimed that

21    all of their records had been deleted and as a result, as a

22    proxy, apparently -- and this is shown in the Min Cho

23    deposition transcript -- Mr. Jung, the named defendant, the

24    president of Chunma, instructed his accountant to prepare a

25    spreadsheet approximating, and Mr. Cho explains that that

1    spreadsheet was prepared by Mr. Jung, giving him numbers

2    over the phone to put into the spreadsheet.

3           And we'd submit that -- and then he explains that

4    his percentage, his cost of goods, just like the expert did,

5    are a prorated approximation based on numbers in the tax

6    returns.

7           So this spreadsheet, we submit, is not a factual

8    document.  It is in some sense a layperson-produced

9    demonstrative of the expert's flawed analysis that happened

10   to have been prepared by someone else.  And we are concerned

11   that allowing that into evidence would confuse the jury into

12   thinking that it was an actual source document showing the

13   defendants' cost of goods because it's a spreadsheet from

14   their accountant.

15          THE COURT:  Is it fair to say Mr. Holmes relied

16   just on that?  Didn't he rely on other materials as well?

17          MR. FIDDELMAN:  Right.  Mr. Holmes did not

18   directly rely on the one-page sales summary.  He applied the

19   identical methodology that the accountant applied in

20   preparing the one-page sales summary.  So this motion, as it

21   relates to the one-page sales summary, is seeking to keep

22   that out of evidence.

23          THE COURT:  Just the one-page summary.

24          MR. FIDDELMAN:  Right.  So it rises and falls in

25   some degree with the Holmes motion, but it also

1  independently should be kept out because it's not labeled as

2  an expert analysis, and it's masquerading as a source fact

3  document.

4       The other issue with this document -- and we

5  didn't really dive into it in detail -- but, based on how

6  it's likely to be presented, there is a concern that it's

7  hearsay because it's the say-so of Mr. Jung over the phone

8  telling the numbers to Mr. Cho who puts them in the

9  spreadsheet and then provides it to the lawyer who produces

10 it to the plaintiffs.

11      THE COURT:  But experts can rely on hearsay.

12      MR. FIDDELMAN:  But Cho is not an expert.

13      THE COURT:  But Holmes is an expert.  And can't

14 the expert rely on hearsay?

15      MR. FIDDELMAN:  Absolutely, but that's not the

16 basis for the objection to the document coming in.

17      THE COURT:  You are saying the document itself is

18 hearsay.

19      MR. FIDDELMAN:  Right.

20      THE COURT:  Okay.  But it's interesting.  We just

21 had a trial couple weeks ago where we had a similar issue --

22 the document itself may be hearsay.  Let's assume I agree

23 with you.  But can't the expert rely on that document to

24 form his or her opinion?  And in some ways it's an end

25 around the hearsay rule because the expert will get up and

```
 1    say, "I relied on these documents."

 2               And in the other trial I had they said, "Did you

 3    look at this document?  Did you rely on it?  What was it?

 4    And did that factor into your opinion?"  How do you get

 5    around that here?

 6               MR. FIDDELMAN:  Well, Mr. Holmes actually explains

 7    in his deposition that he did not rely on the document.

 8    What he did was he, for himself, made the same calculations

 9    that Min Cho did in that document.

10               THE COURT:  But he got that information from the

11    document; right?

12               MR. FIDDELMAN:  No, Your Honor.  He testifies that

13    he got the information directly from the tax returns as

14    well.

15               So in some sense he and Mr. Cho are running the

16    same analysis, not relying on each other, but running the

17    same legally flawed and legally irrelevant analysis.

18               And when it comes to the one-page sales summary,

19    any, sort of, weight, not admissibility gut reaction, to the

20    Daubert motion no longer becomes applicable because it's not

21    being labeled as an expert analysis.  It's being labeled as

22    a fact source document, and it's not.

23               THE COURT:  Fair enough.  I think you probably

24    justified at least a coach flight back to New York.

25               Mr. Rees.
```

1          MR. REES:  Yes, Your Honor.  I think counsel has

2    confused three different issues; so I am going to try to

3    untangle them.

4          The first issue is whether or not in deducting --

5    in calculating a defendants' profits do you deduct just the

6    cost of goods sold attributed to that product, or do you

7    also deduct an overhead factor?  That's a legal question.

8          And our expert calculated it both ways.  He said,

9    if the Court decides you deduct overhead factor, I get this

10   much for profits.  If you deduct only the cost of goods

11   sold, I have an alternative number.

12         As the Court pointed out, depending on how the

13   Court ultimately decides the issue of whether you include

14   overhead or not, we talked about it according to the Court's

15   direction, and we don't have to put into evidence the

16   alternative theory.

17         So that's -- he's wrong to say you have to throw

18   it out because of that.  Their expert only calculated it one

19   way with the reduction for cost of goods sold and no

20   deduction for overhead factor.

21         The second argument he makes is that this sales

22   ratio calculation that is to calculate the cost of goods

23   sold, you take the ratio of Noble Exchange sales revenues to

24   total revenues and multiply that times the cost of goods

25   sold.

```
 1            That's the sales ratio method, and you will see in

 2   my reply papers and in my -- with respect to the Anderson

 3   thing, Anderson said that's a legitimate respected way to

 4   calculate percentages.  So there is nothing wrong with the

 5   sales ratio method.  And, in fact, Anderson used the sales

 6   ratio method when he was talking about calculating

 7   percentage of sales in -- for Coach and Ralph Lauren,

 8   Michael Kors when he was doing his own calculation.  So they

 9   can't say the sales ratio method is a legally flawed method

10   because it's totally used by their expert and approved by

11   their expert.

12            The third issue is this document, which may or may

13   not come into evidence but is independent of the opinions

14   that our expert gives.

15            THE COURT:  Are you conceding there is some food

16   for thought as it relates to the admissibility of that

17   document?

18            MR. REES:  No, and I will tell you why.

19            That document, basically -- the sources for that

20   document are all in the tax returns that they had.  There

21   are two parts to the documents:  The revenue and the

22   expenses.

23            On the revenue, there are two ways you could

24   calculate revenues.  One is look at the tax returns.  The

25   other is look at the thousands and thousands of invoices.
```

```
 1              To create the numbers for that spreadsheet, they
 2     looked at the tax return numbers.  For the -- Mr. Anderson
 3     added up the thousands and thousands and thousands of pages
 4     of invoices.  The difference between those two is only
 5     $28,000.
 6              So they can use -- I mean, you can tell the jury
 7     this is how it was calculated and let the jury decide which
 8     way they want to do it, whether they think counselor's
 9     addition was better than the tax returns.  But everything in
10     that sheet comes from tax returns, and they know that.
11              THE COURT:  Just because it comes from tax
12     returns, how is it not hearsay?  How do you admit it into
13     evidence?
14              MR. REES:  Well, first of all, you can put it in
15     as supporting the opinion.  But, again, our expert
16     independently looked at the tax returns and made his own
17     calculation.
18              The second part of it is, when you have voluminous
19     documents, summaries of voluminous documents get around the
20     hearsay rule just like they get around the best evidence.
21              THE COURT:  Who would introduce that into
22     evidence?
23              MR. REES:  Mr. Cho is on both person's witness
24     list.  Mr. Jung is on both person's witness list.  You can
25     treat it as a summary of voluminous documents.  You can
```

1    treat it as -- if you want, we can bring in all the source

2    documents and have thousands and thousands and thousands of

3    pages of invoices and all of the tax returns.

4            I think as a shorthand there is nothing wrong with

5    that.  And you don't have to decide that in limine.  Their

6    motion really isn't to strike that one piece of paper.

7    Their motion is to strike Mr. Holmes in his entirety, and

8    that's all arguments that go to weight.

9            He did his calculations correctly, he did them in

10   the alternative.  So whichever way the Court decides on the

11   correct measure of defense profits, he can give an opinion,

12   and he's already done that.

13           THE COURT:  All right.

14           Mr. Fiddelman, anything else you want to say in

15   response?

16           MR. FIDDELMAN:  One brief point, Your Honor.

17           THE COURT:  Yes.

18           MR. FIDDELMAN:  The defendants' discussion of the

19   apparent minimal difference between the results in the

20   spreadsheet and the results of our expert's analysis relates

21   only to the revenues calculation, and I think that's not the

22   issue that we have with the document.  The document is with

23   the cost calculations, and those numbers are percentage

24   approximations in that spreadsheet whereas they are actual

25   calculations of purchase invoices when our expert does it,

```
 1    and so it does demonstrate the same flaw.

 2              The second very, very quick point I suppose I'd

 3    make -- it has to do with what our expert used the sales

 4    ratio method for -- that was a minor component of

 5    calculating the eight companies' comparable numbers.

 6              He used an approximation to get their cost of

 7    goods numbers, which in turn is an approximation in the face

 8    of unreliable data.  It is not in the same context as the

 9    calculation of Chunma's actual numbers.

10              Our expert did not use any sort of percentage

11    approximation method when it came to calculating Chunma's

12    numbers, and that's because the law does not allow that in

13    that context.

14              THE COURT:  Thank you.  I appreciate it.

15              I should have mentioned I appreciate the firm's

16    willingness to allow less -- or junior lawyers to argue the

17    motions.  I think that's important.  In spite of

18    Mr. Fiddelman's performance, I will probably allow it again.

19              Which side wishes to be heard as it relates to --

20    and, of course, I am just kidding, just for the record.

21              The next motion in limine.

22              Mr. Gordon.

23              MR. GORDON:  The next motion dealt with two

24    issues, the decision not to do the survey.  There, Your

25    Honor, I would say nothing that's not in the briefing.
```

```
 1              THE COURT:  If you don't mind me asking, the

 2   defense is going to -- if I allow their expert, they are

 3   going to have an expert that says, "We did a survey."  Isn't

 4   it just, sort of, the elephant in the room once that comes

 5   in?

 6              MR. GORDON:  I appreciate that, Your Honor.  Yes.

 7   I mean, the point we were making is that the survey is --

 8   it's just an element.  It is not the element, and,

 9   therefore, because we don't even, as a technical matter,

10   have to put on any evidence of confusion to prevail under

11   Sleekcraft, it's just a balancing test.

12              THE COURT:  But in fairness, I should say -- I

13   guess my question really is there are no cases that preclude

14   or prohibit a party from pointing out the nonexistence of a

15   survey.

16              They talk about the fact -- when I was looking at

17   the cases, it says surveys aren't required, but there is

18   not, sort of, the affirmative statement that you can't

19   present evidence that you didn't do it.

20              MR. GORDON:  That is correct, Your Honor.

21              THE COURT:  Okay.

22              MR. GORDON:  But in any event -- so I don't want

23   to rehash what's in the brief.  I hear your tentative, and

24   the only thing I will say is, though, that I do think, when

25   we get to the jury instruction portion of that, which is
```

```
1    down the road, I appreciate, I think it would be appropriate
2    to let the jury know that, in the instructions, that a
3    survey is -- our case does not rise and fall based on survey
4    evidence.
5            THE COURT:  That's an interesting issue.  I need
6    to think about that because I just think in other trials
7    that I have had where you have expert testimony and one side
8    calls one and maybe the other side doesn't, they make the
9    arguments all the time, "We didn't hear anything from the
10   other side about an expert," but I don't recall any jury
11   instructions dealing with that issue.
12           MR. GORDON:  The trademark law is a little bit
13   unique.  This is one thing if you don't put on expert
14   testimony about an element of your claim.
15           This is not an element of the claim, and the
16   reason behind the motion is we fear and we see it in the
17   papers and we see it elsewhere that plaintiffs are going to
18   suggest to the jury that it is an element to the claim,
19   which is why we made the motion, and I think that's why you
20   will see in our instructions we want the Court to lay out
21   Sleekcraft very carefully.  We want initial interest and
22   post sale confusion laid out very carefully because it is
23   our fear that argument will confuse the jury as to what
24   we're required to offer.
25           THE COURT:  We'll cross that bridge shortly.
```

```
 1          MR. GORDON:  That leads to the second half of the

 2   motion, which I think you've indicated in your tentative you

 3   granted; so I will turn the floor over to Mr. Rees.

 4          THE COURT:  Is there evidence?  Do we know --

 5   consumers seen this plastic bag?

 6          MR. GORDON:  I'm sorry.  I will go and then you

 7   go.  I promise.

 8          No, Your Honor.  There is no evidence in the

 9   record that consumers see that bag, and that's because

10   Chunma is a wholesaler.  It packages its product into -- and

11   it goes to retailers, and that is packaging that is on the

12   product that's given to retailers, but retailers don't -- as

13   you can tell from the survey, which is not in a bag,

14   retailers do not sell that, and we're not -- there is not

15   even consistent record evidence that the packaging is on

16   every product.

17          THE COURT:  I am assuming Mr. Rees will get up and

18   say something along the lines, as he did in the papers,

19   "Look.  It goes towards Chunma's intent.  We're not trying

20   to hide anything.  You look at these plastic bags.  It says

21   all over, not Michael Kors."

22          Obviously, I am joking somewhat, but what's your

23   response to that?  They're saying it goes towards their lack

24   of intent to infringe.

25          MR. GORDON:  Your Honor, they don't -- you can do
```

```
 1    a lot of things when you are a wholesaler.  You can require

 2    that packaging to be on product.  The idea of the Lanham Act

 3    is to protect consumers from confusion.  So the courts are

 4    very careful at looking at what consumers see.

 5            I don't want to repeat all I have said about our

 6    survey, but you are looking at what the consumer sees.  So

 7    there is a hang tag on the product -- and we haven't

 8    objected to evidence of that because that's what the

 9    consumer sees.  But the consumers do not see this bag, and

10    so, therefore, you can -- it doesn't really go to intent.

11            The intent is what the consumers see.  Otherwise,

12    every trademark counterfeiter would put some bag around his

13    or her product before it sells to a store.  They would know

14    full well the store removes that before -- and they would

15    get up and say, "Oh, yeah.  We're a counterfeiter, but that

16    wasn't our intent.  Look.  We put some bag here that says

17    'NX' on it" or something like that.

18            THE COURT:  Let me hear from Mr. Rees.  The two

19    specific questions that I have for you is that -- along the

20    lines of what Mr. Gordon alluded to with respect to jury

21    instructions -- do intend on asking the Court to provide

22    some sort of instruction that the jury can infer no

23    likelihood of confusion because of the lack of a survey?  Or

24    are you just going to utilize it in closing argument to

25    pound the fact that there is no survey by the plaintiff?
```

```
1           MR. REES:  The Court's identified a big
2    philosophical difference between the parties on how to write
3    instructions.  We don't view instructions as getting into
4    the weeds of the facts.  We don't view instructions as to
5    how to argue your case.
6           The instructions that would be appropriate here
7    are the ones we put in our opposition to the effect of, when
8    a party has within its power to provide stronger evidence
9    and fails to provide it, you may draw an inference that --
10   so it's broad like that.  It's not tailored --
11          THE COURT:  Seems pretty argumentative, doesn't it?
12          MR. REES:  It's a standard instruction as to the
13   quality of evidence.  It's not specific to experts or
14   whatever.  We can apply it to our case, but the instruction
15   does not say anything about -- they want an instruction that
16   says "Oh.  Plaintiff doesn't have to have a survey."
17          We don't have anything that says you have to or
18   don't have to have a survey.  We view it in terms of what
19   evidence a party brings or doesn't bring, which is totally
20   appropriate, neutral --
21          THE COURT:  Isn't that the same thing?  You are
22   saying -- I know the instruction.  I am just going to -- I
23   can't find it.  I was trying to find it beforehand, but it,
24   in essence, to argue that -- your statement sounds as if you
25   are trying to, in essence, say the same thing -- if the
```

```
 1    parties have the things available to them and they don't do

 2    it, you can consider that.

 3             So you are going to argue at closing Michael Kors,

 4    this multi-billion dollar corporation, you are going to tell

 5    me that you should consider the fact that they did not do a

 6    survey, to which the plaintiff will say the law doesn't

 7    require them to do a survey.

 8             MR. REES:  They can argue that.  But putting it in

 9    an instruction is really stacking the deck.  I don't say

10    that they do or don't have to have a survey in my proposed

11    instruction.  My proposed instruction has to do with broadly

12    any kind of evidence or any type of situation where somebody

13    has -- I mean, take it out of the trademark context.

14             In a medical record, somebody may or may not have

15    a medical record that says something that might be relevant

16    to an issue.

17             The instruction applies equally to that situation.

18    The instruction just says, if a party has the ability to

19    have stronger evidence and doesn't produce it, you can draw

20    an inference.

21             THE COURT:  And the stronger evidence in your view

22    is the survey to which the law does not require; correct?

23             MR. REES:  Right.  Although, and they -- when they

24    said the law does not require, I can give you probably a

25    half dozen cases that I didn't put into the brief where the
```

1    issue before the Court is should we grant a preliminary

2    injunction? and in each of those cases they say no, there is

3    no confusion, there is no survey here.  So even though it's

4    not required, it's considered by many Courts to be strong

5    evidence.

6            Once you start trying to talk about surveys and

7    the instructions and get into the weeds to that extent, you

8    run the risk of saying now that they say it isn't required,

9    but do I have to follow the six other cases that say it is

10   very important and you should do a case without a survey

11   with great suspicion?

12           That's just fine-tuning the instructions too much

13   and creating a possibility of error.  I think we can argue

14   whatever we want.

15           THE COURT:  Well, look.  I will tell you my

16   thought is you can argue what you want, but I am not --

17   again, I need to digest this more and more as we get closer

18   to trial, but I'm not really comfortable with even the

19   instruction you are providing because the ability to provide

20   stronger evidence suggests that there is stronger evidence

21   out there.

22           And are we going to hear some testimony that

23   suggests that surveys are the stronger evidence?  I get that

24   you have done a survey, and your expert can get up there and

25   say, "I have done it.  This is why I did it," blah, blah,

```
 1    blah, but is there an expert that's going to say surveys are

 2    the stronger evidence that would trigger, I guess, this

 3    instruction that you seek?

 4          Because it seems to me what is good for the goose

 5    is good for the gander.  If you want that instruction, then

 6    I think the jury is entitled to know that there is not a per

 7    se requirement to conduct a survey.

 8          You have got an expert who has done it and has

 9    laid out his or her points as it relates to it.  They have

10    an expert to contradict that.  The jury will evaluate it and

11    make a decision.

12          But throwing out a suggestion that there is,

13    quote/unquote, the ability to present stronger evidence, I

14    worry, sort of, shifts the burden proof inappropriately.

15          MR. REES:  That instruction that I just suggested

16    is a joint one that's already been approved by both that

17    says -- because it relates not only to the survey, but to

18    many other things that may come up during trial where either

19    side may argue, aha.  They could have produced better

20    evidence and they didn't.  And they're going to use that

21    against us where it helps them, and we're going to use it

22    against them when it helps us.

23          But it's a neutral statement on how to evaluate

24    evidence as opposed to getting into the weeds about whether

25    surveys are or not required.
```

```
 1            The plastic wrapping, just briefly.  He repeats

 2   over and over again that the evidence is the consumer never

 3   sees the wrapping.  There is not one speck of evidence as to

 4   whether the consumer does or does not see the wrapping.

 5            THE COURT:  Then it's irrelevant, isn't it, if

 6   there is no evidence either way?

 7            MR. REES:  But it's relevant to the intent because

 8   if we -- I mean, they're going to put up two bags next to

 9   each other and say, "Look how similar these two bags look."

10            When we ship something, it's got -- the only thing

11   you see -- you don't see the NX, you don't see the MK, you

12   don't see anything except a tag that said Noble Exchange,

13   and here is our registration trademark.  That's relevant

14   evidence.

15            THE COURT:  But the consumer never sees it.

16            MR. REES:  We don't know whether the consumer sees

17   it or not.  The consumer might see it; the consumer might

18   not see it.  We don't know, and they don't know.

19            THE COURT:  How would you present evidence -- or

20   how would you lay the foundation as to how these products

21   are shipped?

22            MR. REES:  Exactly like that:  Mr. Jung, when you

23   ship these products, what do they look like?

24            Here is the picture.  Here is the wrapping.

25            Can you see the NX?
```

1          No.

2          What can you see?

3          This label that says Noble Exchange and our

4    registration.

5          THE COURT:  You are saying.  If questioned,

6    Mr. Jung would say, "I don't know what the consumer sees"?

7          MR. REES:  Well, no.  He may see it for

8    different -- consumer may see it in a different context.

9    For example, in some places they may keep them wrapped, in

10   some places they may take them apart.  I don't know.  Nobody

11   has asked that question in discovery thus far.

12         But for them to say it's an absolute done deal

13   that the consumer never sees it in that wrapping isn't the

14   case.  They don't have any evidence of that.  That's just

15   their speculation.

16         THE COURT:  Well, is it really speculation?  All

17   the documents that have been filed in this case, I have not

18   seen a single photograph of these bags in their original

19   wrapping at all.  I mean, in fairness to the plaintiff, I

20   don't think it's speculation.

21         You -- I think either you know or will be able to

22   easily find out that -- whether or not these bags, whether

23   it's at the swap meet, Ross, Marshalls, are they put on the

24   shelves with this plastic wrapping around it?  And if the

25   answer is no, I don't see how that's relevant.

```
 1              MR. REES:  Well, I would ask on that aspect that
 2   the Court defer ruling until we get more foundation for it
 3   one way or the other.
 4              THE COURT:  Okay.  All right.  Anything further on
 5   that motion from either side?
 6              MR. REES:  No.  Thank you, Your Honor.
 7              THE COURT:  Let's shift to the defendants' motions
 8   in limine.
 9              Mr. Rees, which motions would you like to be
10   heard?  Am I going to basically get a replay of Mr. Gordon's
11   argument as it relates to experts now?
12              MR. REES:  On Goldaper, just a couple of things to
13   point out.  One, is that her whole theory is post sale
14   confusion, but there is not one scrap of evidence of anybody
15   ever having post sale confusion other than -- and this
16   relates to Mr. Kors -- so if I may jump to that one issue.
17              Mr. Kors, the whole way that this lawsuit
18   started -- we have got all these lawyers from Beverly Hills
19   and New York against Chunma -- started when Mr. Kors said,
20   "Hey.  That looks like my bag."  And he called up somebody
21   angry and said, "Stop it."
22              And we have the -- I started our opposition with
23   his -- I mean, Krista McDonough's testimony.  That's very
24   relevant because if anybody else -- they have, for
25   example -- Michael Kors has a hotline where people can call
```

```
 1   in and say, "Hey.  I think there is some phony product out
 2   there."  Nobody has ever called this bag in.
 3         But if the boss, the head of the whole company
 4   says, "Hey.  That bag looks like ours," then we should have
 5   the right to challenge it because it's not unreasonable to
 6   expect that, once the emperor says, "This is my new set of
 7   clothes," everybody does with the emperor wants, and we get
 8   to explain that to the jury.
 9         THE COURT:  Explain what?  That the whole reason
10   why this case was filed was because Mr. Kors saw a bag that
11   he thought looked similar to his?
12         MR. REES:  Yes.
13         THE COURT:  Assuming that's the case -- and I
14   don't know if it is -- what's wrong with that?
15         MR. REES:  It explains why -- I think they have
16   something called confirmation bias in psychology.  If the
17   boss says these two items are infringing, even if they're
18   not objectively, everybody downstream of Mr. Kors says, "Oh.
19   We find these two products are infringing," they don't
20   make -- all of the things that flow from that are,
21   basically, biased, and we're entitled to put that argument
22   to the jury.
23         THE COURT:  I am curious.  Which psychologist is
24   going to testify as relates to confirmation bias?
25         MR. REES:  We can argue it.  The idea that, if the
```

1    boss says, "I find these two events -- these two products to
2    be infringing," that that's not from -- it's not binding on
3    the jury certainly, but it's certainly believable why we are
4    here in court two years later.
5            But Mr. Kors comes to L.A.  He's the guy that
6    started the first whole ball rolling.  He's the first
7    domino.  Why can't he be called as a witness?
8            THE COURT:  I will tell you my view.  Because who
9    cares what started the ball rolling?  Unless there is some
10   evidence -- number one, he hasn't been deposed.  So all you
11   know is from what Miss McDonough said.
12           Unless there is some evidence that suggests I am
13   going to file the lawsuit in spite of what my lawyers tell
14   me, I have malicious motives -- who cares?
15           I have done these cases numerous times.  It can be
16   the head of the company.  It could be a representative that
17   just happens to be in a mall and sees something that they
18   think is infringing.  What difference does it make?
19   Ultimately, the jury decides those questions.
20           Just because Michael Kors may have been upset that
21   he saw something that he thought was infringing, I am having
22   difficulty understanding other than, I guess, what you are
23   now describing as this confirmation bias to suggest that
24   somehow he's done a mind-meld over all of his employees and
25   all of his lawyers to think "We must follow orders and

```
 1   proceed with this lawsuit"?
 2              MR. REES:  It's not a mind-meld.  None of his
 3   lawyers made an independent evaluation of -- this is the
 4   argument -- you don't have to agree with it -- but the
 5   argument would be everybody downstream of Mr. Kors says,
 6   "We're going to push this case whether it has merit or not
 7   because that's what our boss wants us to do."
 8              And the jury can hear that evidence and decide for
 9   themselves whether there is really infringement or whether
10   this is just a vanity lawsuit by Mr. Kors.
11              THE COURT:  Okay.  Let's get back to
12   Miss Goldaper.
13              MR. REES:  I assume it's Goldaper.  I don't know
14   for sure.  But the point is she talks about post sale
15   confusion, and there has not been any instance of any injury
16   to them from any post sale confusion.  So the question is
17   what's the real harm that they claim other than her
18   speculation because that's all she does is speculate these
19   two things might be confused post sale.
20              THE COURT:  Isn't she not able to testify about
21   the strength of the Michael Kors brand?  Or do you disagree?
22              MR. REES:  Thank you for bringing that up because
23   that points to another issue that we're going to get later
24   on when we talk about damages, and it's a legal question for
25   the Court to make a ruling on.
```

```
 1              For whatever purpose plaintiff puts all of its IP

 2    into this one company, plaintiff, Michael Kors, LLC.  And

 3    then, when it's convenient for them, they say, "We have

 4    Michael Kors, the holding company with all these various

 5    subsidiaries, and we should be all treated as one big

 6    economic unit."

 7              So the question is, when she talks about the

 8    strength of the Michael Kors brand, does she have to talk

 9    about it as it relates to the economic unit who is the

10    plaintiff that creates it?  Or is she able to talk about

11    we're going to treat all of these Michael Kors subsidiaries

12    as one big happy economic group?

13              And that's neither here nor there -- I will move

14    on.  But that comes when we talk about damages.  That's

15    going to be an important point.

16              THE COURT:  Can you answer this question for me.

17    Isn't Miss Goldaper's testimony relevant to post purchase

18    confusion?

19              MR. REES:  If it existed, that would be fine.  But

20    she only speculates about it.  And no matter how good or

21    qualified your expert is, you can't just give off-the-cuff

22    speculation.

23              And so we're asking what post purchase confusion

24    is in the record other than this second-level hearsay from

25    Mr. Kors?
```

```
 1              THE COURT:  Okay.  Anything further as it relates
 2   to this motion?
 3              MR. REES:  Nothing as it relates to Miss Goldaper.
 4              THE COURT:  Who has drawn the short straw on this
 5   motion from the plaintiff's side?  Mr. Gordon.
 6              MR. GORDON:  Yes.
 7              THE COURT:  Do me a favor, Mr. Gordon.  I
 8   appreciate you wanting to be clear in the mic.  I think we
 9   just got a new sound system here, and so you are a little
10   close, and I think it's buzzing a bit.
11              MR. GORDON:  Sorry.  My wife says the same thing,
12   Your Honor.  Usually not so nice, though.
13              Your Honor, I -- I will be very brief.
14   Miss Goldaper is being put forward here to testify about
15   subjects that Courts here and elsewhere have concluded many,
16   many times.  She has the qualifications and the grounds to
17   give the testimony.
18              As you noted, she's going to talk about the
19   strength of the brand.  She's going to talk about the
20   uniqueness of the trademarks and the trade dress.  She's
21   going to look at our products and explain what elements of
22   those products are unique to Kors and what they're doing.
23   And she's going to talk about similarity and confusion.
24              She's an expert in the fashion industry.  She's
25   well qualified to testify about how consumers are going to
```

```
1    react to these almost identical products.  She gives
2    testimony about initial interest in her deposition -- and
3    there that's pages 48 and 49 which is in the record -- and
4    she talks about how consumers will be drawn to purchase
5    their goods because they look like our goods.
6              She testifies about source confusion, how
7    consumers are likely to think there is some association or
8    affiliation.  And she talks about post sale confusion.  She
9    testifies, if there are two people walking in the street
10   with these kind of bags, people are going to be confused.
11             And she does have decades of experience in
12   branding and fashion, and she has specialized knowledge in
13   the industry that allows her to give this testimony.  It
14   satisfies Rule 702.  It's, therefore, proper.
15             If plaintiffs want to cross and say, "Hey, you
16   don't have a single example of confusion," that they're free
17   to do, and the jury will call it like they see it.  If the
18   jury thinks she's just speculating off the cuff, that's what
19   the jury will think.  But this is classic weight of the
20   evidence-type stuff.
21             THE COURT:  Thank you.
22             Mr. Rees, I assume you want to be heard as it
23   relates to your Motion in Limine Number 2 with respect to
24   Mr. Anderson.
25             Do you want me to just cut and paste the
```

1    transcript from what Mr. Gordon said about their motion in

2    limine?  I am joking, of course, but go ahead.

3          MR. REES:  Just one quick question.  On the issue

4    of royalty, we have two problems.  Number one, this isn't a

5    royalty case.

6          The only time people should be talking about

7    royalties in front of a jury is in situations where there

8    has been a license agreement or a franchise agreement that

9    expired or terminated for whatever reason and the defendant

10   kept selling.

11         He goes after royalties, and then he compounds the

12   problem of raising royalties in the first place by totally

13   speculating.

14         In their papers they say, "Well, it's based on

15   royalties that he looked at that other companies use and

16   royalties that Michael Kors does with everybody else."

17         Every single one of his royalties are based on a

18   percentage of sales.  Yet, in this case, he says, "I

19   speculate that Michael Kors would not agree to a percentage

20   of sales.  The only possible royalty Michael Kors would

21   agree to is a price per unit, ten dollars per item."

22         And he comes up with a price per item that's

23   greater than the total revenue from the item.  And he

24   speculates, "Well, there might be reasons why a company

25   would ever do that."

1      So at least as to his royalty testimony, it should

2  be totally excluded.  It's not a royalty case.  He doesn't

3  have -- even under a royalty case, if you look at the

4  instruction, the federal pattern instruction, it says the

5  royalty has to be one that the parties will agree to.

6      He speculates that this is a per-unit royalty that

7  he has never seen before, at least for Michael Kors or in

8  the fashion industry.  So I think the royalty testimony has

9  to be just --

10      THE COURT:  Let me ask on that front, though.  If

11  there is a finding of liability, wouldn't the plaintiff be

12  entitled to actual damages and disgorgement of profits?

13      MR. REES:  Right.  But they cannot point to any

14  sale that they lost because somebody -- and it doesn't make

15  any sense that they lost any sales because you will never

16  anywhere in this world, except they'll argue on the

17  Internet, see a Michael Kors product next to a Noble

18  Exchange product.

19      They speculate about that.  Their actual damages,

20  if they can prove lost sales, fine, but they can't, and they

21  admit they can't.

22      If they can get our profit -- and we've talked

23  about that -- and that's what our expert analyzed how you

24  calculate our profit, how they calculated our lost profit.

25  We think they are totally absurd by saying Chunma with sales

1    of $4 million is comparable to Coach and Burberry and

2    Ralph Lauren, but that's a weight issue.

3            But on royalty, there is just nothing that would

4    support a royalty remedy here.

5            Even if there were, nothing in the way he

6    calculates it makes any sense and would support a jury

7    verdict.

8            THE COURT:  All right.

9            Back again, Mr. Fiddelman.  I assume you were a

10   math major or something in college.

11           MR. FIDDELMAN:  I was the computer science major.

12           THE COURT:  All right.

13           MR. FIDDELMAN:  So focusing just on the royalty

14   issue, the defendants put forth that this is not a royalty

15   case and that royalties are only appropriate where there is

16   a history of licensing.  But they don't cite any law in

17   support of that proposition, and the law is just to the

18   contrary.

19           A reasonable royalty can be used to calculate the

20   marketplace value of the stolen intellectual property as a

21   measure of the actual damages.

22           So the royalties here are not an attempt to

23   capture Chunma's profits.  And as a result, whether Chunma

24   would agree to pay this royalty or not is actually not part

25   of the calculus.

```
 1              The calculus here for calculating a reasonable
 2    royalty as a measure of actual damages is what does this
 3    intellectual property go for in the marketplace?  And the
 4    cases are clear that, as long as that is based on actual
 5    data, it comes in.
 6              And the actual data that our expert has relied on
 7    here are three prior Michael Kors licensing agreements where
 8    Michael Kors has licensed its intellectual property at a
 9    particular percentage rate as well as confirming as a
10    backstop by looking at other royalty agreements from other
11    fashion houses that have comparable numbers to confirm that
12    this is a realistic rate.
13              And he calculates a percentage of royalty that
14    Michael Kors IP goes for in the marketplace.  But then
15    instead of simply taking that percentage and applying it to
16    Chunma sales, he says, "Wait a minute.  Chunma's products
17    are so far below the quality of Michael Kors products and
18    their price points are so much farther below that
19    Michael Kors would never agree to a percentage revenue on
20    those products because they would be receiving only a tenth
21    or less of the value of their IP."  It's not about what
22    Chunma would agree to.  It's about what Michael Kors would
23    agree to.
24              So as a result, he takes that percentage and
25    figures out, based on what these licensed products actually
```

```
1   go for, what the dollar value of each per bag royalty is by

2   just saying these bags go for $150, the royalty is

3   nine percent, therefore, what Michael Kors recovers when it

4   licenses out its IP is $11.00.

5           THE COURT:  But he's saying that, because the

6   quality is so bad as it relates to the Noble Exchange bags,

7   he would not do it; right?

8           MR. FIDDELMAN:  What he is saying is taking the

9   nine percent royalty rate that Michael Kors traditionally

10  charges for its IP and applying it to the $10.00 price point

11  on a Chunma bag is not an actual calculation of a reasonable

12  royalty that captures the value of the stolen IP, which is

13  what we're going for here.

14           The value of the stolen IP has a dollar value

15  every time it's used.  And the fact that the contracts that

16  support that as evidence calculated in the percentage

17  doesn't mean we have to do the same thing when we apply it

18  to the Chunma bags.

19           THE COURT:  Based on your calculation, it's

20  obviously higher because of the higher price point of the

21  Michael Kors bags.

22           MR. FIDDELMAN:  Exactly.  Because that's an actual

23  representation of the value in the marketplace of the

24  Michael Kors IP that's been stolen.  And the fact that

25  Chunma would never have agreed to pay market value for this
```

```
 1    IP doesn't come in to whether or not they have to pay it in
 2    damages if they are found liable.  Of course, they wouldn't
 3    have agreed to pay for it or else they would have.
 4              THE COURT:  The question I have -- you have
 5    touched upon this -- you don't believe that the royalty
 6    calculation should be a percentage of the gross sales by
 7    Chunma because you say that value is too low; right?
 8              MR. FIDDELMAN:  What our expert calculates, that's
 9    correct, Your Honor, is -- he calculates that in the
10    marketplace, when Michael Kors and other fashion houses
11    license their IP, it ends up being tacked on at about $11.00
12    a product.
13              Then he says Chunma sold 700,000 products.  Let's
14    tack that -- let's calculate the value of the stolen IP at
15    $11.00 per theft times the number of thefts.  It's actually
16    very straightforward.
17              THE COURT:  Admittedly it, at least, raises the
18    question of why should that calculation -- or how could the
19    value of the IP that's stolen be more than what it actually
20    sold for?
21              MR. FIDDELMAN:  If you steal a Ferrari which is
22    valued at $100,000 and you sell it on the street for
23    $20,000, if you have to pay restitution, you are not capped
24    at the $20,000 you sold it for.
25              THE COURT:  Right.
```

```
 1          MR. FIDDELMAN:  What you paid the harmed party is

 2   the value that they lost.

 3          THE COURT:  Right.  But isn't this a little

 4   different?  I'm digressing for a moment, and maybe I

 5   shouldn't, but I had a friend of mine in law school that had

 6   a 1979 Mercedes Benz 280 SEL --

 7          MR. FIDDELMAN:  That was before I was born,

 8   Your Honor.

 9          THE COURT:  -- that had a Chevrolet engine inside

10   and we called it the MerChevy.  Okay?  So it wasn't a

11   Mercedes.  Okay?  So the value of it clearly wasn't the

12   price of a Mercedes.  And if he sold it, he wouldn't get the

13   value of a Mercedes.

14          But you are, in essence, telling Chunma, "You

15   should pay us even though you sold it" -- I am making these

16   numbers up -- "for $2.00.  You should pay us as if you sold

17   our product."  Right?  Isn't that, in essence, what you are

18   asking?

19          MR. FIDDELMAN:  It's not about as if they sold our

20   product, Your Honor.  It's about they took our intellectual

21   property.  And we aren't attempting to calculate a proxy for

22   the value of the Chunma merchandise that's being sold.

23   We're calculating a proxy for the out-of-pocket harm that

24   Michael Kors has suffered.

25          THE COURT:  But you are saying all those
```

```
 1    700,000 -- those are 700,000 items that Michael Kors would
 2    have sold.
 3              MR. FIDDELMAN:  Those are 700,000 items that have
 4    Michael Kors's IP on them.  It's not an -- it's not a
 5    one-to-one translation that each of those bags would have
 6    been a consumer buying a Michael Kors bag.  And that's why
 7    the law does not require you to show actual lost sales.
 8    That's an extremely difficult thing to show.
 9              What the law says -- and we cite a number of cases
10    in our briefing -- says that this methodology is how you
11    approximate the out-of-pocket losses when intellectual
12    property is stolen.
13              THE COURT:  All right.  You may get upgraded to
14    business class at this rate.
15              Mr. Rees, anything further you wish to state?
16              MR. REES:  Very, very briefly.
17              On the point of whether or not the parties have to
18    agree to a royalty, if you look at page 97 of their proposed
19    jury instructions starting at line 20, it says:
20                   (Reading:)  A royalty is a payment
21              for the right to use a trademark.  In
22              determining lost royalty --
23              THE COURT:  Slow down.  At this rate, our
24    reporter's fingers are already falling off.
25              MR. REES:  I'm sorry.
```

```
 1                    (Reading:) -- you should determine
 2               the royalty that the plaintiff and the
 3               defendants would have agreed upon if they had
 4               negotiated the terms of a royalty before the
 5               defendants' infringement.
 6               So I still don't think it's a royalty case, but
 7     they're wrong when they say that the parties don't have to
 8     agree on the royalty.  Their own instruction impeaches them.
 9               THE COURT:  All right.  The next motion in limine,
10     Mr. Rees, with respect to the other lawsuit about Coach, do
11     you wish to be heard?  My inclination is to grant it.  So I
12     assume silence is golden as it relates to that motion.
13               MR. REES:  Yes.
14               THE COURT:  Who from the plaintiff wishes to be
15     heard?
16               MR. GORDON:  Thank you, Your Honor.  Mr. Gordon
17     again.
18               Your Honor, just by way of background here and why
19     we believe this evidence is relevant here, if you look, Your
20     Honor, at the Complaint filed in the Coach action, page 16,
21     paragraph 93, what you can see is that in -- I am just
22     getting the date, Your Honor -- in 2009, Coach accused the
23     defendants here of remarkably similar conduct, which is
24     really taking Coach's letter marks and coming up with two
25     very similar letter marks and positioning them so they
```

1    looked like the same letter marks and then putting them on

2    product that mirrored Coach's trade dress, and Coach filed

3    the action and got a permanent injunction and got -- got a

4    judgment with a permanent injunction.  And that, of course,

5    is exactly what we're saying is the same pattern.

6              And so we're seeking to introduce that evidence --

7              THE COURT:  How does that prior lawsuit, in your

8    opinion, demonstrate intent with respect to the issues in

9    this case?

10             MR. GORDON:  Well, Your Honor, because you already

11   heard a little bit of it with the marks and the packaging.

12   They're coming in and they're going to say, "We did

13   everything we were supposed to do.  We did a trademark

14   search," which they did in the Coach case, "and this was

15   all, sort of, innocent mistake, and we can't be blamed if

16   consumers get confused here."

17             And, Your Honor, what the Coach case shows is,

18   one, this is intentional and willful behavior because this

19   is their business strategy.  They go out and find well-known

20   marks, and they come out with -- they come as near as they

21   can, and so they have knowledge of the trademark laws.  They

22   know they're not allowed to do that.  This isn't an innocent

23   mistake.  This is part of a strategy, and all of that goes

24   to intent and to notice of the law and to familiarity with

25   requirements of the trademark law.

```
 1              And that's why the cases we cited -- and really we
 2    didn't find any cases were under 404(b) this type of
 3    evidence was excluded, and defendant certainly doesn't cite
 4    any, but that's why the Ninth Circuit, when they addressed
 5    the similar argument, they said, "Look.  We agree with the
 6    appellant that an infringer once caught should have his
 7    conduct carefully scrutinized in any future operations so as
 8    to determine his intent in going as far as he does.  He must
 9    be required to keep a safe distance away from the margin
10    line."
11              THE COURT:  I guess as it relates to the cases you
12    cite -- maybe I misheard.  I thought in the cases you cited
13    there were multiple acts of infringement, and maybe I am
14    wrong on that.
15              Are there any cases where it's like we have here,
16    a one time and then used later some time away.  I thought
17    the other cases there were multiple prior acts of
18    infringement.  And, I guess, I raise that as a question of
19    should that be a consideration as well?  Particularly when
20    you have some time, and you have almost ten years.
21              MR. GORDON:  Your Honor, on the time I will note
22    on the Burberry case which did involve more than one
23    action -- but in the Burberry case the acts were from 2000
24    to 2004, and the case was brought in 2013.  So that was a
25    nine-year delta.  In the Playboy case we cite, it was a
```

```
1    five-year delta.

2          I don't think you need -- I don't think the Courts

3    are saying you need a repeat -- multiple repeat offender.  I

4    see nothing -- what 404(b) says is, look.  If you are going

5    to use it to show propensity, it doesn't come in.  But, if

6    you are going to use it to show these other factors like

7    notice and lack of mistake and intent, it comes in.  And I

8    see nothing where there is a numerical threshold in the case

9    law that gets it in.

10         I mean, they were caught once, and the jury is

11   allowed to know that to counter the argument they are going

12   to make which is, "Look.  This is just innocent mistake

13   here.  Sorry.  We have a registration, and we're using it,

14   and if people are confused, that's -- that happens."

15         THE COURT:  Is it fair to say, Mr. Gordon, that

16   they were caught?  I don't know the details, and I don't

17   know if you all know the details.  We know the case was

18   filed, an injunction was issued.  Is that enough?

19         MR. GORDON:  Your Honor, in the -- in the other

20   cases, it's cease and desist letters and settlements.

21   That's not what we have here.  They can put whatever gloss

22   they have.

23         They have a judgment.  It is a judgment.  That is

24   a fairly serious thing in any respect when you are a

25   defendant, but certainly in the trademark thing, it is a
```

```
1   permanent injunction that says stay away.

2           So I would argue, Your Honor, that this case is

3   far more serious than the other cases where you are just

4   getting a cease and desist letter and the issue hasn't been

5   litigated.

6           I don't know what happened either in terms of the

7   course of the case or why they entered into the judgment.

8   It doesn't matter.  There is a judgment, and the

9   Ninth Circuit is very clear in this context in the Plough

10  case that you stay away.  You -- once you are caught, you

11  got to stay away, and you can't come close to the line.

12          And the jury is allowed to know to counter the

13  intent and the mistake and the lack of the knowledge.  You

14  know, they're going to have their trademark counselor come

15  in and tell how he did a trademark search and how this is

16  all innocent mistake.  That is their case, Your Honor.

17          And we're allowed to put in evidence that shows

18  that it is not.  And if Your Honor -- if you have a judgment

19  against you, I think that is more powerful arguably than

20  just a letter where somebody is saying "Please stop doing

21  this or I am going to sue you."

22          THE COURT:  Let me play this out for a second.

23  They bring in a lawyer, a trademark lawyer, that says they

24  did all these things.  Do we know -- was that trademark

25  lawyer at Chunma at the time of the settlement?  Do we
```

1    know -- how would you introduce this evidence other than the

2    Court taking judicial notice and instructing the jury that

3    this occurred?  I am just trying to figure out --

4              MR. GORDON:  I think the Court can take judicial

5    notice, A, and so we can use it; B, I think, on cross, their

6    principal, Mr. Jung, on cross of the lawyer, on cross of

7    just about anybody, we can get up there and, when they try

8    to argue that they have been doing everything by the letter

9    of the law, I think we are entitled to use that document to

10   show that, hey.  You have a history here.  You are an

11   infringer and that lack of intent -- the lack of mistake and

12   the intent to willfully infringe can come in to cross those

13   witnesses.

14             THE COURT:  All right.  Thank you, Mr. Gordon.

15             Let me hear from Mr. Rees.  This one is a close

16   one.  There is a part of me that wonders if I should reserve

17   ruling to see how the evidence plays out.  But what's your

18   response?

19             There are cases that clearly do identify -- or

20   there are cases where courts have allowed this 404(b)-type

21   evidence.  And I think to Mr. Gordon's point, they haven't

22   delineated numbers or amounts, but I did note that the other

23   cases seemed to have little more frequency.  Why is this

24   case different?

25             MR. REES:  Because it was never litigated, and

1    they know that.

2              THE COURT:  But a judgment was issued; right?

3              MR. REES:  But a judgment is -- it's a stipulated

4    judgment.  No admission of liability.  "We won't sell this

5    product."  That's not --

6              THE COURT:  What was the judgment?

7              MR. REES:  It's a judgment, not that there was an

8    infringement.  It's a promise not to sell a particular type

9    of product anymore.  That's all it is.

10             How many times has this Court seen stipulated

11   judgments -- the stipulation is "We can't afford to litigate

12   with these people; so we'll just stop selling that product.

13   It's not a big product anyway."  There is no finding of

14   infringement.

15             But they always talk about everything like every

16   sale of a Chunma bag is a theft and every judgment is a

17   finding of infringement.  That's not an established fact.

18   There is no finding of an infringement.

19             You have a settlement that was done simply out of

20   economic reasons, and that's -- it's not evidence of any

21   wrongdoing whatsoever.

22             THE COURT:  So your position is that Chunma did

23   not admit liability in that settlement.

24             MR. REES:  Correct.

25             THE COURT:  And the judgment just is simply that

1    Chunma would not further produce this bag or item.

2         MR. REES:  Whatever the item is in dispute.  It's

3    like I didn't hit the person, but I will agree to a

4    restraining order because I have no idea that I have -- you

5    can't say he is a violent person because he has a

6    restraining order --

7         THE COURT:  I beg to differ.  That's not the

8    greatest hypothetical.  That's my -- I know a little bit

9    about that line of litigation.

10        MR. REES:  Fair enough.  But my point is you don't

11   have any litigation, and there are many cases that say,

12   look.  Where the judgment wasn't litigated, where there is

13   no admission of liability, you can't turn it into what they

14   want it to be, which is, aha.  We caught them.  That's not

15   what the judgment is.

16        THE COURT:  But in fairness, though -- maybe I

17   will put you on the spot, and you may not want to answer

18   this.  Is it a fair statement to say your defense is, look.

19   This is a mistake.  We created this Noble Exchange and just

20   so happens to look like it.  So be it.

21        MR. REES:  No.  We don't -- we argue that we

22   created a mark that's unique to us, Noble Exchange, that

23   there is no evidence of confusion.  And if some of the

24   products look similar -- you know, there are millions of

25   products out there, and nobody has ever gone to Michael Kors

 1   and said, "Hey.  I thought this was a Michael Kors" and

 2   chose a Noble Exchange thing.

 3          They just assumed the jury is going to find

 4   infringement.  And I think when we were here for the summary

 5   judgment, the Court said, "Well, I just assumed this was

 6   another Santee Alley Korean knockoff case."

 7          But that's a prejudice we have to deal with with

 8   the jury, that they're just going to assume, "Ah, these

 9   Koreans did it.  It's must be a knockoff."  But we

10   registered a trademark, and we'll get to that, I'm sure, at

11   some point today, but this is our mark.  We own it.  We're

12   proud of Noble Exchange.

13          THE COURT:  All right.  Fair enough.  I appreciate

14   the argument.

15          MR. REES:  But Coach has nothing to do with it,

16   and it's no evidence of, aha.  You got busted.  They're just

17   wrong.

18          THE COURT:  All right.  I'd like to hear from

19   Mr. Gordon.  What's your response to that point that it's a

20   judgment, there is no admission of liability, there is no

21   specific finding as relates to it?  The judgment simply says

22   that we agree not to do this?  And, in essence, you all have

23   done this, I am, sure numerous times -- cases settle,

24   judgments get issued for a variety of different reasons.

25          Is the judgment in and of itself evidence that

1    Chunma has agreed that they were infringing upon Coach?

2         MR. GORDON:  All I know from the judgment is the

3    judgment says that they are permanently restrained and

4    enjoined from infringing upon the Coach marks and the Coach

5    letter design.

6         THE COURT:  So that phrase "enjoined from

7    infringing" to you suggests that they knew that they were

8    infringing.

9         MR. GORDON:  It doesn't -- if I wanted to use the

10   judgment that way, I think I would have -- I think,

11   actually, then I would have a 404(a) problem because then I

12   would be saying, because of this finding, you are now,

13   ladies and gentlemen of the jury, entitled to find -- so I

14   think, if I was actually doing what he wanted, it would be

15   an easy call for you, Your Honor.

16        I'm not doing that.  They are putting a parade of

17   witnesses up here.  They have to deal with intent.  He's not

18   willing to stipulate intent, I assure you, Your Honor.

19        So he is going to get up there, and he's going to

20   say, "We did a trademark search.  We followed the rules.  We

21   put this on.  There is no confusion.  Here is our survey.

22   There is no confusion."

23        And I think, Your Honor, that judgments are fairly

24   serious things.  And I think you don't even need a judgment.

25   I could just come with my cease and desist letter or some

1    other pieces of evidence of what happened in the Coach thing

2    to show that these people know what the trademark law is,

3    they know what they have to do to stay away from a mark,

4    they know they have to keep a safe distance away from the

5    mark, and that they have a strategy of coming over the line.

6          THE COURT:  It's interesting.  How does that --

7    how does all of that play into the ultimate point they have

8    a strategy of coming close to the line when -- at least you

9    heard from Mr. Rees -- they're proud of this, they did this

10   search, they came up with Noble Exchange?

11         They can argue, "Look.  We knew what happened with

12   Coach and because of it we did all these things.  That's why

13   we did a trademark search.  That's why we did all these

14   extra efforts, and we were careful.  And as a result of all

15   of that, quote/unquote, due diligence, we came up with this

16   product."

17         MR. GORDON:  They can argue that.  They're

18   entitled to argue that.  But we don't have to accept,

19   Your Honor, that this was some innocent company here that

20   wasn't aware of what they actually had to do because the

21   whole point of the Coach case was they had a registration.

22   And then they entered into this judgment where -- and so,

23   Your Honor, we're allowed to show that these are not

24   innocent people here, that this is not some mistake, that

25   they had -- they were well aware of the law, they were well

1    aware of their obligation as an infringer because that's

2    what a judgment says.

3            This judgment says they cannot infringe.  And we

4    can all make our arguments about it, but the Court's

5    repeatedly have said this is not a 404(b) problem.

6            They may not have liked they entered into this,

7    and they may have an explanation for why they entered into

8    it.  That's fine.  They can put on that evidence.  We're not

9    moving to preclude them from that.  But at the end of the

10   day, the only ground they have given you to keep this out is

11   because this is some 404 propensity evidence.

12           And the Courts have said "If you are just using it

13   to say they are an infringer because they were an infringer

14   in the past, that's a problem.  But if you have another

15   purpose, i.e., you are going to show lack of mistake, you

16   are going to show intent, those by the rule, 404(b), can

17   come in."

18           I'm sorry I'm getting close to the mic again.

19   Even I hear the feedback.

20           So, Your Honor, I think we're just reacting to the

21   motion they put in front of you.  They have given you a

22   ground.  There is a Ninth Circuit case.  There is plenty of

23   district court cases that say the argument they're making

24   doesn't work.

25           So, Your Honor, we're all going -- if the evidence

1   comes in -- I am sure we're all going to have our

2   explanations as to why it doesn't matter, why it does

3   matter.  But, Your Honor, that in and of itself is not a

4   ground to keep it out.

5             THE COURT:  All right.  Fair enough.  All right.

6   Obviously, I will take a closer look at all these motions

7   again.  I think we have now dealt with all the motions in

8   limine.

9             MR. REES:  There is one left.

10            THE COURT:  The monetary recovery motion.

11            MR. REES:  Right.  And I just want to again point

12   out some legal principles that kind of runs -- a thread that

13   goes through a lot of these different issues.

14            The first is this Poly-America case that we cite

15   and they dismiss in a footnote but never address.

16   Poly-America is a very important case.  It's Poly-America

17   versus GSE.

18            In that case, there is -- an IP holding company

19   set up in a patent infringement as opposed to trademark

20   infringement, and the Court says "Look.  If you, the patent

21   holder, want to put all of your intellectual property in

22   this holding company but it doesn't have any business,

23   doesn't have any operations, that's great, and you can get

24   injunctive relief, but you cannot get any kind of lost

25   profits because you don't have anything; and we're going to

```
 1    treat that entity as a stand-alone entity and not marry it
 2    to all the other entities in this holding company, master
 3    holding company."
 4            And there are many cases that follow Poly-America.
 5    Nothing overrules it.  Again, they just dismiss it in their
 6    footnote because it is the beginning and the end of their
 7    whole damage claim.
 8            You're a stand-alone IP company.  The evidence is
 9    undisputed from Krista McDonough they don't have any
10    employees, they have two or three officers, they don't have
11    any operations, they don't have any sales, they don't have
12    anything in retail.
13            If you want to do that because you get an economic
14    benefit with taxes or for whatever reason, that's great.
15    But you can't come in and be the plaintiff and all of a
16    sudden say I get the money that this sister company lost or
17    this brother company lost.  We're not going to allow that.
18    That's very clear throughout the country under Poly-America.
19            So that's point one.  And it goes to the other
20    issues on how you are going to treat plaintiff, whether
21    they're a stand-alone unit when it's convenient for them or
22    whether they're a part of this big family for strength of
23    the mark, et cetera, how much money was spent on the mark,
24    who promoted the mark, et cetera because they don't do any
25    of that.  That's all done by separate companies.
```

```
1          Second point, on the willfulness issue, the
2  evidence of willfulness, I understand why the Court ruled
3  the way it did in the summary judgment, but there is a very
4  important point under -- that state case is A&M Records and
5  Heilman.
6          When somebody says, "I am the designated witness
7  and I have relevant information and I am going to withhold
8  that information on a claim of privilege," great.  But you
9  can't then turn around at trial and say, "I am going to drop
10 the privilege and use all this information I didn't permit
11 you any discovery on."
12         Their designated witness would not testify at all
13 about what evidence she had of willfulness.  And the
14 questions weren't it was conversations with lawyers.  The
15 question was what evidence do you have of Point A, Point B?
16 And it's going to come up in other contexts.  So I just want
17 to establish, at least, our view of the principle which is,
18 if Krista McDonough -- or if they withheld evidence under a
19 claim of privilege, they're bound by that, and they can't
20 conveniently waive it now and bring in a bunch of new
21 evidence.
22         THE COURT:  Does anyone from the plaintiff wish to
23 be heard as it relates to the monetary recovery?
24         But, of course.  We're dealing with money,
25 Mr. Fiddelman.
```

```
 1              MR. FIDDELMAN:  Thank you, Your Honor.

 2          So addressing the three, sort of, unrelated

 3   arguments in turn here, first, with respect to the IP

 4   holding company issue.

 5          The Poly-America case is a federal circuit case

 6   interpreting the long line of cases that in turn interpret a

 7   particular section of the Patent Act.

 8              And as far as we can tell, none of that reasoning

 9   has ever been applied outside of that narrower context.  And

10   in fact, to the contrary, IP holding companies recover for

11   trademark infringement all the time.  It's a very common

12   thing.

13          And there are different policy purposes behind the

14   two statutes and different reasons, but I want to raise one

15   other point which is the defendants say that a holding

16   company can't recover lost profits.

17          Lost profits -- actual damages has to do with harm

18   you are suffering; right?  It's not about measuring sales

19   you would have made absent this conduct, which goes back to

20   what we discussed earlier on the royalty points.

21              And the second thing I will just quickly point out

22   is, even in the patent context, district courts -- in the

23   Poly-America case, they were unrelated -- they were

24   affiliate companies.

25              And at least there are district court cases out
```

1    there that say, when it's a wholly owned subsidiary, you

2    don't have this disconnect problem and they are all one

3    entity.  And that's what we have here; so I really think

4    this is a non-issue, Your Honor.

5            Turning second to the willfulness question,

6    Your Honor has already considered and rejected this issue

7    including on the privilege grounds.

8            On pages 11 and 12 of your summary judgment

9    decision, Your Honor, you pointed out that there is plenty

10   of evidence of willfulness in the record.  We've been

11   discussing more evidence of willfulness, the Coach case.

12           And as Your Honor will see when the trial comes,

13   our position is that the greatest evidence of willfulness is

14   in some sense the inherently incredible story you are going

15   to hear from the defendants about how they developed this

16   mark.  And to foreclose a recovery theory on this -- in this

17   posture of discussing admissibility of evidence is not

18   proper, and the cases make that clear.

19           And just a brief comment on the privilege point

20   here is the questions that were posed to Ms. McDonough, who

21   is an in-house attorney, were not proper questions.  They

22   weren't what evidence of willfulness do you have?  The

23   questions were -- I'm reading one of them now.  Quote, "What

24   is your understanding of the basis for your claim of

25   willfulness?"

1          That's privilege when you ask it of the in-house

2     lawyer.

3          "Are there any other factors you would consider in

4     determining whether Chunma's conduct was willful?"

5          That's not a question asking us to produce

6     evidence of willfulness.  If we had received an

7     interrogatory about evidence of willfulness which has to do

8     with the defendants' conduct, not anything internal, we

9     would have answered it.  That's not what happened here.  So

10    the privilege point is also, sort of, a non sequitur.

11         Lastly, I don't think we need to address the

12    monetary -- the setoff point, which is premature in any

13    event.

14         THE COURT:  Thank you, Counsel.  So I think we

15    have now covered all the motions in limine.  I will take

16    them under submission while I go over my notes of today's

17    arguments, and then we'll issue an order soon as it relates

18    to the motions in limine.

19         I have heard, I think, arguments on -- well, I

20    think I heard mostly from Mr. Rees as it relates to Mr. Kors

21    and Mr. Idol and their testimony.  My tentative again is to

22    grant that.

23         Do the plaintiffs wish to be heard any further on

24    that point?

25         Mr. Fagen, do you want to justify your existence

```
 1   here today?

 2           MR. FAGEN:  I am doing my best, Your Honor.

 3           THE COURT:  All right.  I am sure for all of you

 4   escaping five to six inches of snow was enough of a

 5   motivation to come out here.

 6           MR. FAGEN:  Exactly.  Fiddelman thinks I should

 7   stay seated because he majored in computer science; I

 8   didn't.  And also your rules, Your Honor, do not encourage

 9   old lawyers.  It's only the use of young lawyers, but I am

10   still here.

11           Your Honor, I can't tell you how many motions I

12   have argued where litigants say, "Give me your CEO, give me

13   your chief design officer."  And we all know there is the

14   apex doctrine which is very tough that says you can't get a

15   top executive unless there is no other way.

16           I have heard a lot of creative ways to get around

17   that, but I have never heard an argument about confirmation

18   bias.  If that were real, then I think the Apex Doctrine

19   articulated by the Supreme Court would explode because every

20   king can generate confirmation bias, I guess.

21           But in this case, as Your Honor noted, I think,

22   this has no relevance whatsoever to anything, and there is

23   absolutely no showing whatsoever that Michael Kors himself

24   somehow talked to all the lawyers and said, "Oh, I'm very

25   angry, and I am vain, and you have got to do" -- it's
```

```
 1   ridiculous.
 2            Your Honor, I have been representing Michael Kors
 3   since inception of the company.  I haven't heard a word from
 4   him about this case.  So, Your Honor, with all respect I
 5   think that that's got to go.
 6            And on the Idol, Mr. Idol who is the CEO, my
 7   adversary yanked that application.  He's no longer seeking
 8   Mr. Idol; so we don't have to spend any time on that.
 9            Your Honor, I rise to address that, but there are
10   two other things that I think are urgent.
11            THE COURT:  All right.
12            MR. FAGEN:  It's all together.  One of them is the
13   question of whether Pippa Newman and the investigators could
14   take the stand.  There has been an objection to that when we
15   served our witness list, but it's a much broader question.
16            Your Honor, the pretrial order here is in
17   disarray.  And I love my adversary, and he was very candid
18   last night to say, "I don't have any time to meet with you."
19            THE COURT:  That's on my list is what -- we have
20   no -- well, you filed one, but that was it.
21            MR. FAGEN:  And he said, as honest as he is, he
22   said, "Look.  I will throw myself on my sword," et cetera.
23   I don't need a sword.  I don't think Your Honor does.
24            I think we need a pretrial order.  And my humble
25   request, Your Honor, if you have the time, is I would love a
```

1  direction that the parties spend a good solid two hours

2  together -- could be by phone -- this week to settle this.

3  We don't have stips.  We don't have exhibit authentication.

4  I could go on --

5  THE COURT:  Do you have a camera looking over my

6  notes here because --

7  MR. FAGEN:  I think Fiddelman does.

8  THE COURT:  Probably because I have down here

9  "plaintiff only filed proposed voir dire.  There was a joint

10  statement of the case filed.  Jury instructions are a mess."

11  I was going to ask that you meet and confer,

12  although I am not optimistic about that.  Each side filed

13  their own exhibit list, special verdict form.  There is a

14  whole bunch of things.

15  MR. FAGEN:  I really don't think we're that far

16  apart.  We just haven't collaborated.  I just need two hours

17  with my friend, and I think by phone we can get it done this

18  week.

19  And we need to know, Your Honor, because --

20  whether or not we get authentication of exhibits or stip, it

21  may affect the witness list.  And there is another issue.

22  There is a witness that appeared either last night

23  or the day before -- I can't remember -- on his witness

24  list.

25  This is the now famous trademark lawyer you have

 1   heard about.  It looks like he is coming on as a lay expert

 2   witness.  He's going to talk about trademark registrations

 3   and their significance and why this is important, and that's

 4   lay expert -- never got a report.  And there was loads of

 5   talk months ago, if he is coming on, we need a deposition.

 6   No deposition.  That's a problem.

 7        And the Pippa Newman issue and the investigator

 8   issue, you have heard, I think, or we've heard, at least, in

 9   papers we'd never heard of these people, never disclosed in

10   discovery.  Keep them out.  Well, there is Federal Rule of

11   Civil Procedure 37(c)(1) that tells us what to do in a case

12   like this.

13        And there are two questions:  One, were these

14   witnesses concealed, or were they disclosed?  I represent to

15   Your Honor Ms. Newman was the subject of very significant

16   deposition testimony.  She was asked about who she was.

17   She -- the witness was asked who reports to her.  The

18   witness was asked about her design respon- -- Pippa was

19   disclosed.

20        The investigators.  We have a company called

21   Investigative Consultants.  They've been identified from

22   Day 1 in a 30(b)(6) response.  My friend, my adversary,

23   didn't bother to depose them, never deposed them.

24        THE COURT:  What are these witnesses -- what's the

25   offer of proof as relates to those witnesses?

```
 1                MR. FAGEN:  From the beginning we've said

 2     Investigative Consultants are going to testify to instances

 3     of confusion.  And we have submitted to the adversary

 4     literally 40 pages of reports articulating exactly the

 5     evidence of actual confusion -- all out in the open.

 6                THE COURT:  These consultants, will they say that

 7     they spoke to people who were confused by X, Y, and Z?

 8                MR. FAGEN:  Among other things, they were.  In the

 9     store, they heard them say, "I thought this was this,"

10     et cetera, classic trademark actual confusion evidence.

11     This has been in the open from Day 1.

12                And Pippa Newman, the substance of her testimony

13     is all out there.  It's in the pleading.  It's in

14     interrogatory answers.  It's in deposition evidence.  Her

15     subordinate was deposed.  He testified at length to the

16     same -- Pippa Newman is a great witness, not just from an

17     advocacy point of view but able to answer every question

18     that's posed, cross, direct.  The jury will understand what

19     happened here.  She's good.

20                The actual confusion stuff I don't have to say,

21     Your Honor.  That's pretty important stuff.  We asked the

22     adversary, "Oh, I don't know."

23                We said, "Depose them.  You got her, but you want

24     to depose" -- no, too busy.

25                So, Your Honor, this is kind of a subset, I
```

```
 1   believe, of the pretrial order problem.  We've got to iron

 2   out who the witnesses are, where the stips are, where the

 3   exhibits are.

 4            I haven't seen his exhibits.  So my request,

 5   Your Honor, is two hours, and we're done.  And I think it

 6   will benefit the Court.  It will certainly benefit us

 7   planning for this trial which isn't that far away.

 8            THE COURT:  Mr. Rees.

 9            MR. REES:  Yes.

10            THE COURT:  Let's talk about the witnesses first.

11            MR. REES:  Absolutely.  The name, Philippa Newman,

12   never showed up until they came into the case.  For them to

13   say it's been out in the open from Day 1 is just wrong.  As

14   soon as I got their list, I went back and looked at their

15   Rule 26 disclosures.  I went back and looked at their

16   written discovery responses --

17            THE COURT:  Was Ms. Newman deposed?

18            MR. REES:  No.  I never heard of her.  Krista

19   McDonough was deposed.

20            THE COURT:  I thought I misheard.  I thought there

21   was a representation -- maybe I misheard -- that Miss Newman

22   had been deposed.

23            MR. REES:  That was the representation, but it was

24   totally in error.

25            MR. FAGEN:  Just to be clear, my representation
```

```
 1    was that she was the subject of deposition testimony in a
 2    30(b)(6), and he didn't follow up to depose her.
 3              THE COURT:  Okay.  Thank you for clarifying.  She
 4    was the subject of --
 5              MR. FAGEN:  She came up.
 6              MR. REES:  Okay.  I don't think that's correct
 7    either but --
 8              THE COURT:  But it's different than being deposed.
 9    She has not been deposed.
10              MR. REES:  She has not been deposed.  And I would
11    say, if they're allowed to add her at this late date, then
12    we would have the right to depose her.  It's neither here
13    nor there, but we had the deposition set up.
14              They gave me two names -- McDonough and LaFargue.
15    We had them set for April.  A week before their deposition,
16    they canceled that and said, "We can't do it until June,"
17    and it's been the usual runaround.
18              But that's a name that wasn't in any disclosure,
19    wasn't in any answer to any interrogatory.  The first time I
20    saw it was in their list.
21              Their investigators -- let's talk about that
22    because they have several on their witness list, some of
23    whom they disclosed, others were not disclosed.  And so they
24    have two -- I think one is Brittany Phipps, and the other is
25    somebody else --
```

```
 1              THE COURT:  But they both work for Investigative

 2   Consultants; correct?

 3              MR. REES:  I don't know who they work for.  They

 4   are names that show up on the witness list but were never

 5   disclosed in any answers to any interrogatories, in any

 6   disclosures; so they're brand new witnesses that I haven't

 7   heard of.

 8              THE COURT:  Counsel, let me ask the question.

 9   Let's assume that they do work for Investigative

10   Consultants.

11              MR. REES:  Okay.

12              THE COURT:  Would you still have an objection,

13   then, because you have known about Investigative

14   Consultants.  Correct?

15              MR. REES:  But Investigative Consultants is a

16   family business.  And they say they have produced 40 pages.

17   I'd like to see those 40 pages but --

18              THE COURT:  I'm sure they'll oblige.

19              MR. REES:  That's fine.  But knowing that somebody

20   has hired a company is not the same as disclosing.  Because

21   in Rule 26 they put the names of the specific investigators.

22   In answers to interrogatories they identify investigators.

23   But to come up with brand-new names a month before trial is

24   just not cricket.

25              THE COURT:  Well, it seems to me -- I just want to
```

```
 1    take a look at some notes.

 2          So I guess as -- I'm looking quickly at 30(b)(6).

 3    If I understand correctly, Investigative Consultants was

 4    disclosed under 30(b)(6).  Is that a fair statement,

 5    Mr. Rees?

 6          MR. REES:  I can't tell you because I haven't

 7    looked.  It's been a while since I looked at the 30(b)(6).

 8          In terms of the Answers to Interrogatories and the

 9    disclosure statements under Rule 26, they were not.

10          THE COURT:  Okay.  Let me ask you, Mr. Fagen, if

11    you know or if anyone of the plaintiff side knows was,

12    pursuant to 30(b)(6), was a -- one or more officers,

13    directors, et cetera, or other persons who consent to

14    testify on its behalf on matters in which the person will

15    testify, were those names disclosed pursuant to 30(b)(6)?

16          MR. FAGEN:  I am told that it is -- Investigative

17    Consultants is in 30(b)(6).  It was disclosed.  He did not

18    follow-up to depose them.  He asked who is most

19    knowledgeable.  We identified Investigative Consultants.  I

20    think underneath we had the president's name.

21          THE COURT:  Is that the witness --

22          MR. FAGEN:  One of them.

23          THE COURT:  Because I'm just looking at 30(b)(6),

24    and it says that --

25                      (Reading:)  The party may name as a
```

```
 1              deponent a public or private corporation or

 2              partnership association, et cetera and

 3              describe with reasonable particularity the

 4              matters on which examination is required.  The

 5              organization so named shall designate one or

 6              more officers, directors, et cetera, or other

 7              persons who consent to testify on its behalf

 8              and matters on which the person will testify.

 9          So it seems to me, if Investigative Consultants

10  was designated pursuant to 30(b)(6) and the name of that

11  person will testify was designated, that witness should be

12  allowed to testify.

13          But now you said there is two -- there is four

14  names.  Were those four names listed?

15          MR. FAGEN:  In --

16          THE COURT:  Make sure you speak --

17          MR. FAGEN:  Sorry, Your Honor.

18          If I could just have a point of clarification.  As

19  I understand 30(b)(6), it is a discovery mechanism where

20  somebody says I want to know from you who is most

21  knowledgeable so I can take a deposition.

22          THE COURT:  Right.

23          MR. FAGEN:  And then they take a deposition, which

24  is usually the starting point.  They find out who is

25  involved, and then they take depositions which are plain old
```

```
1    depositions, not 30(b)(6).

2              In this case, we identified the Investigative

3    Consultants.  I believe we identified a person, and that was

4    it.  He never took their deposition under 30(b)(6) or

5    otherwise.

6              THE COURT:  I get that.  And so --

7              MR. FAGEN:  Hence, now here we are at trial, and

8    we have the right to identify witnesses for trial.  We have

9    the right to identify anybody we want as long as they have

10   been disclosed in the process and he was on notice.

11             THE COURT:  But I guess that's the part where I

12   have a question mark.  I understand your point about

13   identifying whoever you want as long as they have been

14   disclosed.  The question in my mind is, if you have

15   disclosed under 30(b)(6) Investigative Consultants, is it

16   your position that any and all employees of Investigative

17   Consultants can come in and testify?

18             MR. FAGEN:  Absolutely.  We identified the

19   consultant who is going to do its work.  That 30(b)(6) thing

20   was gazillions of months ago.  Things happened since.  We're

21   getting ready for trial.  Investigators go out.  They find

22   out the evidence.

23             If he wanted to know exactly who that was in case

24   he wanted to take a deposition -- God knows he doesn't take

25   a 30(b)(6) deposition -- he could have asked.  He didn't.
```

```
 1            THE COURT:  Let me ask you this procedurally,
 2   then.  Let's say you provide the notice.  You say
 3   Investigative Consultants, John Doe.  Mr. Rees takes the
 4   deposition of John Doe, and in that deposition they
 5   disclose, yeah, we did a bunch of things, et cetera,
 6   et cetera.  Come trial, Jane Doe, Jane Smith, Thomas Jones,
 7   all from Investigative Consultants are now designated as
 8   witnesses.  You say that's still fair game?
 9            MR. FAGEN:  Absolutely.  What was his remedy --
10   because Your Honor may think this may not be fair.  What was
11   his remedy?  His remedy was to do a job.  "Let me talk to
12   Investigative Consultants.  I want to know who is doing the
13   work.  I want to know what they found.  I want to know where
14   they went, when they went."  That's what you do to prepare
15   for trial.
16            I don't believe identifying a company and its
17   president then blocks you from trial testimony because he
18   didn't follow up and didn't know.
19            THE COURT:  I'm not suggesting that.  I am just
20   looking at it from the rules.  From reading the rule, does
21   it preclude other names that were not identified pursuant to
22   30(b)(6)?
23            MR. FAGEN:  I have never seen a 30(b)(6) used for
24   that purpose ever.  And I think again, Your Honor, we said
25   to him -- we knew he was unhappy -- "Take a deposition now.
```

1   You didn't do it before.  Here they are."

2          "No."

3          So, I mean, you can't have it both ways.

4          And let me also say, Your Honor, with respect to

5   Rule 37(c)(1), the advisory rules -- and I think this is

6   significant -- say disclosure of a witness in the course of

7   depositions is just fine for the purpose of disclosure when

8   it comes to trial.

9          THE COURT:  I understand that.  That I am clear

10  on.  It's just the 30(b)(6) issue --

11         MR. FAGEN:  So with respect to Pippa Newman, he

12  says he never heard it.  I will show you the transcript.  He

13  took the deposition.  She was described and identified and

14  her job, et cetera, on Investigative Consultants.  He never

15  did it.  So now we're at trial, and we're blocked from

16  proving up stuff?  I don't think that's fair.

17         THE COURT:  I need to look at both those issues,

18  but I appreciate you bringing them to the Court's attention,

19  and I will rule in short order.

20         MR. REES:  If I may address the other --

21         THE COURT:  Yes.

22         MR. REES:  I thank the Court for its patience and

23  my opponent.

24         As the Court may recall, we moved this from last

25  Friday to this Friday because I was supposed on holiday.  I

1   have a set of three cases with the lawyer from Hades on the

2   other side, and I spent all last week in ex partes every

3   morning in superior court.  It's not an excuse, but there is

4   only one of me, and I do my best.

5          On the pretrial order, I got theirs.  I was

6   marrying my memo of contentions which is on file to blend

7   that in, and I think we can work that out.

8          We have our voir dire questions.  The Court has

9   both verdict forms.  And the Court has our -- basically, the

10  set of jury instructions that can be polished.  I think we

11  can have all of that done by next Thursday or Friday.

12          THE COURT:  So is that an agreement because, quite

13  frankly, I was thinking about ordering you all to just go in

14  the witness room -- I have a criminal calendar going on --

15  and work this out.

16          I don't know what your plans are or is it adequate

17  from your perspective, Mr. Fagen, to just hear Mr. Rees's

18  representation that he is willing to meet and confer to

19  discuss all of the issues that you have concerns about and

20  others and get joint filings done by next Thursday?

21          MR. FAGEN:  I love the deadline, but I have some

22  experience with the very, very busy Mr. Rees.  I need by

23  phone two hours, after he gives us his inputs, what is he

24  objecting to, what is he stipulating to?  I need to know

25  something before I can talk to him.

```
 1          And I would respectfully suggest -- and Mr. Rees
 2   will appreciate.  If I have a promise for a two-hour
 3   conversation after he gives us his stuff anytime this week,
 4   I am happy.  You will get a pretrial order that works.
 5          THE COURT:  You want the Court to -- I feel like I
 6   am with my children fighting over Xbox games.  You want me
 7   to order Mr. Rees to meet with you for two hours after he
 8   provides you what exactly?
 9          MR. FAGEN:  I'd like to see his exhibits.  I'd
10   like to see his stip.  I would like to see where he
11   ultimately comes out on Pippa and the investigators.  I
12   would like -- I don't mean to burden the record, Your Honor,
13   but I have got a lot of things that --
14          THE COURT:  All right.  Why don't we do this.  We
15   can do one of two things.  I can have you meet and confer in
16   the witness room, figure out what issues you need to work
17   on, come back and tell me, "Here is what we've agreed to do
18   between now and Thursday," we put it on the record, and then
19   we're done.
20          MR. FAGEN:  I would respectfully suggest that that
21   won't work because Mr. Rees has not done his homework yet.
22   He has to tell us, "Here is my position."  We'll hammer
23   things out.  I would like him to tell us, "Our position on
24   all these deficiencies" -- no issues --
25          THE COURT:  My point is meet and confer right now
```

1    to -- so that you let him know, "Here is what I am looking

2    for."  He says, "Okay.  I am willing to talk with you.

3    We'll get it done on Monday, Tuesday, Wednesday, and then

4    we'll get everything filed Thursday."

5            MR. REES:  Here is my suggestion, Your Honor.

6            THE COURT:  All right.  This is not good when the

7    lawyers keep offering suggestions to my suggestions.

8            MR. REES:  Sorry.  But I think they're trying to

9    catch a plane.  I'm not sure.

10           THE COURT:  I know all the flights back East.  I

11   have done that dance for five or six years.  So I know there

12   is a 5:30, a 7:30 -- well, that's an aside, but go ahead.

13           MR. REES:  I can give them by, say, Tuesday the

14   pretrial order, the voir dire questions.  They have the

15   verdict form.  They have our input on jury instructions.  I

16   can give them a finer exhibit list.  They have our witness

17   list.

18           And then on Wednesday -- we could do two hours by

19   phone on Wednesday after they've gotten my input on Tuesday,

20   and then we'll try and get what we can file on Thursday.

21           THE COURT:  All right.  Can I add to that list,

22   have you all even discussed deposition transcripts and

23   counter-designations?

24           MR. FAGEN:  We have, but we haven't gotten

25   designations from him.

```
 1              THE COURT:  Can you do that as well, Mr. Rees?

 2              MR. REES:  I will try.

 3              MR. FAGEN:  Grateful that Mr. Rees talked about

 4    exhibits, but we need his binder of exhibits in order to

 5    respond to his exhibit list, and we need to know where he

 6    objects to our exhibits or not.

 7              THE COURT:  I am assuming that's what the

 8    conversation will be with respect to exhibits.  Is that

 9    not --

10              MR. FAGEN:  I would hope.

11              MR. REES:  That's my understanding.

12              THE COURT:  So we have got voir dire, verdict

13    form, jury instructions, exhibit list, deposition

14    designations, pretrial conference order, all of that done by

15    Tuesday for a meet-and-confer by phone amongst the parties

16    Wednesday so that final filings can be filed with the Court

17    by the close of business on Thursday, April the 12th.

18              Does that work for both sides, Mr. Rees?

19              MR. REES:  The transcript designation may be a

20    little bit difficult, but everything else I can do -- I will

21    do my best on.

22              THE COURT:  Please do our best.  We've got a

23    trial -- this is my worry.  The reason why I want to do this

24    is because I don't want to waste jury time fighting about

25    depo transcripts, et cetera.  So the sooner you can get that
```

```
 1    done, the better.

 2              MR. REES:  Please, if I can ask the Court, what is

 3    it exactly that's expected in the deposition?  I mean,

 4    identify -- for example, Krista McDonough, she's going to be

 5    here to testify.  Do I have to give up what I am going to

 6    impeach her with?

 7              THE COURT:  I want to know have the parties talked

 8    about which deposition transcripts the parties are going to

 9    designate for each side in the event of -- a witness not

10    showing up, but in the event of prior testimony and things

11    of that nature?  So, yes.  If you plan on impeaching a

12    witness with deposition testimony, I would expect the

13    parties to share those designations with each other.  Maybe

14    I am missing something.

15              MR. REES:  I have never done on that before.

16    That's why I'm asking.

17              THE COURT:  Is that something unique to this

18    Court, Mr. Gordon?

19              MR. GORDON:  Your Honor, we have submitted to

20    Mr. Rees two deposition transcripts that we affirmatively

21    want to use in our case in chief designated from them so we

22    can use them as admissions or however we want to use them.

23    He can counter, he can not counter.  He just has to let us

24    know.

25              And then if he wants to do the same -- he doesn't
```

1    have to give me his cross, but it's one thing to impeach a

2    witness because they say something inconsistent with the

3    transcript, and it's another to have an affirmative

4    admission where you say to the judge, "Krista McDonough said

5    X."  If he is planning on doing that, he needs to show us,

6    of course, the transcript.

7              THE COURT:  That's what I've been used to, but you

8    sound -- your tone of voice suggests that that is something

9    you have not dealt with.

10             MR. REES:  Correct.

11             MR. GORDON:  We can discuss it after.

12             MR. REES:  I think I get the point from his --

13             THE COURT:  I am not asking you to provide him the

14   playbook of your cross-examination, if that's what you are

15   concerned about.  I am not asking that.

16             Mr. Fagen.

17             MR. FAGEN:  I guess that's it.  We'll get a ruling

18   on the Pippa Newman and the investigator thing?

19             THE COURT:  Yes.  I am going to look at that this

20   weekend to try to get a ruling out next week.

21             MR. FAGEN:  Mr. Lee issue about the lay expert --

22             THE COURT:  I'm sorry.  I didn't hear.  What is

23   that issue about, Mr. Rees?

24             MR. REES:  I don't know why they're surprised.

25   From Day 1 we identified Brian Lee as the trademark lawyer

1   for the company.  He was identified in the Answers to

2   Interrogatories.  He was identified on the witness list we

3   filed.

4           THE COURT:  What's your offer of proof as it

5   relates to him?

6           MR. REES:  He is going to explain -- he doesn't

7   have an opinion in the sense -- he's not going to say this

8   is a real mark or whatever.  He is going to say this is how

9   you -- "If you have a design you want to register a

10   trademark, this is what you do.  And this is what we did for

11   the Noble Exchange mark:  We filed this application, we got

12   this number, it gets published here, it gets published

13   there."

14           If they think it's expert opinion -- I don't think

15   it's opinion.  I think it's outside the scope of what a

16   jury's general knowledge is.  They could take his deposition

17   before trial, but he is not in the -- he's like a treating

18   physician versus a doctor hired to give an opinion on

19   causation or something --

20           THE COURT:  Mr. Fagen, what's your objection if

21   the witness testifies -- what's your occupation?

22           I am the trademark lawyer for Chunma.

23           What do you do, generally speaking?

24           Here is what I did in this case:  I filed the

25   trademark.  I searched for a trademark.  I didn't see

1    anything.   I registered the mark, and that was it.

2            What -- is that your concern?  Or are you

3    concerned that he is going to say, "Because I am a trademark

4    lawyer, I know this is right," more the opinion.

5            MR. FAGEN:  It's both.  I don't think a physician

6    explaining what he did and how he did it and why he did it,

7    all of those things, is anything other than lay opinion

8    testimony.

9            THE COURT:  Is it --

10           MR. FAGEN:  He has to --

11           THE COURT:  Is it really lay opinion if he is

12   outlining the steps that he took to register the mark and

13   nothing more?

14           MR. FAGEN:  I think, Your Honor, to have that

15   testimony, somewhere he's got to be asked what is a

16   registration?  What's the purpose of doing it?  Where did

17   you go?  Why is that important?

18           THE COURT:  It's interesting.  I am just trying to

19   parse out your question.  Why is that important?  I get it.

20   What did you do?  What is a registration?  Is that an

21   opinion?

22           MR. FAGEN:  That's big.  In this case, that's a

23   huge part of their defense.  "Oh, we got a registration.

24   We're in the free and clear."  We know that's not the law.

25   But this guy is going to take the stand and probably show

1   his registration, and how could that ever happen given the

2   thematic without him saying, "This is what I did and why.

3   This is what I did and this is what it means.  This is what

4   I did" --

5           THE COURT:  Let me stop you there.

6           "This is what I did," I don't see as an issue.  I

7   have seen the issue what it means, but he can hold up a

8   registration until the cows come home.  If the jurors see

9   these two bags and say, "There is confusion," it doesn't

10  matter if he's registered it.  Correct?

11          MR. FAGEN:  Correct.

12          THE COURT:  Why does it matter if he says this

13  is -- "I am generally familiar with registrations.  So I

14  tried to register this mark.  This is what I did," not why,

15  "I did this, I did this, I did this -- that step, and that

16  was it."  How is that prejudicial, or how is that opinion

17  testimony?

18          MR. FAGEN:  How -- I mean, why is this coming in?

19  Why is he doing this?

20          THE COURT:  Because he is trying to demonstrate

21  their lack of intent to infringe.

22          MR. FAGEN:  I think a lay juror listening to this

23  is going to say, "Registration.  What's that?"  And I think

24  inevitably -- and if I ask him a single question, inevitably

25  it's going to come out, "I did this because I was trying to

1  protect their mark against claims of infringement."  It's

2  going to happen.

3      THE COURT:  Assume that's the case.  Who cares?

4  If you got experts that are saying, "I don't care if he

5  registered this mark.  Look at these things, ladies and

6  gentlemen of the jury.  You are going to tell me these

7  things are not -- that consumers are not going to get

8  confused?"

9      The only reason I am pushing back the way I am, I

10  had a trial last September where the defense claimed that

11  they had registered a design, and that came in.  The jurors

12  put the two pieces of fabric together and said, "I could

13  care less."

14      You are doing what you need to do.  I respect

15  that.  I just think you are being overly cautious if the

16  witness testifies to simply what he did and not the reasons

17  why.

18      MR. FAGEN:  Your Honor, look.  It may come out, as

19  you have suggested, surgically and clean.  But having seen

20  some of these, God knows what happens.  And there is a

21  history here because during the discovery process when this

22  first name came up, we said, "Look.  He is going to get into

23  this area.  This is an expert.  We want a deposition," never

24  happened.

25      Now when you look at the designation, which as I

1    say we just got the other day, it's talking about trademark.

2    It's talking about registration.  That is the kind of stuff

3    we said, "We want your deposition."  We didn't get it.

4           We just got his witness list the other day.  Here

5    we are offering deposition after deposition.  He won't take

6    them.  We're in the position of saying this guy sounds now

7    like the very expert that we were worried about months and

8    months and months ago, and we didn't get his deposition or

9    report.

10          THE COURT:  Mr. Rees.

11          MR. REES:  I am very frustrated because we filed

12   his name on our witness list in February.  To say they just

13   got it the other day --

14          THE COURT:  Take that aside.  Let's talk about the

15   merits.

16          MR. REES:  If all they want is a deposition before

17   trial, and if that deposition will allow Mr. Lee to answer

18   the why question, that's part of our two-hour conversation

19   next week because we're going to talk about Newman --

20          THE COURT:  But I'm not sure I see the relevance

21   as to why -- what more does he need to testify to other

22   than, "I work here.  I registered this trademark.  I did" --

23          MR. REES:  Nothing.  But if you say, "Why do you

24   do something," he has to be able to say because that's

25   what's required under the trademark --

```
 1            THE COURT:  You all need to talk about it.  I
 2   think that's a little problematic.
 3            MR. REES:  Okay.  I am here in the court.
 4            THE COURT:  All right.  Is there anything else
 5   that we need to discuss before we conclude this marathon
 6   session?
 7            MR. GORDON:  Sorry, Your Honor.  I know you have a
 8   calendar.  Could I ask a couple of housekeeping questions?
 9            THE COURT:  Yes.
10            MR. GORDON:  So we don't have to waste time with
11   the jury.  For the bifurcation part phase, are you
12   contemplating separate openings and closings for
13   bifurcation?
14            THE COURT:  That's how I have done them in the
15   past.  The jury doesn't know about the bifurcation, and I
16   give them the bad news at the appropriate time.
17            MR. GORDON:  And on bifurcation, will you be
18   having rebuttal as well, or is it just each side is going to
19   present?
20            THE COURT:  No.  It's just like another trial.
21   Case, defense, rebuttal.
22            MR. GORDON:  There are some bench claims in the
23   case, Your Honor.
24            THE COURT:  I will deal with those later.
25            MR. GORDON:  And, finally, Your Honor, with regard
```

1    to openings and closings, do you have a practice concerning

2    the use of jury instructions in openings and closings?

3             THE COURT:  Not in openings.  In closings, once we

4    have agreed upon them and fought that battle, you can use

5    them in closings.

6             MR. GORDON:  Second of all, openings, do you

7    permit exhibits or do you --

8             THE COURT:  Only if the parties agree.  So if

9    there is not an agreement as it relates to it, then they

10   don't -- then they're not going to be used.

11            MR. GORDON:  Okay.  Do you hear the objections to

12   those exhibits --

13            THE COURT:  Beforehand.  But I strongly encourage

14   the parties to try to agree.  If you can't, then I tend to

15   just say then don't use it.  And if it comes in at trial

16   over one side's objection, you can use it in the closing.

17            MR. GORDON:  I assume the same is true for

18   demonstratives.

19            THE COURT:  Correct.  I've been going through this

20   experiment of allowing the attorneys 15 minutes of

21   voir dire.  I am reluctant -- if you want 15 minutes of

22   voir dire, you each can have 15 minutes of voir dire.

23            MR. GORDON:  With regard to voir dire, I read your

24   rules.  So I have a general understanding, but do you

25   restock the box --

```
 1            THE COURT:  We'll fill up the box with the 16.  I
 2    do voir dire, you do voir dire, then I come to sidebar, and
 3    we begin challenges for cause.  If there is a challenge for
 4    cause, depending on how many challenges, if there is one
 5    cause and we have enough to go through peremptories, then
 6    we'll do peremptories right then and there.  If once we
 7    start running short on jurors, I fill them up once we --
 8    when we fall short.  Does that make sense?
 9            MR. GORDON:  Yeah.  Just -- so I am just trying to
10    figure out whether I need to save a peremptory in my pocket
11    or whether you envision that the first set of jurors is
12    going to pretty much -- you put in your rules you might go
13    six or seven.  So I am just --
14            THE COURT:  For civil?  I usually have eight for
15    civil.
16            MR. GORDON:  But then you say you reserve the
17    right to go six or seven.
18            THE COURT:  I haven't had to do that yet.  So I am
19    hoping this case is not the case.
20            MR. GORDON:  I think I understand.
21            THE COURT:  If there is any questions, let me
22    know, please.
23            Anything further we need to discuss?
24            All right.  I appreciate the time.  I am,
25    actually, very much looking forward to this trial.  We have
```

1   great lawyers on both sides.  It's an interesting case.

2           I trust -- again, I'm not telling anyone how to

3   try their case.  My hope is Mr. Fiddelman will have an

4   opportunity to examine a witness or two.  This is a friendly

5   forum.  So if not now -- I just leave that to you all.  I

6   will see you all on April the 24th.  Thank you.

7           MR. FAGEN:  Thank you, Your Honor.

8           THE CLERK:  All rise.  This Court is in recess.

9       (Proceedings concluded at 1:47 p.m.)

10                      --oOo--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

     I hereby certify that pursuant to Section 753,

Title 28, United States Code, the foregoing is a true and

correct transcript of the stenographically reported

proceedings held in the above-entitled matter and that the

transcript page format is in conformance with the

regulations of the Judicial Conference of the United States.


Date:  April 15, 2018.




                     ___/S/ CHIA MEI JUI _____

                     Chia Mei Jui, CSR No. 3287

**MR. FAGEN: [40]**
3/25 5/15 5/20 78/1
78/5 79/11 79/20 80/6
80/14 81/25 82/7
83/24 84/4 86/15
86/21 87/14 87/16
87/22 88/6 88/17 89/8
89/22 90/10 91/20
92/8 92/19 93/23 94/2
94/9 96/16 96/20 98/4
98/9 98/13 98/21
99/10 99/17 99/21
100/17 105/6

**MR. FIDDELMAN:**
**[30]** 21/6 21/8 21/11
21/13 22/7 24/21 25/8
25/23 26/11 26/16
27/16 27/23 28/11
28/14 28/18 29/5
29/11 33/15 33/17
54/10 54/12 56/7
56/21 57/7 57/20
57/25 58/6 58/18 59/2
74/25

**MR. GATIEN: [1]** 3/5
**MR. GORDON: [40]**
9/1 9/10 10/20 12/5
13/11 16/13 18/8 21/2
34/22 35/5 35/19
35/21 36/11 36/25
37/5 37/24 50/5 50/10
60/15 61/9 62/20
63/18 65/3 69/1 69/8
70/16 95/18 96/10
102/6 102/9 102/16
102/21 102/24 103/5
103/10 103/16 103/22
104/8 104/15 104/19
**MR. REES: [78]** 3/11
4/2 5/22 5/25 6/7 9/18
9/21 18/23 19/5 19/7
29/25 31/17 32/13
32/22 38/25 39/11
40/7 40/22 42/14 43/6
43/15 43/21 44/6
44/25 45/5 45/11
46/11 46/14 46/24
48/1 48/12 48/21
49/18 50/2 52/2 53/12
59/15 59/24 60/12
65/24 66/2 66/6 66/23
67/1 67/9 67/20 68/14
72/8 72/10 83/8 83/10
83/17 83/22 84/5 84/9
85/2 85/10 85/14
85/18 86/5 90/19
90/21 93/4 93/7 93/12
94/1 94/10 94/18 95/1
95/14 96/9 96/11
96/23 97/5 101/10
101/15 101/22 102/2
**THE CLERK: [2]** 3/3
105/7
**THE COURT: [182]**

**$**
**$10.00 [1]** 56/10

**$100,000 [1]** 57/22
**$11.00 [3]** 56/4 57/11
57/15
**$150 [1]** 56/2
**$2.00 [1]** 58/16
**$20,000 [2]** 57/23
57/24
**$28,000 [1]** 32/5
**$4 [1]** 54/1
**$4 million [1]** 54/1

**'**
**'NX' [1]** 38/17

**-**
**--oOo [1]** 105/10
**-type [1]** 65/20

**0**
**0692 [1]** 2/5

**1**
**10 [1]** 15/25
**10019 [1]** 2/10
**101 [1]** 16/24
**11 [1]** 76/8
**11:26 [2]** 1/17 3/2
**12 [1]** 76/8
**120 [1]** 2/4
**1285 [1]** 2/9
**12th [1]** 94/17
**15 [9]** 4/25 5/17 5/19
5/19 5/20 103/20
103/21 103/22 106/10
**152 [1]** 11/10
**16 [2]** 60/20 104/1
**16-1271-AB [2]** 1/8
3/4
**18 [1]** 14/6
**1925 [1]** 2/14
**1979 [1]** 58/6
**1:47 [1]** 105/9

**2**
**20 [2]** 25/19 59/19
**2000 [2]** 2/14 62/23
**2004 [2]** 23/9 62/24
**2009 [1]** 60/22
**2013 [1]** 62/24
**2018 [3]** 1/16 3/1
106/10
**207 [1]** 2/4
**212-373-3575 [1]** 2/10
**24th [3]** 3/22 3/23
105/6
**24th until [1]** 4/12
**26 [3]** 83/15 85/21
86/9
**27th or [1]** 6/5
**27th so [1]** 4/11
**28 [1]** 106/4
**280 [1]** 58/6
**28th [1]** 6/5
**2nd [2]** 4/12 6/11

**3**
**30 [21]** 4/22 5/3 81/22
84/2 86/2 86/4 86/7
86/12 86/15 86/7

86/23 87/3
86/17 87/19
88/1 88/4 88/15 88/19
88/25 89/22 89/23
90/10
**30th [1]** 6/3
**30th when [1]** 6/9
**310-277-7071 [1]** 2/15
**3287 [2]** 1/23 106/15
**350 [1]** 1/24
**3575 [1]** 2/10
**37 [2]** 81/11 90/5
**3rd [2]** 4/9 4/9

**4**
**40 [3]** 82/4 85/16
85/17
**404 [7]** 62/2 63/4
65/20 69/11 71/5
71/11 71/16
**424-302-0692 [1]** 2/5
**4311 [1]** 1/24
**48 [1]** 51/3
**49 [1]** 51/3

**5**
**50 [1]** 26/7
**5:30 [1]** 93/12

**6**
**6 1/2 [1]** 5/5

**7**
**700,000 [4]** 57/13 59/1
59/1 59/3
**702 [1]** 51/14
**7071 [1]** 2/15
**753 [1]** 106/3
**7:30 [1]** 93/12

**9**
**90012 [1]** 1/24
**90067 [1]** 2/15
**90212 [1]** 2/5
**93 [1]** 60/21
**97 [1]** 59/18

**A**
**AB [2]** 1/8 3/4
**ability [2]** 40/18 41/19
42/13
**able [8]** 4/5 4/13 17/24
44/21 48/20 49/10
82/17 101/24
**absent [1]** 75/19
**absolute [1]** 44/12
**absolutely [5]** 28/15
78/23 83/11 88/18
89/9
**absorbed [1]** 22/22
**absorption [4]** 22/21
22/25 23/14 24/25
**absurd [1]** 53/25
**accept [2]** 18/1 70/18
**accepted [12]** 11/14
11/20 12/2 12/25 14/3
15/10 15/13 16/2 17/9
17/17 18/11 18/15
**according [2]** 20/11
30/14

**accountant [4]** 26/16
26/24 27/14 27/19
**accused [1]** 60/22
**Act [4]** 15/1 15/12
38/2 75/7
**action [3]** 60/20 61/3
62/23
**acts [3]** 62/13 62/17
62/23
**actual [22]** 5/6 14/17
21/19 23/19 24/4 24/9
27/12 33/24 34/9
53/12 53/19 54/21
55/2 54/4 55/6 56/11
56/22 59/7 75/17 82/5
82/10 82/20
**add [2]** 84/11 93/21
**added [2]** 10/6 32/3
**addition [1]** 32/9
**address [5]** 13/9
72/15 77/11 79/9
90/20
**addressed [1]** 62/4
**addressing [1]** 75/2
**adequate [1]** 91/16
**admissibility [5]** 7/3
14/15 29/19 31/16
76/17
**admissible [1]** 15/4
**admission [4]** 66/4
67/13 68/20 96/4
**admissions [1]** 95/22
**admit [3]** 32/12 53/21
66/23
**Admittedly [2]** 3/20
57/17
**adversary [5]** 79/7
79/17 81/22 82/3
82/22
**adversary's [1]** 11/2
**advisory [1]** 90/5
**advocacy [1]** 82/17
**affect [1]** 80/21
**affiliate [1]** 75/24
**affiliated [2]** 15/8 20/3
**affiliation [2]** 15/3
51/8
**affirmative [2]** 35/18
96/3
**affirmatively [1]** 95/20
**afford [1]** 66/11
**afield [1]** 20/16
**after [8]** 14/21 52/11
91/23 92/3 92/7 93/19
96/11 101/5
**again [22]** 5/8 8/14 9/3
11/25 12/4 15/25 16/7
19/25 24/7 32/15
34/18 41/17 43/2 54/9
60/17 71/18 72/7
72/11 73/5 77/21
89/24 105/2
**against [6]** 4/18 42/21
42/22 45/19 64/19
100/1
**ago [7]** 8/7 8/8 9/23
28/21 81/5 88/20
101/8

**agree [17]** 11/1 28/22
48/4 52/19 52/21 53/5
54/24 55/19 55/22
55/23 59/18 60/8 62/5
67/3 68/22 103/8
103/14
**agreed [6]** 56/25 57/3
60/3 69/1 92/17 103/4
**agreement [4]** 52/8
52/8 91/12 103/9
**agreements [2]** 55/7
55/10
**Ah [1]** 68/8
**aha [3]** 42/19 67/14
68/16
**ahead [4]** 21/13 24/3
52/2 93/12
**akin [1]** 24/24
**al [1]** 3/5
**Alley [1]** 68/6
**allow [7]** 6/18 34/12
34/16 34/18 35/2
73/17 101/17
**allowed [8]** 61/22
63/11 64/12 64/17
65/20 70/23 84/11
87/12
**allowing [2]** 27/11
103/20
**allows [1]** 51/13
**alluded [1]** 38/20
**almost [2]** 51/1 62/20
**alone [3]** 73/1 73/8
73/21
**along [2]** 37/18 38/19
**already [5]** 33/12
42/16 59/24 61/10
76/6
**alternative [3]** 30/11
30/16 33/10
**although [3]** 26/13
40/23 80/12
**always [4]** 6/14 15/5
15/5 66/15
**America [7]** 72/14
72/16 72/16 73/4
73/18 75/5 75/23
**AMERICAS [1]** 2/9
**Among [1]** 82/8
**amongst [1]** 94/15
**amount [4]** 4/16 5/11
22/3 26/7
**amounts [1]** 65/22
**analysis [8]** 21/22
24/10 27/9 28/2 29/16
29/17 29/21 33/20
**analyzed [1]** 53/23
**and/or [1]** 24/19
**Anderson [9]** 22/1
23/6 24/2 26/19 31/2
31/3 31/5 32/2 51/24
**ANDREW [3]** 2/8 3/7
9/3
**Andrew Gordon [2]**
3/7 9/3
**ANDRÉ [1]** 1/3
**ANGELES [4]** 1/8
1/24 2/15 3/1

**A**

**angry [2]** 45/21 78/25
**another [8]** 4/8 9/15 48/23 68/6 71/14 80/21 96/3 102/20
**answer [8]** 15/12 17/12 44/25 49/16 67/17 82/17 84/19 101/17
**answered [1]** 77/9
**answers [6]** 10/3 82/14 85/5 85/22 86/8 97/1
**anymore [1]** 66/9
**anytime [1]** 92/3
**anyway [1]** 66/13
**apart [2]** 44/10 80/16
**apex [2]** 78/14 78/18
**Apex Doctrine [1]** 78/18
**apologies [2]** 3/14 10/21
**apparent [1]** 33/19
**apparently [2]** 25/20 26/22
**APPEARANCES [1]** 2/1
**appeared [1]** 80/22
**appellant [1]** 62/6
**applicable [1]** 29/20
**application [2]** 79/7 97/11
**applied [3]** 27/18 27/19 75/9
**applies [2]** 22/17 40/17
**apply [2]** 39/14 56/17
**applying [2]** 55/15 56/10
**appreciate [15]** 10/24 16/11 16/18 17/5 17/19 20/21 34/14 34/15 35/6 36/1 50/8 68/13 90/18 92/2 104/24
**appropriate [5]** 36/1 39/6 39/20 54/15 102/16
**approved [4]** 20/6 20/7 31/10 42/16
**approximate [1]** 59/11
**approximating [1]** 26/25
**approximation [5]** 22/14 27/5 34/6 34/7 34/11
**approximations [1]** 33/24
**APRIL [10]** 1/16 3/1 3/22 3/23 4/10 6/3 84/15 94/17 105/6 106/10
**April 24th [1]** 3/23
**April 30th [1]** 6/3
**area [3]** 14/13 14/16 100/23
**aren't [2]** 35/17 58/21

**arguably [1]** 64/19
**argue [16]** 34/16 39/5 39/24 40/3 40/8 41/13 41/16 42/19 46/25 53/16 64/2 65/8 67/21 70/11 70/17 70/18
**argued [1]** 78/12
**argument [12]** 30/21 36/23 38/24 45/11 46/21 48/4 48/5 62/5 63/11 68/14 71/23 78/17
**argumentative [1]** 39/11
**arguments [7]** 18/25 33/8 36/9 71/4 75/3 77/17 77/19
**arose [1]** 23/13
**around [9]** 4/5 28/25 29/5 32/19 32/20 38/12 44/24 74/9 78/16
**articulated [1]** 78/19
**articulating [1]** 82/4
**aside [2]** 93/12 101/14
**asked [10]** 13/2 18/16 44/11 81/16 81/17 81/18 82/21 86/18 88/25 98/15
**asking [9]** 14/21 35/1 38/21 49/23 58/18 77/5 95/16 96/13 96/15
**asks [1]** 12/20
**aspect [1]** 45/1
**associated [1]** 15/23
**association [2]** 51/7 87/2
**assume [12]** 3/22 3/23 25/5 28/22 48/13 51/22 54/9 60/12 68/8 85/9 100/3 103/17
**assumed [2]** 68/3 68/5
**assuming [4]** 12/4 37/17 46/13 94/7
**assure [1]** 69/18
**attack [1]** 24/19
**attempt [1]** 54/22
**attempting [1]** 58/21
**attention [1]** 90/18
**attributed [1]** 30/6
**authentication [2]** 80/3 80/20
**automatically [1]** 23/17
**available [3]** 6/2 6/10 40/1
**AVENUE [1]** 2/9
**averaging [1]** 5/5
**aware [3]** 70/20 70/25 71/1
**away [10]** 7/4 20/22 62/9 62/16 64/1 64/10 64/11 70/3 70/4 83/7

**B**

**back [12]** 16/10 21/8 26/18 29/24 48/11

54/9 74/14 83/14 83/15 92/17 93/10 100/9
**background [1]** 60/18
**backstop [1]** 55/10
**bad [2]** 56/6 102/16
**bag [27]** 7/13 7/22 12/19 12/19 13/16 13/18 19/22 19/23 19/24 20/1 20/6 20/7 37/5 37/9 37/13 38/9 38/12 38/16 45/20 46/2 46/4 46/10 56/1 56/11 59/6 66/16 67/1
**bags [20]** 7/18 7/20 16/24 22/16 22/19 23/20 24/1 24/6 37/20 43/8 43/9 44/18 44/22 51/10 56/2 56/6 56/18 56/21 59/5 99/9
**balancing [1]** 35/11
**ball [2]** 47/6 47/9
**based [15]** 4/24 5/4 21/19 21/20 24/12 24/18 25/18 27/5 28/5 36/3 52/14 52/17 55/4 55/25 56/19
**basic [1]** 11/12
**basically [6]** 4/12 16/12 31/19 45/10 46/21 91/9
**basis [2]** 28/16 76/24
**battle [1]** 103/4
**becomes [1]** 29/20
**before [18]** 3/15 3/16 5/9 38/13 38/14 41/1 53/7 58/7 60/4 80/23 84/15 85/23 90/1 91/25 95/15 97/17 101/16 102/5
**beforehand [2]** 39/23 103/13
**beg [1]** 67/7
**begin [1]** 104/3
**beginning [2]** 73/6 82/1
**behalf [2]** 86/14 87/7
**behavior [1]** 61/18
**behind [2]** 36/16 75/13
**believable [1]** 47/3
**believe [6]** 19/7 57/5 60/19 83/1 88/3 89/16
**believes [1]** 8/9
**below [2]** 17/16 55/17 55/18
**bench [2]** 5/4 102/22
**benefit [3]** 73/14 83/6 83/6
**Benz [1]** 58/6
**best [5]** 32/20 78/2 91/4 94/21 94/22
**better [6]** 17/3 18/1 19/9 32/9 42/19 95/1
**between [5]** 23/12 32/4 33/19 39/2 92/18
**BEVERLY [2]** 2/5 45/18

**Beverly Hills [1]** 45/18
**bias [5]** 46/16 46/24 47/23 78/18 78/20
**biased [1]** 46/21
**bifurcated [1]** 6/3
**bifurcation [4]** 102/11 102/13 102/15 102/17
**big [7]** 22/8 39/1 49/5 49/12 66/13 73/22 98/22
**billion [1]** 40/4
**binder [1]** 94/4
**binding [1]** 47/2
**BIROTTE [1]** 1/3
**bit [5]** 36/12 50/10 61/11 67/8 94/20
**blah [3]** 41/25 41/25 42/1
**blamed [1]** 61/15
**blend [1]** 91/6
**blocked [1]** 90/15
**blocks [1]** 89/17
**bona [2]** 20/18 20/20
**bona fide [1]** 20/20
**born [1]** 58/7
**boss [4]** 46/3 46/17 47/1 48/7
**Boston [1]** 4/9
**both [14]** 3/13 3/24 6/25 30/8 32/23 32/24 42/16 85/1 90/3 90/17 91/9 94/18 98/5 105/1
**bother [1]** 81/23
**bound [1]** 74/19
**box [2]** 103/25 104/1
**brand [5]** 48/21 49/8 50/19 85/6 85/23
**brand-new [1]** 85/23
**branding [1]** 51/12
**Brian [1]** 96/25
**bridge [2]** 6/12 36/25
**brief [7]** 12/10 15/15 33/16 35/23 40/25 50/13 76/19
**briefing [5]** 16/1 18/10 23/6 34/25 59/10
**briefly [2]** 43/1 59/16
**bring [3]** 33/1 39/19 64/23 74/20
**bringing [2]** 48/22 90/18
**brings [1]** 39/19
**Brittany [1]** 84/24
**broad [1]** 39/10
**broader [1]** 79/15
**broadly [1]** 40/11
**brother [1]** 73/17
**brought [2]** 6/1 62/24
**bunch [4]** 25/4 74/20 80/14 89/5
**Burberry [1]** 54/1 62/22 62/23
**burden [6]** 22/9 22/10 22/11 24/8 42/14 92/12
**business [5]** 59/14 61/19 72/22 85/16

94/17
**busted [1]** 68/16
**busy [2]** 82/24 91/22
**Butler [1]** 15/17
**buying [1]** 59/6
**buzzing [1]** 50/10

**C**

**calculate [7]** 30/22 31/4 31/24 53/24 54/19 57/14 58/21
**calculated [5]** 30/8 30/18 32/7 53/24 56/16
**calculates [6]** 22/15 24/5 54/6 55/13 57/8 57/9
**calculating [7]** 22/4 30/5 31/6 34/5 34/11 55/1 58/23
**calculation [18]** 24/12 25/14 25/20 25/23 25/24 26/1 26/4 26/5 26/5 30/22 31/8 32/17 33/21 34/9 56/11 56/19 57/6 57/18
**calculations [6]** 22/2 26/19 29/8 33/9 33/23 33/25
**calculus [2]** 54/25 55/1
**calendar [4]** 4/7 4/10 91/14 102/8
**CALIFORNIA [7]** 1/2 1/9 1/18 1/24 2/5 2/15 3/1
**call [4]** 9/15 45/25 51/17 69/15
**called [7]** 17/11 45/20 46/2 46/16 47/7 58/10 81/20
**Calling [1]** 3/4
**calls [2]** 22/20 36/8
**came [8]** 20/2 34/11 70/10 70/15 83/12 84/5 100/11 100/22
**camera [1]** 80/5
**CAMINO [1]** 2/4
**cancel [1]** 4/10
**canceled [1]** 84/16
**candid [1]** 79/17
**capped [1]** 57/23
**capture [1]** 54/23
**captures [1]** 56/12
**care [3]** 20/4 100/4 100/13
**careful [2]** 38/4 70/14
**carefully [3]** 36/21 36/22 62/7
**cares [4]** 20/5 47/9 47/14 100/3
**cases [30]** 12/14 15/16 23/8 35/13 35/17 40/25 41/2 41/9 47/15 55/4 59/9 62/1 62/2 62/11 62/12 62/15 62/17 63/20 64/3 65/19 65/20

**C**

**cases... [9]** 65/23
67/11 68/23 71/23
73/4 75/6 75/25 76/18
91/1
**catch [1]** 93/9
**caught [6]** 10/19 62/6
63/10 63/16 64/10
67/14
**causation [1]** 97/19
**cause [3]** 104/3 104/4
104/5
**cautious [1]** 100/15
**caveats [2]** 22/20
22/24
**CCRR [1]** 1/23
**cease [3]** 63/20 64/4
69/25
**CENTRAL [1]** 1/2
**CENTURY [1]** 2/14
**CEO [2]** 78/12 79/6
**certainly [5]** 47/3 47/3
62/3 63/25 83/6
**CERTIFICATE [1]**
106/1
**certify [1]** 106/3
**cetera [12]** 4/21 73/23
73/24 79/22 82/10
86/13 87/2 87/6 89/5
89/6 90/14 94/25
**challenge [2]** 46/5
104/3
**challenges [3]** 6/25
104/3 104/4
**chance [3]** 3/19 8/15
10/9
**characterizes [1]**
11/10
**charges [1]** 56/10
**chess [1]** 4/16
**Chevrolet [1]** 58/9
**CHIA [3]** 1/23 106/14
106/15
**chief [2]** 78/13 95/21
**children [1]** 92/6
**Cho [7]** 26/22 26/25
28/8 28/12 29/9 29/15
32/23
**chop [1]** 7/4
**chose [1]** 68/2
**CHUNMA [27]** 1/9 3/5
3/21 22/15 24/4 24/5
26/20 26/24 37/10
45/19 53/25 54/23
55/16 55/22 56/11
56/18 56/25 57/7
57/13 58/14 58/22
64/25 66/16 66/22
67/1 69/1 97/22
**Chunma's [9]** 23/21
23/22 26/16 34/9
34/11 37/19 54/23
55/16 77/4
**circles [1]** 17/18
**circuit [5]** 23/7 62/4
64/9 71/22 75/5
**cite [8]** 15/15 15/25
54/16 59/9 62/3 62/12

**cited [2]** 62/1 62/12
**civil [3]** 81/11 104/14
104/15
**Civil Procedure 37 [1]**
81/11
**claim [10]** 17/21 17/21
36/14 36/15 36/18
48/17 73/7 74/8 74/19
76/24
**claimed [2]** 26/20
100/10
**claims [1]** 100/1
102/22
**clarification [1]** 87/18
**clarify [1]** 9/19
**clarifying [1]** 84/3
**class [1]** 59/14
**classic [2]** 51/19
82/10
**clean [1]** 100/19
**clear [11]** 15/17 20/19
23/5 50/8 55/4 64/9
73/18 76/18 83/25
90/9 98/24
**clearly [2]** 58/11
65/19
**clicking [1]** 4/20
**clock [3]** 4/17 4/17
4/20
**close [6]** 50/10 64/11
65/15 70/8 71/18
94/17
**closely [1]** 3/20
**closer [2]** 41/17 72/6
**closing [4]** 4/23 38/24
40/3 103/16
**closings [6]** 5/18
102/12 103/1 103/2
103/3 103/5
**clothes [1]** 46/7
**cmjui.csr [1]** 1/25
**coach [18]** 8/5 29/24
31/7 54/1 60/10 60/20
60/22 61/2 61/14
61/17 68/15 69/1 69/4
69/4 70/1 70/12 70/21
76/11
**Coach's [2]** 60/24
61/2
**Code [1]** 106/4
**collaborated [1]** 80/16
**colleague [1]** 9/6
**colleagues [1]** 9/8
**college [1]** 54/10
**comes [16]** 21/25
23/5 29/18 32/10
32/11 35/4 47/5 49/14
52/22 55/5 63/7 72/1
76/12 90/8 92/11
103/15
**comfortable [1]** 41/18
**coming [9]** 16/25
28/16 60/24 61/12
70/5 70/8 81/1 81/5
99/18
**comment [1]** 76/19
**common [1]** 75/11

**companies [4]** 52/15
73/25 75/10 75/24
**companies' [1]** 34/5
**company [21]** 1/6
46/3 47/16 49/2 49/4
52/24 70/19 72/18
72/22 73/2 73/3 73/8
73/16 73/17 75/4
75/16 79/3 81/20
85/20 89/16 97/1
**comparable [3]** 34/5
54/1 55/11
**comparables [1]**
26/19
**Complaint [1]** 60/20
**completed [2]** 6/5 6/9
**component [1]** 34/4
**compounds [1]** 52/11
**computer [1]** 54/11
78/7
**concealed [1]** 81/14
**conceding [1]** 31/15
**concern [4]** 6/8 24/16
28/6 98/2
**concerned [4]** 25/7
27/10 96/15 98/3
**concerning [2]** 9/7
103/1
**concerns [1]** 91/19
**Concessions [1]**
23/11
**conclude [2]** 4/13
102/5
**concluded [2]** 50/15
105/9
**conditions [3]** 12/10
13/1 19/5
**conduct [7]** 7/12 42/7
60/23 62/7 75/19 77/4
77/8
**conducting [1]** 7/15
**confer [5]** 80/11 91/18
92/15 92/25 94/15
**conference [3]** 3/17
94/14 106/8
**confirm [2]** 3/23 55/11
**confirmation [5]**
46/16 46/24 47/23
78/17 78/20
**confirming [1]** 55/9
**conformance [1]**
106/7
**confuse [1]** 19/21
27/11 36/23
**confused [7]** 30/2
48/19 51/10 61/16
63/14 82/7 100/8
**confusion [41]** 11/15
12/15 12/24 13/3 13/4
14/25 14/25 15/1
15/14 15/19 15/21
16/4 17/4 17/8 17/8
17/9 17/22 17/23
35/10 36/22 38/3
38/23 41/3 45/14
45/15 48/15 48/16
49/18 49/23 50/23
51/6 51/8 51/16 67/23

**connect [4]** 52/15
69/21 69/22 82/3 82/5
82/10 82/20 99/9
**connected [1]** 15/8
**connection [2]** 15/3
22/14
**consent [2]** 86/13
87/7
**consider [5]** 17/17
25/22 40/2 40/5 77/3
**consideration [1]**
62/19
**considered [4]** 25/11
25/19 41/4 76/6
**consistent [3]** 9/7
19/12 37/15
**consistently [1]** 16/1
**consultant [1]** 88/19
**consultants [18]**
81/21 82/2 82/6 85/2
85/10 85/14 85/15
86/3 86/17 86/19 87/9
88/3 88/15 88/17 89/3
89/7 89/12 90/14
**consumer [15]** 12/16
13/5 20/5 38/6 38/9
43/2 43/4 43/15 43/16
43/17 43/17 44/6 44/8
44/13 59/6
**consumers [14]** 7/21
13/13 13/20 37/5 37/9
38/3 38/4 38/9 38/11
50/25 51/4 51/7 61/16
100/7
**contemplating [1]**
102/12
**contend [1]** 13/21
**contentions [1]** 91/6
**context [7]** 34/8 34/13
40/13 44/8 64/9 75/9
75/22
**contexts [1]** 74/16
**contracts [1]** 56/15
**contradict [1]** 42/10
**contrary [2]** 54/18
75/10
**control [4]** 16/20
16/20 16/21 16/22
**convenient [2]** 49/3
73/21
**conveniently [1]**
74/20
**conversation [3]** 92/3
94/8 101/18
**conversations [1]**
74/14
**copyright [1]** 23/8
**corporation [3]** 1/9
40/4 87/1
**correctly [3]** 6/4 33/9
86/3
**cost [14]** 22/18 22/21
22/22 25/17 26/4 27/4
27/13 30/6 30/10
30/19 30/22 30/24
33/23 34/6
**costs [5]** 22/5 22/5
22/9 22/17 23/15
**counsel [13]** 2/1

69/21 69/22 82/3 82/5
82/10 82/20 99/9
11/23 20/24 21/2
21/13 21/23 22/25
24/13 24/18 24/19
30/1 77/14 85/8
**counselor [1]** 64/14
**counselor's [1]** 32/8
**counter [5]** 63/11
64/12 93/23 95/23
95/23
**counter-designations
[1]** 93/23
**counterfeiter [2]**
38/12 38/15
**country [1]** 73/18
**couple [3]** 28/21
45/12 102/8
**course [6]** 34/20 52/2
57/2 61/4 64/7 74/24
90/6 96/6
**court reporter [2]** 6/7
9/1
**Court's [8]** 7/1 18/2
18/25 25/7 30/14 39/1
71/4 90/18
**courts [12]** 12/13
12/24 14/11 23/9
23/11 38/3 41/4 50/15
63/2 65/20 71/12
75/22
**covered [1]** 77/15
**cows [1]** 99/8
**create [6]** 12/12 12/25
14/9 14/10 19/5 32/1
**created [2]** 67/19
67/22
**creates [1]** 49/10
**creating [4]** 17/6
17/10 17/11 41/13
**creative [1]** 78/16
**cricket [1]** 85/24
**criminal [2]** 3/14
91/14
**criteria [2]** 11/13 14/2
**cross [21]** 4/21 5/2
6/12 7/4 11/3 12/1
16/17 17/2 17/17
24/17 24/23 25/21
36/25 51/15 65/5 65/6
65/6 65/12 82/18 96/1
96/14
**cross-examination [3]**
5/2 7/4 96/14
**cross-examine [2]**
24/17 25/21
**CSR [1]** 1/23 106/15
**cuff [1]** 49/21 51/18
**curious [1]** 46/23
**cut [1]** 51/25
**CV [2]** 1/8 3/4

**D**

**damage [1]** 73/7
**damages [16]** 6/10
7/7 8/1 8/2 9/8 21/16
22/1 22/3 48/24 49/14
53/12 53/19 54/21
55/2 57/2 75/17
**dance [1]** 93/11

**D**

**data [5]** 21/20 24/9 34/8 55/5 55/6
**date [6]** 3/24 3/24 4/13 60/22 84/11 106/10
**Daubert [9]** 11/7 11/9 11/13 14/11 16/16 17/16 18/4 21/18 29/20
**day [10]** 5/5 7/10 80/23 81/22 82/11 83/13 96/25 101/1 101/4 101/13
**Day 1 [4]** 81/22 82/11 83/13 96/25
**days [3]** 4/11 5/6 9/23
**deadline [1]** 91/21
**deal [10]** 3/16 5/10 5/11 10/18 10/19 10/20 44/12 68/7 69/17 102/24
**dealing [2]** 36/11 74/24
**dealt [3]** 34/23 72/7 96/9
**decades [1]** 51/11
**decide [3]** 32/7 33/5 48/8
**decides [4]** 30/9 30/13 33/10 47/19
**deciding [1]** 20/23
**decision [5]** 7/12 13/25 34/24 42/11 76/9
**deck [1]** 40/9
**deduct [5]** 22/5 30/5 30/7 30/9 30/10
**deducted [2]** 22/2 23/17
**deductible [1]** 22/6
**deducting [1]** 30/4
**deduction [1]** 30/20
**defendant [5]** 22/10 26/23 52/9 62/3 63/25
**defendants [10]** 1/11 2/12 3/12 9/14 25/10 54/14 60/3 60/23 75/15 76/15
**defendants' [11]** 7/23 21/16 21/25 22/3 23/14 27/13 30/5 33/18 45/7 60/5 77/8
**defends [1]** 20/19
**defense [8]** 5/20 23/24 33/11 35/2 67/18 98/23 100/10 102/21
**defer [1]** 45/2
**deficiencies [1]** 92/24
**deficient [1]** 13/8
**degree [1]** 27/25
**DELAWARE [1]** 1/5
**deleted [1]** 26/21
**Deli [1]** 23/9
**delineated [1]** 65/22
**delta [2]** 62/25 63/1
**demand [1]** 17/11

**demonstrate [3]** 34/1 61/8 99/20
**demonstrative [1]** 27/9
**demonstratives [1]** 103/18
**deny [6]** 6/23 7/5 7/14 7/25 8/3 8/12
**departs [1]** 11/15
**depending [2]** 30/12 104/4
**depo [1]** 94/25
**deponent [1]** 87/1
**depose [7]** 10/9 81/23 82/23 82/24 84/2 84/12 86/18
**deposed [12]** 8/18 10/1 10/8 47/10 81/23 82/15 83/17 83/19 83/22 84/8 84/9 84/10
**deposition [38]** 18/16 19/25 20/19 22/13 22/24 26/23 29/7 51/2 81/5 81/6 81/16 82/14 84/1 84/13 84/15 87/21 87/23 88/4 88/24 88/25 89/4 89/4 89/25 90/13 93/22 94/13 95/3 95/8 95/12 95/20 97/16 100/23 101/3 101/5 101/5 101/8 101/16 101/17
**depositions [3]** 87/25 88/1 90/7
**describe [1]** 87/3
**described [1]** 90/13
**describing [1]** 47/23
**design [6]** 13/13 69/5 78/13 81/18 97/9 100/11
**designate [2]** 87/5 95/9
**designated [7]** 10/5 74/6 74/12 87/10 87/11 89/7 95/21
**designation [2]** 94/19 100/25
**designations [4]** 93/23 93/25 94/14 95/13
**desist [3]** 63/20 64/4 69/25
**detail [2]** 11/24 28/5
**details [2]** 63/16 63/17
**determine [3]** 13/2 60/1 62/8
**determining [1]** 15/18 59/22 77/4
**developed [1]** 76/15
**differ [1]** 67/7
**difference [4]** 32/4 33/19 39/2 47/18
**different [16]** 11/17 14/1 16/24 19/15 21/17 25/14 30/2 44/8 44/8 58/4 65/24 68/24 72/13 75/13 75/14

84/8 **differently [1]** 17/25
**difficult [2]** 59/8 94/20
**difficulty [1]** 47/22
**digest [1]** 41/17
**digressing [1]** 58/4
**diligence [1]** 70/15
**dire [10]** 80/9 91/8 93/14 94/12 103/21 103/22 103/22 103/23 104/2 104/2
**direct [3]** 4/20 5/1 82/18
**directed [1]** 26/7
**direction [2]** 30/15 80/1
**directly [2]** 27/18 29/13
**directors [2]** 86/13 87/6
**disagree [3]** 11/4 20/22 48/21
**disagrees [1]** 11/17
**disappears [1]** 12/19
**disarray [1]** 79/17
**disclose [1]** 89/5
**disclosed [15]** 9/25 10/14 10/14 81/9 81/14 81/19 84/23 84/23 85/5 86/4 86/15 86/17 88/10 88/14 88/15
**disclosing [1]** 85/20
**disclosure [4]** 84/18 86/9 90/6 90/7
**disclosures [4]** 10/3 10/15 83/15 85/6
**disconnect [1]** 76/2
**discount [4]** 19/11 19/16 19/17 19/17
**discovery [9]** 9/25 10/14 26/20 44/11 74/11 81/10 83/16 87/19 100/21
**discuss [6]** 3/18 7/22 91/19 96/11 102/5 104/23
**discussed [2]** 75/20 93/22
**discussing [2]** 76/11 76/17
**discussion [1]** 33/18
**disgorgement [1]** 53/12
**dismiss [2]** 72/15 73/5
**dispute [2]** 23/12 67/2
**distance [2]** 62/9 70/4
**distribution [1]** 23/3
**district [10]** 1/1 1/2 1/3 23/10 23/10 23/10 23/11 71/23 75/22 75/25
**dive [1]** 28/5
**DIVISION [1]** 1/2
**doctor [1]** 97/18
**doctrine [2]** 78/14 84/8

**document [21]** 26/15 27/8 27/12 28/3 28/4 28/16 28/17 28/22 28/23 29/3 29/7 29/9 29/11 29/22 31/12 31/17 31/19 31/20 33/22 33/22 65/9
**documents [11]** 25/11 25/13 25/19 25/19 29/1 31/21 32/19 32/19 32/25 33/2 44/17
**documents-considered [1]** 25/19
**Doe [3]** 89/3 89/4 89/6
**dollar [3]** 40/4 56/1 56/14
**dollars [1]** 52/21
**domino [1]** 47/7
**down [6]** 7/1 9/1 25/18 36/1 59/23 80/8
**downstream [2]** 46/18 48/5
**dozen [1]** 40/25
**draw [2]** 39/9 40/19
**drawn [2]** 50/4 51/4
**dress [2]** 50/20 61/2
**DRIVE [1]** 2/4
**driven [2]** 24/9 24/9
**driving [1]** 16/13
**drop [1]** 74/9
**due [1]** 70/15
**during [4]** 9/24 26/20 42/18 100/21

**E**

**each [14]** 4/22 4/25 4/25 6/18 29/16 41/2 43/9 56/1 59/5 80/12 95/9 95/13 102/18 103/22
**earlier [1]** 75/20
**easily [1]** 44/22
**EAST [3]** 2/14 21/8 93/10
**easy [1]** 69/15
**economic [5]** 49/6 49/9 49/12 66/20 73/13
**economics [1]** 20/15
**effect [2]** 17/11 39/7
**efforts [1]** 70/14
**eight [2]** 34/5 104/14
**either [9]** 5/13 13/4 42/18 43/6 44/21 45/5 64/6 80/22 84/7
**EL [1]** 2/4
**element [5]** 35/8 35/8 36/14 36/15 36/18
**elements [1]** 50/21
**elephant [1]** 35/4
**eliminate [1]** 16/23
**elsewhere [2]** 36/17 50/15
**emperor [2]** 46/6 46/7
**employees [3]** 47/24 73/10 88/16
**employees' [1]** 23/16

**employs [1]** 11/8
**encounter [1]** 12/17
**encourage [2]** 78/8 103/13
**end [4]** 10/18 28/24 71/9 73/6
**ends [1]** 57/11
**engagement [1]** 4/8
**engine [1]** 58/9
**enjoined [2]** 69/4 69/6
**enough [11]** 5/2 9/22 18/6 26/10 29/23 63/18 67/10 68/13 72/5 78/4 104/5
**ensuring [1]** 11/8
**entered [4]** 64/7 70/22 71/6 71/7
**entirety [1]** 33/7
**entities [1]** 73/2
**entitled [7]** 42/6 46/21 53/12 65/9 69/13 70/18 106/6
**entity [3]** 73/1 73/1 76/3
**envision [1]** 104/11
**equally [1]** 40/17
**error [2]** 41/13 83/24
**escaping [1]** 78/4
**essence [5]** 39/24 39/25 58/14 58/17 68/22
**essential [1]** 15/18
**establish [1]** 74/17
**established [1]** 66/17
**establishing [1]** 18/4
**estimates [1]** 4/24
**evaluate [2]** 42/10 42/23
**evaluation [1]** 48/3
**eve [1]** 10/11
**even [19]** 13/22 14/16 16/6 17/7 18/20 20/11 24/7 35/9 37/15 41/3 41/18 46/17 53/3 54/5 58/15 69/24 71/19 75/22 93/22
**evening [1]** 5/10
**event [4]** 35/22 77/13 95/9 95/10
**events [1]** 47/1
**Eveready [6]** 11/15 11/18 15/4 16/3 18/12 20/20
**everybody [4]** 46/7 46/18 48/5 52/16
**evidence [79]** 5/1 7/19 7/20 12/15 13/7 23/17 26/6 27/11 27/22 30/15 31/13 32/13 32/20 32/22 35/10 35/19 36/4 37/4 37/8 37/15 38/8 39/8 39/13 39/19 40/12 40/19 40/21 41/5 41/20 41/20 41/23 42/2 42/13 42/20 42/24 43/2 43/3 43/6 43/14 43/19 44/14 45/14

**E**

evidence... **[37]** 47/10 47/12 48/8 51/20 56/16 60/19 61/6 62/3 64/17 65/1 65/17 65/21 66/20 67/23 68/16 68/25 70/1 71/8 71/11 71/25 73/8 74/2 74/13 74/15 74/18 74/21 76/10 76/11 76/13 76/17 76/22 77/6 77/7 82/5 82/10 82/14 88/22
evidence-type **[1]** 51/20
ex **[1]** 91/2
ex partes **[1]** 91/2
exact **[1]** 23/12
exactly **[12]** 19/20 20/7 20/8 20/23 43/22 56/22 61/5 78/6 82/4 88/23 92/8 95/3
examination **[4]** 5/2 7/4 87/4 96/14
examine **[3]** 24/17 25/21 105/4
example **[5]** 20/16 44/9 45/25 51/16 95/4
examples **[1]** 16/19
except **[2]** 43/12 53/16
exceptional **[1]** 7/4
Exchange **[13]** 19/23 20/6 30/23 43/12 44/3 53/18 56/6 67/19 67/22 68/2 68/12 70/10 97/11
excise **[3]** 25/8 25/8 26/3
excising **[1]** 26/9
exclude **[2]** 7/15 8/2
excluded **[4]** 11/12 23/18 53/2 62/3
excludes **[2]** 14/6 14/6
exclusion **[2]** 6/21 11/3
excuse **[1]** 91/3
executive **[1]** 78/15
exhibits **[10]** 80/20 83/3 83/4 92/9 94/4 94/4 94/6 94/8 103/7 103/12
existed **[1]** 49/19
existence **[1]** 77/25
expect **[2]** 46/6 95/12
expected **[1]** 95/3
expenses **[3]** 23/2 23/22 31/22
experience **[4]** 13/5 13/5 51/11 91/22
experiment **[1]** 103/20
expert **[65]** 6/2 6/22 7/7 7/24 8/1 8/2 9/5 10/24 11/2 11/10 12/4 12/7 15/17 16/12 18/19 19/1 20/15 20/16 21/17 21/19

22/1 23/14 24/2 24/3 24/17 25/11 25/13 25/15 27/14 28/2 28/12 28/13 28/14 28/23 28/25 29/21 30/8 30/18 31/10 31/11 31/14 32/15 33/25 34/3 34/10 35/2 35/3 36/7 36/10 36/13 41/24 42/1 42/8 42/10 49/21 50/24 53/23 55/6 57/8 81/1 81/4 96/21 97/14 100/23 101/7
expert's **[3]** 21/22 27/9 33/20
experts **[8]** 6/25 7/5 11/2 23/12 28/11 39/13 45/11 100/4
expired **[1]** 52/9
explain **[4]** 46/8 46/9 50/21 97/6
explaining **[1]** 98/6
explains **[7]** 19/9 22/12 25/16 26/25 27/3 29/6 46/15
explanation **[2]** 19/2 71/7
explanations **[1]** 72/2
explode **[1]** 78/19
extent **[3]** 4/15 25/7 41/7
extra **[2]** 4/23 70/14
extremely **[1]** 59/8

**F**

fabric **[1]** 100/12
face **[1]** 34/7
fact **[12]** 24/9 25/22 28/2 29/22 31/5 35/16 38/25 40/5 56/15 56/24 66/17 75/10
factor **[4]** 29/4 30/7 30/9 30/20
factors **[2]** 63/6 77/3
facts **[2]** 22/15 39/4
factual **[1]** 23/2 27/7
FAGEN **[7]** 2/8 3/7 77/25 86/10 91/17 96/16 97/20
fails **[1]** 39/9
fair **[16]** 9/22 12/1 18/6 25/3 26/10 27/15 29/23 63/15 67/10 67/18 68/13 72/5 86/4 89/8 89/10 90/16
fairly **[2]** 63/24 69/23
fairness **[1]** 35/12 44/19 67/16
fall **[2]** 36/3 104/8
falling **[1]** 59/24
falls **[2]** 12/7 27/24
familiar **[1]** 99/13
familiarity **[1]** 61/24
family **[2]** 73/22 85/16
famous **[2]** 23/9 80/25
fancier **[1]** 19/14

far... **[40]** 40/16 44/11 55/17 62/8 64/3 75/8 80/15 83/7
farther **[1]** 55/18
fashion **[7]** 7/24 15/7 50/24 51/12 53/8 55/11 57/10
favor **[1]** 50/7
FCRR **[1]** 1/23
fear **[3]** 11/20 36/16 36/23
featured **[1]** 13/19
February **[1]** 101/12
federal **[4]** 1/23 53/4 75/5 81/10
feedback **[1]** 71/19
feel **[1]** 92/5
Ferrari **[1]** 57/21
FIDDELMAN **[10]** 2/9 3/8 9/6 21/6 33/14 54/9 74/25 78/6 80/7 105/3
Fiddelman's **[1]** 34/18
fide **[2]** 20/18 20/20
field **[1]** 11/11
fighting **[2]** 92/6 94/24
figure **[3]** 65/3 92/16 104/10
figures **[1]** 55/25
figuring **[1]** 17/4
filed **[22]** 3/20 8/5 8/15 9/19 9/22 10/4 10/12 44/17 46/10 60/20 61/2 63/18 79/20 80/9 80/10 80/12 93/4 94/16 97/3 97/11 97/24 101/11
filings **[2]** 91/20 94/16
fill **[2]** 104/1 104/7
final **[1]** 94/16
finally **[1]** 102/25
find **[11]** 39/23 39/23 44/22 46/19 47/1 61/19 62/2 68/3 69/13 87/24 88/21
finding **[6]** 53/11 66/13 66/17 66/18 68/21 69/12
fine **[6]** 41/12 49/19 53/20 71/8 85/19 90/7 47/6 47/6 52/12 72/14 75/3 83/10 84/19 100/22 104/11
five **[4]** 5/6 63/1 78/4 93/11
five-year **[1]** 63/1
flashes **[1]** 12/18

flaw **[1]** 34/1
flawed **[3]** 27/9 29/17 31/9
flew **[1]** 10/1
flight **[2]** 21/11 29/24
flights **[1]** 93/10
floor **[1]** 37/3
flow **[1]** 46/20
focusing **[1]** 54/13
follow **[7]** 15/5 41/9 47/25 73/4 84/2 86/18 89/18
follow-up **[2]** 15/5 86/18
followed **[1]** 69/20
food **[1]** 31/15
footnote **[2]** 72/15 73/6
foreclose **[1]** 76/16
foregoing **[1]** 106/4
form **[4]** 28/24 80/13 93/15 94/13
formal **[1]** 10/15
format **[1]** 106/7
forms **[1]** 91/9
formulating **[1]** 25/5
forth **[3]** 16/11 23/25 54/14
forum **[1]** 105/5
forward **[2]** 50/14 104/25
fought **[1]** 103/4
found **[2]** 57/2 89/13
foundation **[2]** 43/20 45/2
four **[2]** 87/13 87/14
franchise **[1]** 52/8
Frank **[1]** 23/8
frankly **[1]** 91/13
free **[2]** 51/16 98/24
frequency **[1]** 65/23
FRIDAY **[6]** 1/6 3/1 4/7 90/25 90/25 91/11
friend **[3]** 58/5 80/17 81/22
friendly **[1]** 105/4
from 2000 **[1]** 62/23
front **[3]** 52/7 53/10 71/21
frustrated **[1]** 101/11
fueled **[1]** 8/19
full **[6]** 22/21 22/25 23/14 24/24 26/7 38/14
further **[8]** 18/7 26/10 45/4 50/1 59/15 67/1 77/23 104/23
future **[1]** 62/7

**G**

game **[2]** 12/1 89/8
games **[1]** 92/6
gander **[1]** 42/5
garbage **[7]** 16/13 16/14 16/15 16/20 17/1 17/13 18/3
GARRISON **[2]** 2/7 3/9
gatekeeper **[1]** 11/8

gatekeeping **[2]** 16/9 16/16
GATIEN **[3]** 2/3 2/3 3/6
gave **[1]** 84/14
gazillions **[1]** 88/20
general **[3]** 6/24 97/16 103/24
generally **[15]** 6/23 11/14 11/19 12/1 12/25 14/3 15/10 15/13 16/2 17/9 17/16 18/11 18/15 97/23 99/13
generate **[1]** 78/20
gentlemen **[2]** 69/13 100/6
genuine **[2]** 18/13 18/17
gets **[5]** 9/1 22/22 63/9 97/12 97/12
getting **[6]** 39/3 42/24 60/22 64/4 71/18 88/21
give **[17]** 4/15 6/17 7/10 10/9 33/11 40/24 49/21 50/17 51/13 78/12 78/12 93/13 93/16 95/5 96/1 97/18 102/16
given **[5]** 11/7 37/12 71/10 71/21 99/1
gives **[5]** 19/14 31/14 51/1 91/23 92/3
giving **[1]** 27/1
glance **[1]** 8/15
gloss **[1]** 63/21
gmail.com **[1]** 1/25
God **[2]** 88/24 100/20
goes **[16]** 6/10 7/2 11/2 13/15 16/17 20/12 25/25 37/11 37/19 37/23 52/11 55/14 61/23 72/13 73/19 75/19
Goldaper **[9]** 7/25 19/12 19/25 20/12 45/12 48/12 48/13 50/3 50/14
Goldaper's **[1]** 49/17
golden **[1]** 60/12
Goldpaper **[1]** 7/24
gone **[1]** 67/25
good **[13]** 3/11 3/13 3/24 5/6 9/2 11/24 13/13 42/4 42/5 49/20 80/1 82/19 93/6
goods **[13]** 13/20 22/23 23/19 27/4 27/13 30/6 30/10 30/19 30/22 30/24 34/7 51/5 51/5
goose **[1]** 42/4
GORDON **[15]** 2/8 2/8 3/7 9/3 21/2 34/22 38/20 50/5 50/7 52/1 60/16 63/15 65/14 68/19 95/18

**G**

Gordon's [2] 45/10 65/21
Goto [1] 12/14
gotten [2] 93/19 93/24
grant [7] 7/17 8/6 8/10 8/16 41/1 60/11 77/22
granted [1] 37/3
Grateful [1] 94/3
great [7] 17/3 41/11 72/23 73/14 74/8 82/16 105/1
greater [1] 52/23
greatest [2] 67/8 76/13
gross [1] 57/6
ground [3] 71/10 71/22 72/4
grounds [2] 50/16 76/7
group [1] 49/12
GSE [1] 72/17
guard [1] 10/20
guess [13] 4/14 8/19 24/15 25/8 35/13 42/2 47/22 62/11 62/18 78/20 86/2 88/11 96/17
gut [1] 29/19
guy [3] 47/5 98/25 101/6

**H**

Hades [1] 91/1
half [3] 23/20 37/1 40/25
hammer [1] 92/22
handle [2] 9/4 9/8
hang [2] 13/18 38/7
happen [2] 99/1 100/2
happened [8] 27/9 64/6 70/1 70/11 77/9 82/19 88/20 100/24
happens [4] 47/17 63/14 67/20 100/20
happy [2] 49/12 92/4
harm [3] 48/17 58/23 75/17
harmed [1] 58/1
have -- I [1] 69/10
having [6] 6/7 26/14 45/15 47/21 100/19 102/18
he's [18] 13/24 14/19 18/11 26/5 30/17 33/12 47/5 47/6 47/24 56/5 69/17 69/19 79/7 81/2 97/7 97/17 98/15 99/10
head [2] 46/3 47/16
hear [16] 5/24 8/7 8/8 18/8 35/23 36/9 38/18 41/22 48/8 65/15 68/18 71/19 76/15 91/17 96/22 103/11
heard [26] 6/19 8/23 10/7 21/1 34/19 45/10 51/22 60/11 60/15

61/11 70/9 74/23 77/19 77/20 77/23 78/16 78/17 79/3 81/1 81/8 81/8 81/9 82/9 83/18 85/7 90/12
hearing [2] 3/16 6/7
hearsay [9] 28/7 28/11 28/14 28/18 28/22 28/25 32/12 32/20 49/24
Heilman [1] 74/5
held [3] 14/11 23/7 106/6
helps [2] 42/21 42/22
Hence [1] 88/7
hereby [1] 106/3
hey [9] 14/1 17/25 18/2 45/20 46/1 46/4 51/15 65/10 68/1
hide [1] 37/20
higher [2] 56/20 56/20
HILLS [2] 2/5 45/18
himself [3] 18/16 29/8 78/23
hired [2] 85/20 97/18
his -- I [1] 45/23
history [3] 54/16 65/10 100/21
hit [1] 67/3
hold [1] 99/7
holder [1] 72/21
holding [8] 49/4 72/18 72/22 73/2 73/3 75/4 75/10 75/15
holiday [1] 90/25
Holmes [13] 7/8 21/16 22/12 24/11 24/23 25/3 26/14 27/15 27/17 27/25 28/13 29/6 33/7
home [1] 99/8
homework [1] 92/21
honest [1] 79/21
HONORABLE [1] 1/3
hope [3] 4/12 94/10 105/3
hoping [1] 104/19
hotline [1] 45/25
hour [2] 92/2 101/18
hours [12] 4/16 4/25 5/3 5/5 5/17 5/19 80/1 80/16 83/5 91/23 92/7 93/18
house [2] 76/21 77/1
housekeeping [1] 102/8
houses [3] 19/17 55/11 57/10
however [2] 15/6 95/22
huge [1] 98/23
humble [1] 79/24
hypothetical [1] 67/8
HYUN [1] 1/10

**I**

I'd [6] 8/8 34/2 68/18 85/17 92/9 92/9

i.e [1] 71/8
idea [5] 16/20 19/21 38/2 46/25 67/4
identical [2] 27/19 51/1
identified [12] 9/25 39/1 81/21 86/19 88/2 88/3 88/18 89/21 90/13 96/25 97/1 97/2
identifies [4] 19/8 19/9 19/17 19/21
identify [5] 65/19 85/22 88/8 88/9 95/4
identifying [2] 88/13 89/16
Idol [5] 8/14 77/21 79/6 79/6 79/8
impeach [2] 95/6 96/1
impeaches [1] 60/8
impeaching [1] 95/6
important [10] 18/20 34/17 41/10 49/15 72/16 74/4 81/3 82/21 98/17 98/19
in 2013 [1] 62/24
in-house [2] 76/21 77/1
inadequate [1] 11/21
inappropriately [1] 42/14
INC [2] 1/9 3/5
inception [1] 79/3
inches [1] 78/4
inclination [2] 8/16 60/11
inclined [1] 7/17
include [2] 23/15 30/13
included [1] 18/17
includes [1] 5/1
including [2] 11/2 76/7
inclusive [1] 5/17
inconsistent [1] 96/2
incorrect [2] 21/23 24/20
incredible [1] 76/14
independent [2] 31/13 48/3
independently [2] 28/1 32/16
indicated [1] 37/2
INDIVIDUAL [1] 1/10
individuals [1] 8/17
industry [3] 50/24 51/13 53/8
inevitably [1] 99/24 99/24
infer [1] 38/22
inference [3] 23/21 39/9 40/20
information [6] 7/15 29/10 29/13 74/7 74/8 74/10
infringe [4] 37/24 65/12 71/3 99/21
infringement [13] 48/9 60/5 62/13 62/18

66/8 66/14 66/17 66/18 68/4 72/19 72/20 75/11 100/1
infringer [5] 62/6 65/11 71/1 71/13 71/13
infringing [10] 23/19 46/17 46/19 47/2 47/18 47/21 69/1 69/4 69/7 69/8
inherently [1] 76/14
initial [5] 13/4 14/18 17/8 36/21 51/2
injunction [5] 41/2 61/3 61/4 63/18 64/1
injunctive [1] 72/24
injury [4] 48/15
innocent [6] 61/15 61/22 63/12 64/16 70/19 70/24
input [2] 93/15 93/19
inputs [1] 91/23
inside [1] 58/9
instance [2] 16/19 48/15
instances [1] 82/2
instead [1] 55/15
instructed [2] 22/25 26/24
instructing [1] 65/2
instruction [20] 21/23 24/13 35/25 38/22 39/12 39/14 39/15 39/22 40/9 40/11 40/11 40/17 40/18 41/19 42/3 42/5 42/15 53/4 53/4 60/8
instructions [17] 21/21 36/2 36/11 36/20 38/21 39/3 39/3 39/4 39/6 41/7 41/12 59/19 80/10 91/10 93/15 94/13 103/2
intellectual [7] 1/9 54/20 55/3 55/8 58/20 59/11 72/21
intend [1] 38/21
intent [18] 8/9 37/19 37/24 38/10 38/11 38/16 43/7 61/8 61/24 62/8 63/7 64/13 65/11 65/12 69/17 69/18 71/16 99/21
intentional [1] 61/18
interest [5] 13/4 14/18 17/8 36/21 51/2
interesting [5] 28/20 36/5 70/6 98/18 105/1
internal [1] 77/8
International [1] 23/8
Internet [4] 12/18 13/15 13/22 53/17
interpret [1] 75/6
interpreting [1] 75/6
interrogatories [5] 10/3 85/5 85/22 86/8 97/2
interrogatory [3] 77/7

82/14 84/19
introduce [3] 32/21 61/6 65/1
Investigative [17] 81/21 82/2 85/1 85/9 85/13 85/15 86/3 86/16 86/19 87/9 88/2 88/15 88/16 89/3 89/7 89/12 90/14
investigator [2] 81/7 96/18
investigators [10] 9/13 9/15 10/13 79/13 81/20 84/21 85/21 85/22 88/21 92/11
invoices [6] 24/4 24/5 31/25 32/4 33/3 33/25
involve [1] 62/22
involved [1] 87/25
IP [17] 49/1 55/14 55/21 56/4 56/10 56/12 56/14 56/24 57/1 57/11 57/14 57/19 59/4 72/18 73/8 75/3 75/10
iron [1] 83/1
irrelevant [2] 29/17 43/5
issue [36] 4/4 6/1 6/16 20/12 20/21 24/16 24/21 28/4 28/21 30/4 30/13 31/12 33/22 36/5 36/11 40/16 41/1 45/16 48/23 52/3 54/2 54/14 64/4 74/1 75/4 76/4 76/6 77/17 80/21 81/7 81/8 90/10 96/21 96/23 99/6 99/7
issued [2] 63/18 66/2 68/24
issues [14] 3/15 5/10 11/24 16/9 16/17 30/2 34/24 61/8 72/13 73/20 90/17 91/19 92/16 92/24
item [5] 52/21 52/22 52/23 67/1 67/2
items [4] 25/23 46/17 59/1 59/3
itself [4] 28/17 28/22 68/25 72/3

**J**

JACOB [2] 2/9 3/8
JAE [1] 1/10
Jaime [1] 7/8
Jaime Holmes [1] 7/8
Jane [2] 89/6 89/6
Jane Doe [1] 89/6
Jerry's [1] 23/9
job [3] 18/3 89/11 90/14
John [3] 8/14 89/3 89/4
John Doe [2] 89/3 89/4
John Idol [1] 8/14
joint [3] 42/16 80/9

**J**

joint... [1] 91/20
joking [2] 37/22 52/2
Jones [1] 89/6
JR [1] 1/3
judge [2] 1/3 96/4
judgment [28] 61/4
63/23 63/23 64/7 64/8
64/18 66/2 66/3 66/4
66/6 66/7 66/16 66/25
67/12 67/15 68/5
68/20 68/21 68/25
69/2 69/3 69/10 69/24
70/2 71/2 71/3 74/3
76/8
judgments [3] 66/11
68/24 69/23
judicial [3] 65/2 65/4
106/8
JUI [3] 1/23 106/14
106/15
jump [1] 45/16
June [1] 84/16
JUNG [8] 1/10 26/23
27/1 28/7 32/24 43/22
44/6 65/6
junior [3] 9/8 12/21
34/16
juror [1] 99/22
jurors [5] 5/12 99/8
100/11 104/7 104/11
jury's [2] 13/25 97/16
justification [1] 23/25
justified [2] 21/10
29/24
justify [1] 77/25

**K**

Kamar [1] 23/8
KEATS [1] 2/3
Keegan [11] 6/22
10/24 11/5 11/8 11/25
16/12 18/16 18/20
19/2 19/13 20/18
Keegan's [1] 19/4
keep [11] 5/9 12/8
16/21 27/21 44/9 62/9
70/4 71/10 72/4 81/10
93/7
kept [2] 28/1 52/10
kidding [1] 34/20
kind [7] 24/9 40/12
51/10 72/12 72/24
82/25 101/2
king [1] 78/20
kiosks [2] 13/23 19/16
knew [3] 69/7 70/11
89/25
knock [1] 26/3
knockoff [2] 68/6 68/9
knowing [1] 85/19
knowledge [4] 51/12
61/21 64/13 97/16
knowledgeable [2]
86/19 87/21
known [2] 61/19
85/13
knows [4] 23/16 86/11

KONRAD [2] 2/3 3/6
Konrad Gatien [1] 3/6
Korean [1] 68/6
Koreans [1] 68/9
KORS [57] 1/5 3/4
3/10 8/14 8/19 15/23
18/13 19/13 19/24
20/2 20/3 20/4 20/6
31/8 37/21 40/3 45/16
45/17 45/19 45/25
46/10 46/18 47/5
47/20 48/5 48/10
48/21 49/2 49/4 49/8
49/11 49/25 50/22
52/16 52/19 52/20
53/7 53/17 55/7 55/8
55/14 55/17 55/19
55/22 56/3 56/9 56/21
56/24 57/10 58/24
59/1 59/6 67/25 68/1
77/20 78/23 79/2
Kors's [1] 59/4
Krista [7] 10/2 45/23
73/9 74/18 83/18 95/4
96/4

**L**

L.A [1] 47/5
L.L.C [1] 1/5
label [1] 44/3
labeled [3] 28/1 29/21
29/21
lack [8] 37/23 38/23
63/7 64/13 65/11
65/11 71/15 99/21
ladies [2] 69/13 100/5
LaFargue [2] 10/2
84/14
laid [2] 36/22 42/9
Lanham [3] 15/1
15/12 38/2
Lanham Act [2] 15/1
15/12
largely [1] 26/13
larger [1] 8/18
last [5] 79/18 80/22
90/24 91/2 100/10
Lastly [1] 77/11
late [1] 84/11
later [5] 5/9 47/4
48/23 62/16 102/24
Lauren [2] 31/7 54/2
law [37] 2/3 2/8 2/8
2/9 2/13 2/13 3/8
14/25 15/15 21/23
22/6 23/1 23/5 23/18
24/10 24/14 24/20
24/25 26/2 26/4 34/12
36/12 40/6 40/22
40/24 54/16 54/17
58/5 59/7 59/9 61/24
61/25 63/9 65/9 70/2
70/25 98/24
laws [1] 61/21
lawsuit [8] 8/5 8/18
45/17 47/13 48/1
48/10 60/10 61/7

lawyer [10] 28/9 64/23
64/23 64/25 65/6 77/2
80/25 91/1 96/25
97/22 98/4
lawyers [11] 34/16
45/18 47/13 47/25
48/3 74/14 78/9 78/9
78/24 93/7 105/1
lay [9] 11/23 36/20
43/20 81/1 81/4 96/21
98/7 98/11 99/22
layperson [1] 27/8
layperson-produced
 [1] 27/8
leads [2] 4/14 37/1
least [14] 4/24 6/15
6/17 7/1 7/14 23/1
29/24 53/1 53/7 57/17
70/8 74/17 75/25 81/8
leave [1] 105/5
leaves [1] 26/9
lectern [4] 4/17 4/20
6/6 9/21
Lee [3] 96/21 96/25
101/17
left [2] 26/5 72/9
legal [4] 21/20 30/7
48/24 72/12
legally [1] 13/8 16/9
17/20 18/4 29/17
29/17 31/9
legitimate [2] 17/2
31/3
length [1] 82/15
LESLIE [2] 2/8 3/7
less [5] 7/2 23/20
34/16 55/21 100/13
let [20] 3/23 9/17
10/23 19/14 19/19 32/7
36/2 38/18 53/10
64/22 65/15 85/8
86/10 89/11 90/4
93/1 95/23 99/5
104/21
letter [8] 60/24 60/25
61/1 64/4 64/20 65/8
69/5 69/25
letters [1] 63/20
level [2] 11/9 49/24
levels [1] 19/15
liability [9] 1/5 6/2 6/8
6/9 53/11 66/4 66/23
67/13 68/20
liable [1] 57/2
license [3] 20/3 52/8
57/11
licensed [4] 15/9
15/24 55/8 55/25
licenses [1] 56/4
licensing [2] 54/16
55/7
like [35] 8/6 8/8 12/14
13/23 18/8 27/4 32/20
38/17 39/10 42/4
43/23 45/9 45/20 46/4
51/5 51/17 61/1 62/15
63/6 66/15 67/3 67/20
68/18 81/1 81/12

85/17 92/5 92/9 92/10
92/10 92/12 92/23
97/17 101/7 102/20
like -- I [1] 92/12
liked [1] 71/6
likelihood [9] 12/23
13/3 13/3 15/13 15/19
17/7 17/22 17/23
38/23
likely [2] 28/6 51/7
limine [25] 3/18 6/16
6/19 6/21 7/8 7/11
7/23 8/1 8/4 8/11 8/22
10/16 10/19 10/20
20/25 21/15 33/5
34/21 45/8 51/23 52/2
60/9 72/8 77/15 77/18
limited [2] 1/5 5/4
limits [1] 5/14
line [8] 12/8 59/19
62/10 64/11 67/9 70/5
70/8 75/6
line 20 [1] 59/19
lines [2] 37/18 38/20
list [25] 9/23 10/5
10/12 10/17 25/11
25/19 32/24 32/24
79/15 79/19 80/13
80/21 80/24 83/14
84/20 84/22 85/4
93/16 93/17 93/21
94/5 94/13 97/2 101/4
101/12
listed [2] 25/19 87/14
listening [1] 99/22
literally [2] 3/15 82/4
litigants [1] 78/12
litigate [1] 66/11
litigated [3] 64/5
65/25 67/12
litigation [2] 67/9
67/11
little [11] 8/7 8/8 18/6
36/12 50/9 58/3 61/11
65/23 67/8 94/20
102/2
LLC [2] 3/5 49/2
LLP [3] 2/3 2/7 3/9
loads [1] 81/4
long [4] 55/4 75/6
88/9 88/13
longer [3] 26/4 29/20
79/7
look [39] 9/17 12/3
12/24 18/3 24/4 25/6
29/3 31/24 31/25
37/19 37/20 38/16
41/15 43/9 43/9 43/23
50/21 51/5 53/3 59/18
60/19 62/5 63/4 63/12
67/12 67/18 67/20
67/24 70/11 72/6
72/20 79/22 86/1
90/17 96/19 100/5
100/18 100/22 100/25
looked [10] 25/13
32/2 32/16 46/11
52/15 61/1 83/14

83/15 86/7 86/7
looking [10] 35/16
38/4 38/6 55/10 80/5
86/2 86/23 89/20 93/1
104/25
looks [3] 45/20 46/4
81/1
LOS [4] 1/18 1/24 2/15
3/1
losses [1] 59/11
lost [12] 53/14 53/15
53/20 53/24 58/2 59/7
59/22 72/24 73/16
73/17 75/16 75/17
lot [6] 7/1 19/12 38/1
72/13 78/16 92/13
love [3] 79/17 79/25
91/21
low [1] 57/7
lowest [1] 19/15

**M**

made [6] 15/22 29/8
32/16 36/19 48/3
75/19
major [2] 54/10 54/11
majored [1] 78/7
make [16] 12/9 13/21
21/4 22/16 34/3 36/8
42/11 46/20 47/18
48/25 53/14 63/12
71/4 76/18 87/16
104/8
makes [6] 15/6 15/17
19/19 20/11 30/21
54/6
making [3] 35/7 58/15
71/23
malicious [1] 47/14
mall [1] 47/17
man [1] 10/2
manufacturing [1]
22/22
many [9] 41/4 42/18
50/15 50/16 66/10
67/11 73/4 78/11
104/4
marathon [1] 102/5
March [1] 4/9
margin [1] 62/9
mark [19] 6/22 12/17
12/21 67/22 68/11
70/3 70/5 73/23 73/23
73/24 76/16 88/12
97/8 97/11 98/1 98/12
99/14 100/1 100/5
Mark Keegan [1] 6/22
market [2] 19/5 56/25
marketplace [11]
12/10 13/1 14/4 14/10
17/5 17/7 54/20 55/3
55/14 56/23 57/10
marks [6] 60/24 60/25
61/1 61/11 61/20 69/4
marry [1] 73/1
marrying [1] 91/6
Marshalls [1] 44/23
masquerading [1]

**M**

masquerading... [1] 28/2
master [1] 73/2
materials [2] 25/4 27/16
math [1] 54/10
matter [14] 3/14 8/20 14/14 14/14 17/17 22/9 35/9 49/20 64/8 72/2 72/3 99/10 99/12 106/6
matters [5] 3/19 5/10 86/14 87/4 87/8
Matthew [1] 10/2
May 2nd [1] 6/11
maybe [8] 9/22 36/8 58/4 62/12 62/13 67/16 83/21 95/13
McCarthy [1] 15/16
McDonough [9] 10/2 47/11 73/9 74/18 76/20 83/19 84/14 95/4 96/4
McDonough's [1] 45/23
mean [13] 24/3 32/6 35/7 40/13 43/8 44/19 45/23 56/17 63/10 90/3 92/12 95/3 99/18
means [3] 99/3 99/7
measure [3] 33/11 54/21 55/2
measuring [1] 75/18
mechanism [1] 87/19
medical [2] 40/14 40/15
meet [9] 11/12 44/23 79/18 80/11 91/18 92/7 92/15 92/25 94/15
meet-and-confer [1] 94/15
meets [1] 13/23
MEI [3] 1/23 106/14 106/15
meld [2] 47/24 48/2
memo [1] 91/6
men [1] 14/6
mention [1] 25/8
mentioned [2] 10/4 34/15
Mercedes [4] 58/6 58/11 58/12 58/13
merchandise [1] 58/22
MerChevy [1] 58/10
merit [1] 48/6
merits [1] 101/15
mess [2] 11/6 80/10
method [11] 22/21 23/1 24/12 24/25 31/1 31/5 31/6 31/9 31/9 34/4 34/11
methodology [8] 11/14 11/20 12/2 12/25 15/10 16/2 27/19 59/10

mic [2] 50/8 71/18
MICHAEL [46] 1/5 3/4 3/9 8/14 8/19 15/23 19/13 19/24 20/2 20/3 20/4 20/6 31/8 37/21 40/3 45/25 47/20 48/21 49/2 49/4 49/8 49/11 52/16 52/19 52/20 53/7 53/17 55/7 55/8 55/14 55/17 55/19 55/22 56/3 56/9 56/21 56/24 57/10 58/24 59/1 59/4 59/6 67/25 68/1 78/23 79/2
Michael Kors [41] 8/14 8/19 15/23 19/13 19/24 20/2 20/3 20/4 20/6 31/8 37/21 40/3 45/25 47/20 48/21 49/2 49/4 49/8 49/11 52/16 52/19 52/20 53/7 53/17 55/8 55/14 55/17 55/19 55/22 56/3 56/9 56/21 56/24 57/10 58/24 59/1 59/6 67/25 68/1 78/23 79/2
Michael Kors's [1] 59/4
might [10] 6/10 14/7 17/18 17/24 40/15 43/17 43/17 48/19 52/24 104/12
million [1] 54/1
millions [1] 67/24
Min [2] 26/22 29/9
mind [4] 35/1 47/24 48/2 88/14
mind-meld [2] 47/24 48/2
mine [1] 18/5 58/5
minimal [1] 33/19
minimize [1] 5/11
minor [1] 34/4
minute [1] 55/16
minutes [5] 4/22 4/23 103/20 103/21 103/22
mirrored [1] 61/2
misheard [3] 62/12 83/20 83/21
misrepresents [1] 14/7
Miss [8] 7/24 15/17 47/11 48/12 49/17 50/3 50/14 83/21
Miss Butler [1] 15/17
Miss Goldaper [3] 48/12 50/3 50/14
Miss Goldaper's [1] 49/17
Miss Goldpaper [1] 7/24
Miss McDonough [1] 47/11
Miss Newman [1] 83/21
missing [1] 95/14
mistake [10] 61/15 61/23 63/7 63/12

64/17 64/20 65/11 67/19 70/24 71/15
MK [1] 43/11
mom [1] 19/16
mom-and-pop [1] 19/16
moment [3] 3/21 13/16 58/4
Monday [1] 93/3
monetary [4] 8/11 72/10 74/23 77/12
money [3] 73/16 73/23 74/24
month [1] 85/23
months [5] 81/5 88/20 101/7 101/8 101/8
more [20] 4/11 7/2 8/7 8/8 14/16 17/13 41/17 41/17 45/2 57/19 62/22 64/3 64/19 65/23 76/11 86/12 87/6 98/4 98/13 101/21
morning [4] 3/11 3/13 9/2 91/3
most [4] 10/25 23/9 86/18 87/20
mostly [2] 11/2 77/20
motion [43] 7/5 7/8 7/11 7/17 7/25 8/1 8/3 8/4 8/6 8/10 8/11 8/12 8/16 9/11 10/16 10/23 18/8 20/25 21/15 21/17 21/25 25/10 26/12 26/13 27/20 27/25 29/20 33/6 33/7 34/21 34/23 36/16 36/19 37/2 45/5 50/2 50/5 51/23 52/1 60/9 60/12 71/21 72/10
motions [18] 3/18 6/16 6/19 6/20 7/23 8/22 8/24 9/5 10/19 10/20 34/17 45/7 45/9 72/6 72/7 77/15 77/18 78/11
motivation [1] 78/5
motives [1] 47/14
move [3] 4/10 20/24 49/13
moved [1] 90/24
moving [1] 71/9
Mr. Anderson [4] 22/1 24/2 32/2 51/24
Mr. Cho [4] 26/25 28/8 29/15 32/23
Mr. Fagen [3] 77/25 86/10 91/17
Mr. Fiddelman [6] 9/6 21/6 33/14 54/9 74/25 105/3
Mr. Fiddelman's [1] 34/18
Mr. Gordon [10] 21/2 38/20 50/5 50/7 52/1 60/16 63/15 65/14 68/19 95/18
Mr. Gordon's [1]

65/21
Mr. Holmes [9] 21/16 22/12 24/11 24/23 25/3 27/15 27/17 29/6 33/7
Mr. Idol [3] 77/21 79/6 79/8
Mr. Jung [7] 26/23 27/1 28/7 32/24 43/22 44/6 65/6
Mr. Keegan [7] 10/24 11/5 11/8 11/25 18/16 18/20 19/2
Mr. Keegan's [1] 19/4
Mr. Kors [9] 45/16 45/17 45/19 46/10 46/18 48/5 48/10 49/25 77/20
Mr. Lee [2] 96/21 101/17
Mr. Rees [29] 4/2 5/22 18/8 18/23 25/5 29/25 37/3 37/17 38/18 45/9 51/22 59/15 60/10 65/15 70/9 77/20 83/8 86/5 89/3 91/22 92/1 92/7 92/21 94/1 94/3 94/18 95/20 96/23 101/10
Mr. Rees's [1] 91/17
Ms. McDonough [1] 76/20
Ms. Newman [2] 81/15 83/17
much [8] 24/5 30/10 41/12 55/18 73/23 79/15 104/12 104/25
multi [1] 40/4
multi-billion [1] 40/4
multiple [3] 62/13 62/17 63/3
multiply [1] 30/24
Music [1] 23/8
myself [1] 79/22

**N**

name [10] 9/1 9/25 13/18 83/11 84/18 86/20 86/25 87/10 100/22 101/12
named [5] 10/2 10/2 10/13 26/23 87/5
names [9] 21/4 84/14 85/4 85/21 85/23 86/15 87/14 87/14 89/21
narrower [1] 75/9
nature [1] 95/11
near [1] 61/20
need [24] 5/11 36/5 41/17 63/2 63/3 69/24 77/11 79/23 79/24 80/16 80/19 81/5 90/17 91/22 92/14 92/16 94/4 94/5 100/14 101/21 102/1

102/5 104/10 104/23
needs [1] 96/5
negotiated [1] 60/4
neither [3] 8/17 49/13 84/12
neutral [1] 39/20 42/23
never [28] 9/25 10/4 10/7 10/13 10/14 43/2 43/15 44/13 53/7 53/15 55/19 56/25 65/25 72/15 78/17 81/4 81/9 81/9 81/23 83/12 83/18 85/4 88/4 89/23 90/12 90/14 95/15 100/23
new [11] 2/10 2/10 9/23 10/1 29/24 45/19 46/6 50/9 74/20 85/6 85/23
New York [3] 10/1 29/24 45/19
Newman [15] 9/15 9/24 10/4 10/6 79/13 81/7 81/15 82/12 82/16 83/11 83/17 83/21 90/11 96/18 101/19
news [1] 102/16
next [11] 4/14 20/25 34/21 34/23 43/8 53/17 60/9 91/11 91/20 96/20 101/19
nice [1] 50/12
night [2] 79/18 80/22
nine [4] 8/7 56/3 56/9 62/25
nine percent [2] 56/3 56/9
nine-year [1] 62/25
Ninth [4] 23/7 62/4 64/9 71/22
Ninth Circuit [4] 23/7 62/4 64/9 71/22
Noble [13] 19/23 20/6 30/23 43/12 44/3 53/17 56/6 67/19 67/22 68/2 68/12 70/10 97/11
Noble Exchange [7] 20/6 30/23 43/12 44/3 56/6 67/19 67/22
nobody [4] 13/15 44/10 46/2 67/25
noise [1] 16/23
non [2] 76/4 77/10
non-issue [1] 76/4
none [2] 48/2 75/8
nonexistence [1] 35/14
Normally [1] 4/5
Northern [1] 23/11
note [2] 62/21 65/22
noted [3] 14/18 50/18 78/21
notes [3] 77/16 80/6 86/1
nothing [13] 26/9 31/4

## N

nothing... [11] 33/4 34/25 50/3 54/3 54/5 63/4 63/8 68/15 73/5 98/13 101/23
notice [6] 61/24 63/7 65/2 65/5 88/10 89/2
number [18] 3/18 7/8 7/11 8/2 8/5 8/11 11/16 16/5 16/6 21/16 24/6 30/11 47/10 51/23 52/4 57/15 59/9 97/12
Number 2 [5] 7/8 8/2 16/5 21/16 51/23
Number 3 [3] 7/11 8/5 16/6
Number 4 [1] 8/11
number one [2] 47/10 52/4
numbers [17] 22/2 23/25 24/11 25/17 27/1 27/5 28/8 32/1 32/2 33/23 34/5 34/7 34/9 34/12 55/11 58/16 65/22
numerical [1] 63/8
numerous [2] 47/15 68/23
NX [6] 22/16 22/19 23/20 24/1 43/11 43/25

## O

object [1] 10/7
objected [1] 38/8
objecting [1] 91/24
objection [8] 5/14 10/12 10/16 28/16 79/14 85/12 97/20 103/16
objections [1] 103/11
objectively [1] 46/18
objects [1] 94/6
obligation [1] 71/1
oblige [1] 85/18
obviously [3] 37/22 56/20 72/6
occupation [1] 97/21
occurred [1] 65/3
off [4] 10/20 49/21 51/18 59/24
off-the-cuff [1] 49/21
offender [1] 63/3
offer [3] 36/24 81/25 97/4
offering [2] 93/7 101/5
office [1] 23/16
officer [1] 78/13
officers [3] 73/10 86/12 87/6
OFFICIAL [1] 1/23
Oh [6] 38/15 39/16 46/18 78/24 82/22 98/23
old [2] 78/9 87/25
once [10] 14/16 35/4 41/6 46/6 62/6 63/10

64/10 103/3 104/6 104/7
one [62] 4/17 5/23 6/1 6/21 7/24 9/11 14/13 18/10 18/18 25/6 26/15 26/18 27/18 27/20 27/21 27/23 29/18 30/18 31/24 33/6 33/16 36/7 36/8 36/13 42/16 43/3 45/3 45/13 45/14 45/16 47/10 49/2 49/5 49/12 52/3 52/4 52/17 53/5 59/5 59/5 61/18 62/16 62/22 65/15 65/16 72/9 73/19 75/14 76/2 76/23 79/12 79/20 81/13 84/24 86/12 86/22 87/5 91/4 92/15 96/1 103/16 104/4
one-page [7] 26/15 26/18 27/18 27/20 27/21 27/23 29/18
one-to-one [1] 59/5
ones [1] 39/7
only [25] 12/15 13/22 15/1 20/5 22/10 25/6 26/5 30/10 30/18 32/4 33/21 35/24 42/17 43/10 49/20 52/6 52/20 54/15 55/20 71/10 78/9 80/9 91/4 100/9 103/8
oOo [1] 105/10
open [3] 82/5 82/11 83/13
opening [1] 4/22
openings [6] 5/18 102/12 103/1 103/2 103/3 103/6
operations [3] 62/7 72/23 73/11
opinion [16] 25/5 26/9 28/24 29/4 32/15 33/11 61/8 97/7 97/14 97/15 97/18 98/4 98/7 98/11 98/21 99/16
opinions [1] 31/13
opponent [1] 90/23
opportunity [1] 105/4
opposed [3] 18/5 42/24 72/19
opposition [4] 8/15 25/10 39/7 45/22
optimistic [1] 80/12
orally [1] 6/18
order [15] 6/16 8/13 67/4 67/6 77/17 79/16 79/24 83/1 90/19 91/5 92/4 92/7 93/14 94/4 94/14
ordering [1] 91/13
orders [1] 47/25
organization [1] 87/5
original [1] 44/18
others [2] 84/23 91/20
otherwise [2] 38/11 88/5

ours [1] 104/4 54/4
out [73] 6/13 8/9 9/6 11/1 11/23 12/8 14/5 14/23 15/2 15/6 15/21 15/22 16/2 16/4 17/4 18/10 18/14 19/19 21/11 24/13 24/16 25/2 26/3 27/22 28/1 30/12 30/18 35/14 36/20 36/22 40/13 41/21 42/9 42/12 44/22 45/13 46/1 55/25 56/4 58/23 59/11 61/19 61/20 64/22 65/3 65/17 66/19 67/25 71/10 72/4 72/12 75/21 75/25 76/9 78/5 81/10 82/5 82/13 83/2 83/13 87/24 88/21 88/22 91/7 91/15 92/11 92/16 92/23 96/20 98/19 99/25 100/18 104/10
out-of-pocket [2] 58/23 59/11
outlining [1] 98/12
outside [2] 75/9 97/15
over [13] 18/22 27/2 28/7 37/3 37/21 43/2 43/2 47/24 70/5 77/16 80/5 92/6 103/16
overall [1] 22/15
overhead [4] 30/7 30/9 30/14 30/20
overly [1] 100/15
overrules [1] 73/5
own [6] 19/2 31/8 32/16 60/8 68/11 80/13
owned [1] 76/1

## P

P.C [1] 2/13
packages [1] 37/10
packaging [4] 37/11 37/15 38/2 61/11
page [14] 11/10 15/25 22/13 25/16 26/15 26/18 27/18 27/20 27/21 27/23 29/18 59/18 60/20 106/7
page 10 [1] 15/25
page 152 [1] 11/10
page 16 [1] 60/20
page 2 [2] 22/13 25/16
page 97 [1] 59/18
pages [7] 32/3 33/3 51/3 76/8 82/4 85/16 85/17
pages 11 [1] 76/8
pages 48 [1] 51/3
paid [1] 58/1
paper [1] 33/6
papers [8] 3/19 3/20 9/16 31/2 36/17 37/18 52/14 81/9

parade [1] 69/16
paragraph [1] 60/21
paragraph 93 [1] 60/21
PARK [1] 2/14
parse [1] 98/19
part [12] 9/13 25/25 26/12 32/18 54/24 61/23 65/16 73/22 88/11 98/23 101/18 102/11
partes [1] 91/2
particular [4] 26/14 55/9 66/8 75/7
particularity [1] 87/3
particularly [2] 7/20 62/19
parties [15] 4/15 5/9 7/10 39/2 40/1 53/5 59/17 60/7 80/1 94/15 95/7 95/8 95/13 103/8 103/14
partnership [1] 87/2
parts [1] 31/21
party [8] 4/17 21/6 35/14 39/8 39/19 40/18 58/1 86/25
past [5] 14/12 16/7 20/17 71/14 102/15
paste [1] 51/25
patent [4] 72/19 72/20 75/7 75/22
patience [1] 90/22
pattern [2] 53/4 61/5
PAUL [2] 2/7 3/8 9/3
pay [7] 54/24 56/25 57/1 57/3 57/23 58/15 58/16
payment [1] 59/20
pays [1] 24/6
peer [1] 11/18
people [13] 10/1 19/20 19/22 45/25 51/9 51/10 52/6 63/14 66/12 70/2 70/24 81/9 82/7
per [8] 5/5 42/6 52/21 52/21 52/22 53/6 56/1 57/15
per-unit [1] 53/6
percent [2] 56/3 56/9
percentage [16] 22/15 22/17 25/18 27/4 31/7 33/23 34/10 52/18 52/19 55/9 55/13 55/15 55/19 55/24 56/16 57/6
percentages [1] 31/4
peremptories [2] 104/5 104/6
peremptory [1] 104/10
performance [1] 34/18
performing [1] 15/13
permanent [3] 61/3 61/4 64/1
permanently [1] 69/3

permit [2] 74/10 103/7
permitted [1] 9/14
person [7] 10/4 67/3 67/5 86/14 87/8 87/11 88/3
person's [2] 32/23 32/24
persons [2] 86/13 87/7
perspective [2] 7/1 91/17
phase [2] 13/4 102/11
Philippa [2] 9/24 83/11
philosophical [1] 39/2
Phipps [1] 84/24
phone [2] 27/2 28/7 80/2 80/17 91/23 93/19 94/15
phony [1] 46/1
photograph [1] 44/18
phrase [2] 9/7 69/6
physician [2] 97/18 98/5
picture [2] 12/19 22/9 43/24
piece [1] 33/6
pieces [2] 70/1 100/12
pin [1] 10/22
ping [1] 18/6
ping-pong [1] 18/6
Pippa [9] 9/15 79/13 81/7 81/18 82/12 82/16 90/11 92/11 96/18
Pippa Newman [1] 9/15
place [2] 19/11 52/12
placebo [1] 16/21
places [4] 13/23 19/17 44/9 44/10
plain [1] 87/25
plaintiff [31] 1/7 2/2 3/6 3/9 4/1 4/23 5/15 5/16 5/19 7/13 7/15 8/9 8/23 9/22 20/25 26/8 38/25 39/16 40/6 44/19 49/1 49/2 49/10 53/11 60/2 60/14 73/15 73/20 74/22 80/9 86/11
plaintiff's [5] 6/20 8/2 21/15 22/10 50/5
plaintiffs [4] 28/10 36/17 51/15 77/23
plan [2] 9/4 95/11
plane [1] 93/9
planning [2] 83/7 96/5
plans [1] 91/13
plastic [7] 7/13 7/19 7/21 37/5 37/20 43/1 44/24
play [4] 8/9 24/16 64/22 70/7
playbook [1] 96/14
Playboy [1] 62/25
plays [1] 65/17
pleading [1] 82/13

**P**

**please [4]** 64/20 94/22 95/2 104/22
**plenty [2]** 71/22 76/9
**Plough [1]** 64/9
**pocket [3]** 58/23 59/11 104/10
**point [51]** 4/14 9/6 11/1 12/6 12/9 13/10 14/5 14/7 14/8 14/8 17/2 17/19 18/9 18/14 19/19 21/17 26/11 33/16 34/2 35/7 45/13 48/14 49/15 53/13 56/10 56/20 59/17 65/21 67/10 68/11 68/19 70/7 70/21 72/11 73/19 74/1 74/4 74/15 74/15 75/15 75/21 76/19 77/10 77/12 77/24 82/17 87/18 87/24 88/12 92/25 96/12
**pointed [2]** 30/12 76/9
**pointing [1]** 35/14
**points [4]** 42/9 48/23 55/18 75/20
**policy [1]** 75/13
**polished [1]** 91/10
**Poly [7]** 72/14 72/16 72/16 73/4 73/18 75/5 75/23
**Poly-America [7]** 72/14 72/16 72/16 73/4 73/18 75/5 75/23
**pong [1]** 18/6
**pop [1]** 19/16
**popped [1]** 3/15
**portion [2]** 25/6 35/25
**posed [2]** 76/20 82/18
**position [6]** 66/22 76/13 88/16 92/22 92/23 101/6
**positioning [1]** 60/25
**possibility [1]** 41/13
**possible [1]** 52/20
**post [12]** 13/5 14/19 17/8 36/22 45/13 45/15 48/14 48/16 48/19 49/17 49/23 51/8
**posture [1]** 76/17
**potential [2]** 4/4 12/21
**pound [1]** 38/25
**power [1]** 39/8
**powerful [1]** 64/19
**practice [3]** 11/10 15/12 103/1
**preclude [4]** 8/11 35/13 71/9 89/21
**prejudice [1]** 68/7
**prejudicial [1]** 99/16
**preliminary [1]** 41/1
**premature [1]** 77/12
**premised [1]** 21/22
**premises [1]** 21/20
**prepare [2]** 26/24 89/14

**prepared [2]** 27/1 27/10
**preparing [1]** 27/20
**present [7]** 5/1 24/15 24/19 35/19 42/13 43/19 102/19
**presented [1]** 28/6
**president [2]** 26/24 89/17
**president's [1]** 86/20
**pressing [1]** 3/15
**pretrial [9]** 3/17 5/10 79/16 79/24 83/1 91/5 92/4 93/14 94/14
**pretty [4]** 11/23 39/11 82/21 104/12
**prevail [1]** 35/10
**price [9]** 14/7 14/8 14/8 52/21 52/22 55/18 56/10 56/20 58/12
**principal [1]** 65/6
**principle [1]** 74/17
**principles [1]** 72/12
**prior [4]** 55/7 61/7 62/17 95/10
**private [1]** 87/1
**privilege [7]** 74/8 74/10 74/19 76/7 76/19 77/1 77/10
**pro [1]** 22/17
**pro rata [1]** 22/17
**probably [5]** 29/23 34/18 40/24 80/8 98/25
**problem [16]** 5/17 11/5 13/24 14/24 15/20 16/5 16/6 26/8 26/17 52/12 69/11 71/5 71/14 76/2 81/6 83/1
**problematic [2]** 26/9 102/2
**problems [4]** 11/1 14/9 17/19 52/4
**procedural [1]** 3/18
**procedurally [1]** 89/1
**Procedure [1]** 81/11
**proceed [1]** 48/1
**proceedings [1]** 1/15 105/19 106/6
**process [3]** 26/20 88/10 100/21
**produce [3]** 40/19 67/1 77/5
**produced [3]** 27/8 42/19 85/16
**produces [1]** 28/9
**producing [1]** 22/19
**product [35]** 7/13 7/18 7/19 7/21 12/12 12/21 13/14 13/19 13/22 14/22 14/23 15/2 15/6 15/6 16/4 18/13 30/6 37/10 37/12 37/16 38/2 38/7 38/13 46/1 53/17 53/18 57/12 58/17 58/20 61/2 66/5

66/9 66/12 66/13 70/16
**production [2]** 23/3 23/19
**products [17]** 19/13 23/4 23/22 43/20 43/23 46/19 47/1 50/21 50/22 51/1 55/16 55/17 55/20 55/25 57/13 67/24 67/25
**profit [4]** 22/4 53/22 53/24 53/24
**profits [8]** 30/5 30/10 33/11 53/12 54/23 72/25 75/16 75/17
**progeny [1]** 16/3
**prohibit [1]** 35/14
**prohibited [2]** 26/1 26/4
**prohibited-by-law [1]** 26/4
**prominently [1]** 13/19
**promise [3]** 37/7 66/8 92/2
**promoted [1]** 73/24
**proof [3]** 42/14 81/25 97/4
**propensity [2]** 63/5 71/11
**proper [3]** 51/14 76/18 76/21
**property [6]** 54/20 55/3 55/8 58/21 59/12 72/21
**proposal [1]** 5/13
**proposed [5]** 5/14 40/10 40/11 59/18 80/9
**proposition [1]** 54/17
**prorated [2]** 25/18 27/5
**protect [2]** 38/3 100/1
**protective [1]** 8/13
**proud [2]** 68/12 70/9
**prove [1]** 53/20
**provide [6]** 38/21 39/8 39/9 41/19 89/2 96/13
**provides [2]** 28/9 92/8
**providing [1]** 41/19
**proving [1]** 90/16
**proxy [3]** 66/22 58/21 58/23
**psychologist [1]** 46/23
**psychology [1]** 46/16
**public [1]** 87/1
**published [1]** 11/19 97/12 97/12
**purchase [9]** 13/10 13/13 13/14 14/7 24/5 33/25 49/17 49/23 51/4
**purchaser [1]** 13/14
**purpose [5]** 49/1 71/15 89/24 90/7 98/16
**purposes [2]** 12/11

75/13
**pursuant [5]** 86/12 86/15 87/10 89/21 106/3
**push [1]** 48/6
**pushing [2]** 6/11 100/9
**puts [7]** 14/23 15/2 15/6 16/4 22/9 28/8 49/1
**putting [3]** 40/8 61/1 69/16

**Q**

**qualifications [1]** 50/16
**qualified [2]** 49/21 50/25
**quality [3]** 39/13 55/17 56/6
**question [34]** 5/23 7/18 14/21 15/5 15/11 19/22 22/5 22/6 23/4 24/11 25/25 30/7 35/13 44/11 48/16 48/24 49/7 49/16 52/3 57/4 57/18 62/18 74/15 76/5 77/5 79/13 79/15 82/17 85/8 88/12 88/14 98/19 99/24 101/18
**questioned [1]** 44/5
**questioning [1]** 17/24
**questions [19]** 7/9 12/20 15/14 15/17 16/23 17/10 18/12 24/23 38/19 47/19 74/14 76/20 76/21 76/23 81/13 91/8 93/14 102/8 104/21
**quick [2]** 34/2 52/3
**quickly [2]** 75/21 86/2
**quite [1]** 91/12
**quote [2]** 12/14 42/13 70/15 76/23
**quote/unquote [2]** 42/13 70/15
**quoting [1]** 11/9

**R**

**raise [3]** 20/12 62/18 75/14
**raised [1]** 9/14
**raises [1]** 57/17
**raising [1]** 52/12
**Ralph [2]** 31/7 54/2
**Ralph Lauren [2]** 31/7 54/2
**rata [1]** 22/17
**rate [5]** 55/9 55/12 56/9 59/14 59/23
**rather [1]** 11/3
**ratio [7]** 30/22 30/23 31/1 31/5 31/6 31/9 34/4
**re [4]** 12/12 14/10 17/6 19/5
**re-create [3]** 12/12

14/10 19/5
**re-creating [1]** 17/6
**react [1]** 51/1
**reacting [1]** 71/20
**reaction [1]** 29/19
**read [1]** 103/23
**reading [5]** 59/20 60/1 76/23 86/25 89/20
**ready [1]** 88/21
**real [4]** 12/16 48/17 78/18 97/8
**realistic [1]** 55/12
**really [20]** 6/25 11/6 13/21 14/20 16/13 17/4 24/10 28/5 33/6 35/13 38/10 40/9 41/18 44/16 48/9 60/24 62/1 76/3 80/15 98/11
**reason [6]** 36/16 46/9 52/9 73/14 94/23 100/9
**reasonable [4]** 54/19 55/1 56/11 87/3
**reasoning [1]** 75/8
**reasons [5]** 52/24 66/20 68/24 75/14 100/16
**rebut [1]** 24/8
**rebuttal [3]** 4/24 102/18 102/21
**recall [2]** 9/18 18/18 36/10 90/24
**received [1]** 77/6
**receiving [1]** 55/20
**recent [1]** 23/9
**recess [1]** 105/8
**recognize [1]** 24/8
**recognizes [1]** 21/19
**recognizing [1]** 18/20
**record [11]** 8/25 34/20 37/9 37/15 40/14 40/15 49/24 51/3 76/10 92/12 92/18
**records [2]** 26/21 74/4
**recover [2]** 75/10 75/16
**recovers [1]** 56/3
**recovery [4]** 8/12 72/10 74/23 76/16
**reduction [1]** 30/19
**REES [32]** 2/13 2/13 3/12 4/2 5/22 18/8 18/23 25/5 29/25 37/3 37/17 38/18 45/9 51/22 59/15 60/10 65/15 70/9 77/20 83/8 86/5 89/3 91/22 92/1 92/7 92/21 94/1 94/3 94/18 95/20 96/23 101/10
**Rees's [1]** 91/17
**reference [2]** 8/4 8/5
**reflecting [1]** 12/10
**reflects [1]** 14/4
**regard [3]** 14/6 102/25 103/23
**regarding [3]** 8/14

**R**

**regarding... [2]** 10/23
21/16
**register [3]** 97/9 98/12
99/14
**registered [6]** 68/10
98/1 99/10 100/5
100/11 101/22
**registration [11]**
43/13 44/4 63/13
70/21 98/16 98/20
98/23 99/1 99/8 99/23
101/2
**registrations [2]** 81/2
99/13
**regulations [1]** 106/8
**rehash [1]** 35/23
**rejected [1]** 76/6
**related [2]** 9/9 9/16
**relates [31]** 6/19 7/11
7/14 8/13 8/21 8/23
18/7 21/17 27/21
31/16 33/20 34/19
42/9 42/17 45/11
45/16 46/24 49/9 50/1
50/3 51/23 56/6 60/12
62/11 68/21 74/23
77/17 77/20 81/25
97/5 103/9
**relevance [3]** 24/11
78/22 101/20
**relevant [14]** 8/20
11/11 13/10 13/25
21/24 25/12 40/15
43/7 43/13 44/25
45/24 49/17 60/19
74/7
**reliably [1]** 15/18
**relied [5]** 25/4 25/6
27/15 29/1 55/6
**relief [1]** 72/24
**reluctant [1]** 103/21
**rely [7]** 27/16 27/18
28/11 28/14 28/23
29/3 29/7
**relying [1]** 29/16
**remarkably [1]** 60/23
**remedied [1]** 14/25
**remedy [4]** 54/4 89/9
89/11 89/11
**remember [1]** 80/23
**removes [1]** 38/14
**renders [1]** 12/11
**repeat [3]** 38/5 63/3
63/3
**repeatedly [7]** 12/14
14/11 16/1 16/11 22/20
22/24 23/7 71/5
**repeats [1]** 43/1
**replay [1]** 45/10
**replicate [1]** 12/16
**reply [1]** 31/2
**reported [1]** 106/5
**reporter [3]** 1/23 6/7
9/1
**reporter's [2]** 1/15
59/24
**reports [2]** 81/17 82/4

**represent [1]** 81/14
**representation [5]**
56/23 83/21 83/23
83/25 91/18
**representative [1]**
47/16
**representing [1]** 79/2
**request [3]** 7/14 79/25
83/4
**require [5]** 38/1 40/7
40/22 40/24 59/7
**required [10]** 23/1
24/25 35/17 36/24
41/4 41/8 42/25 62/9
87/4 101/25
**requirement [1]** 42/7
**requirements [1]**
61/25
**requires [4]** 16/3
23/18 24/10 24/14
**reserve [2]** 65/16
104/16
**respect [23]** 6/21 7/7
7/12 7/17 7/19 9/23
8/4 11/25 18/11 21/15
22/1 31/2 38/20 51/23
60/10 61/8 63/24 75/3
79/4 90/4 90/11 94/8
100/14
**respected [1]** 31/3
**respectfully [3]** 11/4
92/1 92/20
**respects [2]** 11/16
18/21
**respon [1]** 81/18
**respond [1]** 94/5
**respondent's [1]**
15/22
**response [18]** 18/10
25/13 33/15 37/23
65/18 68/19 81/22
**responses [2]** 25/9
83/16
**responsibility [2]** 12/8
18/5
**restitution [1]** 57/23
**restock [1]** 103/25
**restrained [1]** 69/3
**restraining [2]** 67/4
67/6
**result [5]** 21/23 26/21
54/23 55/24 70/14
**resulting [1]** 24/11
**results [2]** 33/19
33/20
**retail [3]** 14/8 19/15
73/12
**retailers [4]** 37/11
37/12 37/12 37/14
**retails [1]** 19/15
**return [2]** 22/18 32/2
**returns [10]** 25/17
27/6 29/13 31/20
31/24 32/9 32/10
32/12 32/16 33/3
**revenue [5]** 26/5
31/21 31/23 52/23
55/19

**revenues [7]** 22/4
22/11 26/7 30/23
30/24 31/24 33/21
**review [2]** 3/19 3/20
**reviewed [1]** 11/18
**revised [4]** 9/23 10/5
10/12 10/16
**ridiculous [1]** 79/1
**RIFKIND [2]** 2/7 3/8
**right [53]** 3/15 5/21
6/15 9/10 13/19 19/2
19/3 21/10 24/22
24/24 26/17 27/17
27/24 28/19 29/11
33/13 40/23 45/4 46/5
53/13 54/8 54/12 56/7
57/7 57/25 58/3 58/17
59/13 59/21 60/9
65/14 66/2 68/13
68/18 72/5 72/5 72/11
75/18 78/3 79/11
84/12 87/22 88/8 88/9
92/14 92/25 93/6
93/21 98/4 102/4
104/6 104/17 104/24
**rigor [1]** 11/9
**rise [3]** 36/3 79/9
105/8
**rises [1]** 27/24
**risk [2]** 11/21 41/8
**road [1]** 36/1
**ROBERT [2]** 2/13 3/12
**Robert Rees [1]** 3/12
**rocks [1]** 20/20
**role [3]** 11/7 16/16
18/2
**rolling [2]** 47/6 47/9
**room [4]** 1/24 35/4
91/14 92/16
**Ross [1]** 44/23
**royalties [8]** 52/7
52/11 52/12 52/15
52/16 52/17 54/15
54/22
**royalty [31]** 52/4 52/5
52/20 53/1 53/2 53/3
53/5 53/6 53/8 54/3
54/4 54/13 54/14
54/19 54/24 55/2
55/10 55/13 56/1 56/2
56/9 56/12 57/5 59/18
59/20 59/22 60/2 60/4
60/6 60/8 75/20
**rule [14]** 15/21 15/22
26/7 28/25 32/20
51/14 71/16 81/10
83/15 85/21 86/9
89/20 90/5 90/19
**Rule 26 [3]** 83/15
85/21 86/9
**Rule 50 [1]** 26/7
**ruled [1]** 74/2
**rules [7]** 9/7 69/20
78/8 89/20 90/5
103/24 104/12
**ruling [5]** 45/2 48/25
65/17 96/17 96/20
**run [2]** 11/20 41/8

**runaround [1]** 84/17
**running [4]** 4/18 29/15
29/16 104/7
**runs [1]** 72/12

**S**

**safe [2]** 62/9 70/4
**salaries [1]** 23/16
**sale [13]** 13/5 14/19
17/9 23/3 36/22 45/13
45/15 48/14 48/16
48/19 51/8 53/14
66/16
**sales [29]** 22/16 23/21
24/4 24/6 25/18 26/15
26/18 27/18 27/20
27/21 29/18 30/21
30/23 31/1 31/5 31/5
31/7 31/9 34/3 52/18
52/20 53/15 53/20
53/25 55/16 57/6 59/7
73/11 75/18
**same [17]** 11/9 16/21
29/8 29/16 29/17 34/1
34/8 39/21 39/25
50/11 56/17 61/1 61/5
82/16 85/20 95/25
103/17
**Santee [1]** 68/6
**satisfies [1]** 51/14
**save [1]** 104/10
**say-so [1]** 28/7
**saying [21]** 12/4 16/11
18/15 19/13 28/17
37/23 39/22 41/8 44/5
53/25 56/2 56/5 56/8
58/25 61/5 63/3 64/20
69/12 99/2 100/4
101/6
**school [1]** 58/5
**science [2]** 54/11 78/7
**scope [1]** 97/15
**scrap [1]** 45/14
**scrutinized [1]** 62/7
**search [5]** 61/14
64/15 69/20 70/10
70/13
**searched [1]** 97/25
**seated [1]** 78/7
**second [13]** 19/19
25/25 26/12 30/21
32/18 34/2 37/1 49/24
64/22 74/1 75/21 76/5
103/6
**second-level [1]**
49/24
**section [2]** 75/7 106/3
**see [40]** 8/17 11/25
13/20 19/22 31/1
36/16 36/17 36/20
37/9 38/4 38/9 38/11
43/4 43/11 43/11
43/11 43/12 43/17
43/18 43/25 44/2 44/7
44/8 44/25 51/17
53/17 60/21 63/4 63/8
65/17 76/12 85/17
92/9 92/10 92/10

97/25 99/6 99/8
101/20 105/6
**seeing [1]** 18/18
**seek [1]** 42/3
**seeking [3]** 27/21
61/6 79/7
**seem [1]** 6/14
**seemed [1]** 65/23
**seems [5]** 6/24 39/11
42/4 85/25 87/9
**seen [10]** 18/17 19/14
37/5 44/18 53/7 66/10
83/4 89/23 99/7
100/19
**sees [11]** 12/12 12/21
13/16 38/6 38/9 43/3
43/15 43/16 44/6
44/13 47/17
**SEL [1]** 58/6
**sell [4]** 37/14 57/22
66/4 66/8
**selling [3]** 22/22 52/10
66/12
**sells [1]** 38/13
**sense [8]** 20/11 27/8
29/15 53/15 54/6
76/14 97/7 104/8
**separate [2]** 73/25
102/12
**September [1]** 100/10
**sequitur [1]** 77/10
**serious [3]** 63/24 64/3
69/24
**served [1]** 79/15
**session [1]** 102/6
**set [9]** 3/22 3/23 46/6
72/19 84/13 84/15
91/1 91/10 104/11
**setoff [1]** 77/12
**setting [1]** 12/16
**settle [2]** 68/23 80/2
**settlement [3]** 64/25
66/19 66/23
**settlements [1]** 63/20
**seven [2]** 104/13
104/17
**several [1]** 84/22
**shall [1]** 87/5
**share [1]** 95/13
**sheet [1]** 32/10
**shelves [1]** 44/24
**shift [1]** 45/7
**shifts [2]** 22/11 42/14
**ship [2]** 43/10 43/23
**shipped [1]** 43/21
**shop [1]** 13/17
**shopper [2]** 12/12
12/20
**shoppers [1]** 19/10
**shopping [2]** 13/5
19/11
**short [6]** 11/19 12/7
50/4 90/19 104/7
104/8
**shorthand [1]** 33/4
**shortly [2]** 7/22 36/25
**show [16]** 12/23 22/10
26/8 59/7 59/8 63/5

**S**

**show... [10]** 63/6 65/10 70/2 70/23 71/15 71/16 85/4 90/12 96/5 98/25
**showed [1]** 83/12
**showing [5]** 22/9 23/2 27/12 78/23 95/10
**shown [2]** 22/18 26/22
**shows [3]** 13/14 61/17 64/17
**side [16]** 4/22 4/25 5/13 6/18 34/19 36/7 36/8 36/10 42/19 45/5 50/5 80/12 86/11 91/2 95/9 102/18
**side's [1]** 103/16
**sidebar [1]** 104/2
**sides [4]** 3/24 6/25 94/18 105/1
**significance [1]** 81/3
**significant [3]** 14/16 81/15 90/6
**silence [1]** 60/12
**similar [7]** 28/21 43/9 46/11 60/23 60/25 62/5 67/24
**similarity [1]** 50/23
**similarly [2]** 7/7 8/1
**simply [6]** 25/17 55/15 66/19 66/25 68/21 100/16
**since [4]** 4/6 79/3 86/7 88/20
**single [4]** 44/18 51/16 52/17 99/24
**sir [1]** 5/25 9/21
**sister [1]** 73/16
**situation [3]** 23/12 40/12 40/17
**situations [2]** 20/14 52/7
**six [6]** 5/6 41/9 78/4 93/11 104/13 104/17
**six inches [1]** 78/4
**skills [1]** 7/4
**Sleekcraft [2]** 35/11 36/21
**slightly [1]** 21/17
**Slow [1]** 59/23
**Smith [1]** 89/6
**snow [1]** 78/4
**sold [15]** 13/22 30/6 30/11 30/19 30/23 30/25 57/13 57/20 57/24 58/12 58/15 58/16 58/19 58/22 59/2
**solid [1]** 80/1
**somebody [10]** 20/2 40/12 40/14 45/20 53/14 64/20 74/6 84/25 85/19 87/20
**somehow [4]** 4/10 6/13 47/24 78/24
**someone [2]** 20/3 27/10

**something [20]** 11/17 12/13 23/20 24/24 25/1 37/18 38/17 40/15 43/10 46/16 47/17 47/21 54/10 91/25 95/14 95/17 96/2 96/8 97/19 101/24
**sometimes [1]** 12/7
**somewhat [1]** 37/22
**somewhere [2]** 19/14 98/15
**soon [2]** 77/17 83/14
**sooner [1]** 94/25
**sorry [10]** 4/9 37/6 50/11 59/25 63/13 71/18 87/17 93/8 96/22 102/7
**sort [14]** 7/18 8/8 11/24 24/15 24/18 29/19 34/10 35/4 35/18 38/22 42/14 61/15 75/2 77/10
**sorting [1]** 25/1
**sound [2]** 50/9 96/8
**sounds [2]** 39/24 101/6
**source [16]** 13/4 14/20 15/11 15/21 16/3 17/8 19/20 19/22 20/7 20/11 25/4 27/12 28/2 29/22 33/1 51/6
**sources [1]** 31/19
**SOUTH [1]** 2/4
**speak [1]** 87/16
**speaking [2]** 6/24 97/23
**special [1]** 80/13
**specialized [1]** 51/12
**specific [4]** 38/19 39/13 68/21 85/21
**specifically [1]** 8/14
**speck [1]** 43/3
**speculate [3]** 48/18 52/19 53/19
**speculates [3]** 49/20 52/24 53/6
**speculating [1]** 51/18 52/13
**speculation [5]** 44/15 44/16 44/20 48/18 49/22
**spend [2]** 79/8 80/1
**spent [2]** 73/23 91/2
**spite [2]** 34/17 47/13
**spoke [1]** 82/7
**sponsorship [1]** 15/3
**spot [2]** 18/25 67/17
**spreadsheet [9]** 26/25 27/1 27/2 27/7 27/13 28/9 32/1 33/20 33/24
**stacking [1]** 40/9
**stand [6]** 5/24 73/1 73/8 73/21 79/14 98/25
**stand-alone [1]** 73/1 73/8 73/21
**standard [4]** 11/15

15/7 25/18 39/12
**start [4]** 6/20 10/23 41/6 104/7
**started [5]** 45/18 45/19 45/22 47/6 47/9
**starting [3]** 4/6 59/19 87/24
**starts [1]** 22/3
**state [8]** 8/25 26/6 59/15 74/4
**statement [7]** 24/20 35/18 39/24 42/23 67/18 80/10 86/4
**statements [1]** 86/9
**STATES [3]** 1/1 104/4 106/8
**statute [2]** 22/8 22/9
**statutes [1]** 75/14
**stay [5]** 64/1 64/10 64/11 70/3 78/7
**Steak [1]** 12/14
**steal [1]** 57/21
**stenographically [1]** 106/5
**step [3]** 6/6 9/21 99/15
**steps [1]** 98/12
**stip [2]** 80/20 92/10
**stips [2]** 80/3 83/2
**stipulate [1]** 69/18
**stipulated [2]** 66/3 66/10
**stipulating [1]** 91/24
**stipulation [1]** 66/11
**stolen [7]** 54/20 56/12 56/14 56/24 57/14 57/19 59/12
**stop [4]** 45/21 64/20 66/12 99/5
**store [3]** 38/13 38/14 82/9
**stores [2]** 19/14 19/16
**story [1]** 76/14
**straightforward [1]** 57/16
**strategy [4]** 61/19 61/23 70/5 70/8
**straw [1]** 50/4
**street [3]** 1/24 51/9 57/22
**strength [4]** 48/21 49/8 50/19 73/22
**strenuous [1]** 5/14
**strike [2]** 33/6 33/7
**strong [1]** 41/4
**stronger [8]** 39/8 40/19 40/21 41/20 41/20 41/23 42/2 42/13
**strongly [1]** 103/13
**studies [1]** 15/14
**study [2]** 15/5 20/20
**stuff [6]** 51/20 82/20 82/21 90/16 92/3 101/2
**styled [1]** 26/13
**subject [4]** 10/15 81/15 84/1 84/4

**subjects [1]** 50/15
**submission [1]** 77/16
**submit [4]** 23/24 25/12 27/3 27/7
**submitted [3]** 9/16 82/3 95/19
**subordinate [1]** 82/15
**subset [1]** 82/25
**subsidiaries [2]** 49/5 49/11
**subsidiary [1]** 76/1
**substance [1]** 82/12
**such [5]** 11/6 14/10 15/17 17/19 18/3
**sudden [1]** 73/16
**sue [1]** 64/21
**suffered [1]** 58/24
**suffering [1]** 75/18
**suggest [5]** 7/21 36/18 47/23 92/1 92/20
**suggested [2]** 42/15 100/19
**suggesting [2]** 17/12 89/19
**suggestion [2]** 42/12 93/5
**suggestions [2]** 93/7 93/7
**suggests [6]** 13/18 41/20 41/23 47/12 69/7 96/8
**SUITE [2]** 2/4 2/14
**summaries [1]** 32/19
**summary [11]** 26/15 26/18 27/18 27/20 27/21 27/23 29/18 32/25 68/4 74/3 76/8
**super [2]** 19/16 19/17
**superior [1]** 91/3
**supplies [1]** 23/16
**support [5]** 23/15 54/4 54/6 54/17 56/16
**supporting [1]** 32/15
**supports [2]** 19/13 19/25
**suppose [1]** 34/2
**supposed [6]** 18/21 20/8 20/23 25/1 61/13 90/25
**Supreme [2]** 17/15 78/19
**sure [15]** 6/8 8/19 9/2 13/15 16/8 21/4 48/14 68/10 68/23 72/1 78/3 85/18 87/16 93/9 101/20
**surgically [1]** 100/19
**surprised [1]** 96/24
**survey [57]** 6/22 7/12 7/16 9/5 10/24 11/2 11/5 11/11 11/15 11/16 12/11 12/18 13/8 13/9 13/10 13/14 14/1 14/2 14/3 14/10 14/17 15/10 15/21 16/15 16/24 17/1 17/10 17/12 17/13

17/20 18/12 18/17 18/21 19/5 19/18 34/24 35/3 35/7 35/15 36/3 36/3 37/13 38/6 38/23 38/25 39/16 39/18 40/6 40/7 40/10 40/22 41/3 41/10 41/24 42/7 42/17 69/21
**surveys [7]** 12/15 16/1 35/17 41/6 41/23 42/1 42/25
**suspicion [1]** 41/11
**Swann [1]** 15/16
**swap [2]** 13/22 44/23
**sword [2]** 79/22 79/23
**system [1]** 50/9

---

**T**

**tack [1]** 57/14
**tacked [1]** 57/11
**tag [1]** 13/18 38/7 43/12
**tailored [1]** 39/10
**take [21]** 12/9 16/19 20/22 30/23 40/13 44/10 65/4 72/6 77/15 79/14 86/1 87/21 87/23 87/25 88/24 88/24 89/25 97/16 98/25 101/5 101/14
**takes [5]** 22/14 22/16 24/4 55/24 89/3
**taking [4]** 55/15 56/8 60/24 65/2
**talk [23]** 3/21 6/15 20/15 35/16 41/6 48/24 49/8 49/10 49/14 50/18 50/19 50/23 66/15 81/2 81/5 83/10 84/21 89/11 91/25 93/2 101/14 101/19 102/1
**talked [5]** 30/14 53/22 78/24 94/3 95/7
**talking [5]** 5/6 31/6 52/6 101/1 101/2
**talks [4]** 48/14 49/7 51/4 51/8
**tax [12]** 22/18 25/17 27/5 29/13 31/20 31/24 32/2 32/9 32/10 32/11 32/16 33/3
**taxes [1]** 73/14
**technical [1]** 35/9
**telling [3]** 28/8 58/14 105/2
**tells [1]** 81/11
**ten [4]** 4/23 9/23 52/21 62/20
**tend [2]** 11/1 103/14
**tentative [15]** 6/16 6/23 7/5 7/10 7/13 7/25 8/3 8/6 8/10 9/12 10/25 18/25 35/23 37/2 77/21
**tentatives [2]** 6/18 8/21

**T**

**tenth [1]** 55/20
**terminated [1]** 52/9
**terms [5]** 9/12 39/18
60/4 64/6 86/8
**test [9]** 13/6 14/20
16/22 17/3 17/3 17/23
19/20 20/7 35/11
**tested [1]** 11/19
**testified [1]** 82/15
**testifies [5]** 29/12
51/6 51/9 97/21
100/16
**testify [15]** 46/24
48/20 50/14 50/25
74/12 82/2 86/14
86/15 87/7 87/8 87/11
87/12 88/17 95/5
101/21
**testimony [22]** 11/11
21/19 36/7 36/14
41/22 45/23 49/17
50/17 51/2 51/13 53/1
53/8 77/21 81/16
82/12 84/1 89/17
95/10 95/12 98/8
98/15 99/17
**testing [7]** 13/24
14/17 14/18 14/19
17/7 20/8 20/10
**thank [17]** 18/24
20/24 21/7 21/12
21/14 34/14 45/6
48/22 51/21 60/16
65/14 75/1 77/14 84/3
90/22 105/6 105/7
**theft [2]** 57/15 66/16
**thefts [1]** 57/15
**theirs [1]** 91/5
**them [48]** 4/18 8/22
19/15 20/10 25/18
28/8 30/3 33/9 40/1
40/7 42/21 42/22 44/9
44/10 44/12 48/16
49/3 59/4 60/8 60/25
61/1 67/14 71/9 73/21
76/23 77/16 79/12
81/10 81/23 81/23
82/9 82/23 83/12
84/15 86/18 86/22
90/18 93/13 93/16
95/21 95/22 95/22
101/6 102/14 102/16
103/4 103/5 104/7
**thematic [1]** 99/2
**themselves [1]** 48/9
**theory [4]** 8/18 30/16
45/13 76/16
**therefore [5]** 13/6
35/9 38/10 51/14 56/3
**thing [21]** 18/10 20/5
25/14 31/3 35/24
36/13 39/21 39/25
43/10 50/11 56/17
59/8 63/24 63/25 68/2
70/1 75/12 75/21
88/19 96/1 96/18
**things [24]** 6/14 19/3

25/6 38/1 40/1 42/18
45/12 46/20 48/19
64/24 69/24 70/12
79/10 80/14 82/8
88/20 89/5 92/13
92/15 92/23 95/10
98/7 100/5 100/7
**think [100]** 4/4 4/25
9/13 10/25 11/5 11/7
12/7 14/13 14/22
14/23 15/7 15/8 15/23
16/15 17/1 17/15 18/2
18/24 19/23 19/23
20/1 29/23 30/1 32/8
33/4 33/21 34/17
35/24 36/1 36/6 36/6
36/19 37/2 41/13 42/6
44/20 44/21 46/1
46/15 47/18 47/25
50/8 50/10 51/7 51/19
53/8 53/25 60/6 63/2
63/2 64/19 65/4 65/5
65/9 65/21 68/4 69/10
69/10 69/14 69/23
69/24 71/20 72/7 76/3
77/11 77/14 77/19
77/20 78/18 78/21
79/5 79/10 79/23
79/24 80/7 80/15
80/17 81/8 83/5 84/6
84/24 86/20 89/10
89/24 90/5 90/16 91/7
91/10 93/8 96/12
97/14 97/14 97/15
98/5 98/14 99/22
99/23 100/15 102/2
104/20
**think a [1]** 98/5
**thinking [2]** 27/12
91/13
**thinks [2]** 51/18 78/6
**third [1]** 31/12
**Thomas [1]** 89/6
**thornier [1]** 24/16
**though [8]** 9/11 24/7
35/24 41/3 50/12
53/10 58/15 67/16
**thought [10]** 31/16
41/16 46/11 47/21
62/12 62/16 68/1 82/9
83/20 83/20
**thoughts [1]** 6/24
**thousands [8]** 31/25
31/25 32/3 32/3 32/3
33/2 33/2 33/2
**thread [1]** 72/12
**three [5]** 30/2 55/7
73/10 75/2 91/1
**threshold [1]** 63/8
**throughout [2]** 22/24
73/18
**throw [3]** 20/20 30/17
79/22
**throwing [1]** 42/12
**thrown [1]** 16/2
**Thursday [6]** 91/11
91/20 92/18 93/4
93/20 94/17

thus [1] 56/4
**tie [1]** 23/18
**tied [3]** 23/3 23/22
23/25
**ties [1]** 26/18
**Title [1]** 106/4
**to -- I [2]** 39/22 92/5
**today [3]** 3/7 68/11
78/1
**today's [1]** 77/16
**together [3]** 79/12
80/2 100/12
**told [3]** 24/18 24/19
86/16
**tone [1]** 96/8
**too [3]** 41/12 57/7
82/24
**took [5]** 25/17 58/20
88/4 90/13 98/12
**top [1]** 78/15
**total [4]** 22/17 23/21
30/24 52/23
**totally [1]** 16/24 31/10
39/19 52/12 53/3
53/25 83/24
**touched [1]** 57/5
**tough [1]** 78/14
**towards [4]** 7/2 7/2
37/19 37/23
**trade [2]** 50/20 61/2
**trade dress [2]** 50/20
61/2
**trademark [32]** 19/21
36/12 38/12 40/13
43/13 59/21 61/13
61/21 61/25 63/25
64/14 64/15 64/23
64/24 68/10 69/20
70/2 70/13 72/19
75/11 80/25 81/2
82/10 96/25 97/10
97/22 97/25 97/25
98/3 101/1 101/22
101/25
**trademarks [1]** 50/20
**traditionally [1]** 56/9
**transcript [9]** 1/15
26/23 52/1 90/12
94/19 96/3 96/6 106/5
106/7
**transcripts [4]** 93/22
94/25 95/8 95/20
**translation [1]** 59/5
**travel [1]** 21/8
**treat [5]** 32/25 33/1
49/11 73/1 73/20
**treated [1]** 49/5
**treating [1]** 97/17
**treatises [1]** 15/15
**trial [35]** 3/22 3/23 4/6
4/7 4/11 4/13 4/24 5/3
5/6 5/7 10/12 24/16
28/21 29/2 41/18
42/18 74/9 76/12 83/7
85/23 88/7 88/8 88/21
89/6 89/15 89/17 90/8
90/15 94/23 97/17
100/10 101/17 102/20

103/15 104/25
**trials [1]** 36/6
**tried [1]** 99/14
**tries [1]** 15/11
**trigger [1]** 42/2
**trouble [1]** 6/7
**true [3]** 12/5 103/17
106/4
**trust [1]** 105/2
**try [9]** 4/16 5/11 30/2
65/7 93/20 94/2 96/20
103/14 105/3
**trying [14]** 6/4 14/20
15/11 24/19 37/19
39/23 39/25 41/6 65/3
93/8 98/18 99/20
99/25 104/9
**Tuesday [5]** 4/6 93/3
93/13 93/19 94/15
**tuning [1]** 41/12
**turn [7]** 18/22 34/7
37/3 67/13 74/9 75/3
75/6
**Turning [1]** 76/5
**turns [1]** 24/13
**two [42]** 10/1 10/5
10/13 16/19 16/24
25/9 31/21 31/23 32/4
34/23 38/18 43/8 43/9
46/17 46/19 47/1 47/1
47/4 48/19 51/9 52/4
60/24 73/10 75/14
79/10 80/1 80/16
81/13 83/5 84/14
84/24 87/13 91/23
92/2 92/7 92/15 93/18
95/20 99/9 100/12
101/18 105/4
**two-hour [2]** 92/2
101/18
**type [7]** 15/14 16/9
40/12 51/20 62/2
65/20 66/8
**typically [1]** 4/15

**U**

**ultimate [1]** 70/7
**ultimately [3]** 30/13
47/19 92/11
**Um [1]** 12/14
**under [21]** 11/7 14/6
14/11 14/25 15/12
16/2 16/16 18/4 26/13
35/10 53/3 62/2 73/18
74/4 74/14 77/16 86/4
86/9 88/4 88/15
101/25
**underneath [1]** 86/20
**understand [8]** 16/8
74/2 82/18 86/3 87/19
88/12 90/9 104/20
**understanding [5]**
11/21 47/22 76/24
94/11 103/24
**understood [1]** 6/4
**undisputed [1]** 73/9
**unfounded [1]** 23/23
**unhappy [1]** 89/25

**unique [4]** 36/13
50/22 67/22 95/17
**uniqueness [1]** 50/20
**unit [5]** 49/6 49/9
52/21 53/6 73/21
**UNITED [3]** 1/1 106/4
106/8
**unless [4]** 18/7 47/9
47/12 78/15
**unquote [2]** 42/13
70/15
**unreasonable [1]** 46/5
**unrelated [2]** 75/2
75/23
**unreliable [1]** 34/8
**unsufficient [1]** 20/11
**unsupported [1]**
23/21
**untangle [1]** 30/3
**until [7]** 4/12 6/2 6/9
45/2 83/12 84/16 99/8
**up [46]** 3/15 4/20 5/24
6/1 15/5 17/2 20/10
21/25 22/16 23/5
24/12 28/25 32/3
37/17 38/15 41/24
42/18 43/8 45/20
48/22 52/22 57/11
58/16 60/24 65/7
69/17 69/19 70/10
70/15 72/19 74/16
83/12 84/2 84/5 84/13
85/4 85/23 86/18
89/18 90/16 95/5
95/10 99/7 100/22
104/1 104/7
**upgraded [1]** 59/13
**upon [5]** 57/5 60/3
69/1 69/4 103/4
**upset [2]** 8/19 47/20
**urgent [1]** 79/10
**us [17]** 18/15 18/19
42/21 42/22 48/7
58/15 58/16 67/22
77/5 81/11 83/6 91/23
92/3 92/22 92/23
95/23 96/5
**USA [2]** 1/9 3/5
**use [25]** 4/19 9/8
11/14 14/2 18/12 32/6
34/10 42/20 42/21
52/15 59/21 63/5 63/6
65/5 65/9 69/9 74/10
78/9 95/21 95/22
95/22 103/2 103/4
103/15 103/16
**use -- I [1]** 32/6
**used [11]** 23/14 31/5
31/10 34/3 34/6 54/19
56/15 62/16 89/23
96/7 103/10
**useless [1]** 12/11
**user [1]** 12/21
**uses [2]** 14/8 24/6
**using [4]** 17/9 18/11
63/13 71/12
**usual [1]** 84/17
**usually [4]** 5/9 50/12

**U**

usually... [2]  87/24
104/14
utilize [2]  7/3 38/24

**V**

vain [1]  78/25
value [15]  54/20 55/21
56/1 56/12 56/14
56/14 56/23 56/25
57/7 57/14 57/19 58/2
58/11 58/13 58/22
valued [1]  57/22
vanity [1]  48/10
variety [1]  68/24
various [1]  49/4
verdict [6]  26/7 54/7
80/13 91/9 93/15
94/12
versa [1]  4/18
versus [3]  3/5 72/17
97/18
vice [1]  4/18
vice versa [1]  4/18
view [7]  39/3 39/4
39/18 40/21 47/8
74/17 82/17
violent [1]  67/5
voice [1]  96/8
voir [10]  80/9 91/8
93/14 94/12 103/21
103/22 103/22 103/23
104/2 104/2
voir dire [10]  80/9
91/8 93/14 94/12
103/21 103/22 103/22
103/23 104/2 104/2
voluminous [3]  32/18
32/19 32/25

**W**

Wait [1]  55/16
waiting [1]  5/12
waive [1]  74/20
walking [1]  51/9
wanted [9]  7/9 7/10
9/11 10/21 16/6 69/9
69/14 88/23 88/24
wanting [1]  50/8
wants [4]  20/25 46/7
48/7 95/25
waste [2]  94/24
102/10
wasting [1]  17/14
we -- I [1]  43/8
weaknesses [1]  11/24
Website [1]  13/16
Wednesday [4]  93/3
93/18 93/19 94/16
weeds [3]  39/4 41/7
42/24
week [8]  4/11 80/2
80/18 84/15 91/2 92/3
96/20 101/19
weekend [1]  96/20
weeks [1]  28/21
weight [13]  7/2 11/3
11/6 13/7 14/14 16/7

16/17 19/1 20/13
29/19 33/8 51/19 54/2
WEISS [3]  2/7 3/8 9/3
welcome [1]  21/6
well-known [1]  61/19
went [4]  83/14 83/15
89/14 89/14
WEST [1]  1/24
WESTERN [1]  1/2
WHARTON [2]  2/7 3/9
whereby [1]  22/21
whichever [1]  33/10
whole [10]  19/21 25/4
45/13 45/17 46/3 46/9
47/6 70/21 73/7 80/14
wholesale [1]  14/8
wholesaler [2]  37/10
38/1
wholly [1]  76/1
why [45]  8/22 11/25
15/4 19/3 19/7 25/21
31/18 36/19 36/19
41/25 46/10 46/15
47/3 47/7 52/24 57/18
59/6 60/18 62/1 62/4
64/7 65/23 70/12
70/13 71/7 72/2 72/2
74/2 81/3 92/14 94/23
95/16 96/24 98/6
98/17 98/19 99/2
99/12 99/14 99/18
99/19 100/17 101/18
101/21 101/23
wife [1]  50/11
willful [2]  61/18 77/4
willfully [1]  65/12
willfulness [11]  74/1
74/2 74/13 76/5 76/10
76/11 76/13 76/22
76/25 77/6 77/7
willing [3]  69/18 91/18
93/2
willingness [1]  34/16
Winterland [1]  23/11
wish [4]  59/15 60/11
74/22 77/23
wishes [3]  8/23 34/19
60/14
withdrew [1]  10/5
withheld [1]  74/18
withhold [1]  74/7
without [5]  22/14 23/2
23/15 41/10 99/2
witness [36]  6/9 9/15
9/23 9/24 10/5 10/17
32/23 32/24 47/7 74/6
74/12 79/15 80/21
80/22 80/23 81/2
81/17 81/18 82/16
84/22 85/4 86/21
87/11 90/6 91/14
92/16 93/16 95/9
95/12 96/2 97/2 97/21
100/16 101/4 101/12
105/4
witnesses [11]  10/6
65/13 69/17 81/14
81/24 81/25 83/2

83/7 88/8 89/8
woefully [2]  12/7
17/16
Wolfe [1]  23/7
woman [1]  10/1
women [1]  14/6
wonders [1]  65/16
word [3]  18/12 18/17
79/3
work [14]  4/5 6/13
71/24 85/1 85/3 85/9
88/19 89/13 91/7
91/15 92/16 92/21
94/18 101/22
works [1]  92/4
world [3]  12/12 12/16
53/16
worried [1]  101/7
worry [2]  42/14 94/23
worse [1]  13/21
wrapped [1]  44/9
wrapping [7]  43/1
43/3 43/4 43/24 44/13
44/19 44/24
write [1]  39/2
written [1]  83/16
wrong [8]  30/17 31/4
33/4 46/14 60/7 62/14
68/17 83/13
wrongdoing [1]  66/21

**X**

Xbox [1]  92/6
Xbox games [1]  92/6

**Y**

yanked [1]  79/7
year [2]  62/25 63/1
years [4]  8/8 47/4
62/20 93/11
yesterday [3]  3/21 6/2
8/16
YORK [5]  2/10 2/10
10/1 29/24 45/19
young [1]  78/9
Your Honor [93]  4/1
5/16 5/21 9/2 9/4 9/13
9/19 10/25 11/4 12/6
13/7 14/5 14/9 14/13
14/18 14/24 15/20
15/25 16/6 16/15
16/19 16/25 17/6
17/18 18/9 18/19 21/3
21/9 23/6 24/22 25/9
26/1 26/13 29/12 30/1
33/16 35/6 35/20 37/8
37/25 45/6 50/12
50/13 57/9 58/8 58/20
60/18 60/22 61/10
61/17 62/21 63/19
64/2 64/16 64/18
69/15 69/18 69/23
70/19 70/23 71/20
71/25 72/3 76/4 76/6
76/9 76/12 78/2 78/8
78/11 78/21 79/2 79/4
79/9 79/16 79/23
79/25 80/19 81/15

82/25 83/5 89/10
89/24 90/4 92/12 93/5
95/19 98/14 100/18
102/7 102/23 102/25
105/7